AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| ENRIQUE MARQUEZ, JR. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

FILED
CLERK, U.S. DISTRICT COURT

DEC 1 7 2015

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

5:15MJ 498

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___unknown date to July 17, 2015___ in the county of ___Riverside___ in the ___Central___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 2339A(a) | Conspiring to Provide Material Support to Terrorists |
| 18 U.S.C. Section 922(a)(6) | Making a False Statement in Connection with the Acquisition of Firearms |
| 18 U.S.C. Section 1546 | Fraud and Misuse of Visas, Permits, and Other Documents |

This criminal complaint is based on these facts:

See attached affidavit, which is incorporated as part of this complaint.

❏ Continued on the attached sheet.

/s/

_Complainant's signature_

Joel T. Anderson, Special Agent, FBI

_Printed name and title_

Sworn to before me and signed in my presence.

Date: __DEC 1 7 2015__

**SHERI PYM**

_Judge's signature_

City and state: ___Riverside, California___

Honorable Sheri Pym, U.S. Magistrate Judge

_Printed name and title_

# A F F I D A V I T

I, Joel T. Anderson, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2008. From March 2009 to November 2012, I was assigned to the FBI's Philadelphia Division where I investigated criminal violations involving International Terrorism and Organized Crime.  Since November 2012, I have been assigned to the FBI's Riverside Resident Agency, where I have investigated violations to include International Terrorism and Computer Intrusions.  During the course of these investigations, I have participated in all aspects of the investigations of such violations, including obtaining search and arrest warrants.

## II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a criminal complaint charging ENRIQUE MARQUEZ, JR. ("MARQUEZ") for: (1) conspiring to provide material support or resources (which includes personnel, firearms, and explosives) knowing and intending that they are to be used in preparation for, or in carrying out, crimes of terrorism, including to maliciously damage or destroy, or attempt to damage or destroy, by means of fire or an explosive, any institution or organization receiving Federal financial assistance or any building, vehicle, or other real or personal property used in interstate or foreign commerce, or in any activity affecting interstate or foreign

1

commerce, in violation of Title 18, United States Code, Sections 844(f)(1) and (i), all in violation of Title 18, United States Code, Section 2339A(a); (2) making a false statement in connection with acquisition of a firearm from a licensed firearms dealer, in violation of Title 18, United States Code, Section 922(a)(6); and (3) participating in fraud and misuse of visas, permits, and other documents, in violation of Title 18, United States Code, Section 1546.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, my review of investigative reports and other documents, and information obtained from various law enforcement personnel and witnesses.

4.     This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times referenced herein are approximate.

### III. SUMMARY OF THE INVESTIGATION

5.     As discussed in more detail below, in approximately 2004, MARQUEZ moved to Riverside, California, where he met Syed Rizwan Farook ("Farook"), who was MARQUEZ's neighbor.  In late 2005, Farook introduced MARQUEZ to Islam and began educating MARQUEZ about religion.

2

6.    In 2007, MARQUEZ converted to Islam.  Shortly
thereafter, Farook introduced MARQUEZ to radical Islamic
ideology, which included expressing disdain towards Muslims in
the U.S. military that killed other Muslims, and discussing the
extremist views of the now-deceased imam and Islamic lecturer
Anwar al-Aulaqi ("al-Aulaqi").

7.    Beginning in approximately 2011, MARQUEZ and Farook
began planning to commit terrorist acts in the Southern
California area.  MARQUEZ and Farook discussed using firearms
and explosives to attack Riverside Community College ("RCC") and
State Route 91 ("SR-91").  Additionally, MARQUEZ and Farook took
steps to carry out their plans by purchasing firearms,
ammunition, and other tactical gear, as well as going to local
firing ranges.

8.    In late 2011 and early 2012, MARQUEZ purchased
firearms on two occasions from local sporting goods stores.
MARQUEZ identified himself as the actual buyer of the two rifles
at the time of the purchase.  MARQUEZ, however, bought the
rifles for Farook as a part of their plans to attack RCC and SR-
91.

9.    In or around 2012, MARQUEZ purchased explosive
materials - specifically, a bottle of smokeless powder - for the
purpose of making explosives with Farook for a future attack.

10.    In or around 2012, after purchasing the firearms and
explosive materials, MARQUEZ and Farook continued to prepare to
carry out their terrorist plots.  Specifically, MARQUEZ and

3

Farook went to firing ranges in Riverside and Los Angeles to practice firing weapons.

11.   While MARQUEZ and Farook continued to be in contact with each other from 2012 to 2015, in 2013 their contact began to decline and according to MARQUEZ they ceased planning any attacks together.

12.   In November 2014, MARQUEZ entered into a fraudulent marriage with a woman who was the sister of the wife of Farook's brother for which he was paid $200 a month.   In July 2014, MARQUEZ submitted documents to the Department of Homeland Security, United States Citizenship and Immigrations Services ("USCIS") under penalty of perjury, in which he submitted false statements to the effect that he lived with his sham wife.

13.   On December 2, 2015, Farook went to an event at the Inland Regional Center ("IRC") in San Bernardino, California, left an item on the table, and left.   Shortly thereafter, two individuals entered the IRC and shot and killed 14 people and injured at least 22 others.   The shooters subsequently left in a black Sports Utility Vehicle ("SUV").

14.   Later, law enforcement pursued a black SUV near Farook's residence after it failed to yield.   The SUV was subsequently stopped, after which, the occupants exchanged gunfire with law enforcement.   The SUV's occupants were killed in the gunfight with law enforcement.   Subsequent identification by law enforcement confirmed that the two individuals who were in the SUV and engaged in the gunfight with law enforcement were Farook and his wife, Tafsheen Malik ("Malik").

15.    After the shooting, law enforcement recovered four
(4) firearms at the scene where the black SUV was stopped,
including the two rifles MARQUEZ purchased for Farook in late
2011 and early 2012.  Subsequent forensic testing confirmed that
these two rifles were the firearms used in the earlier attack at
the IRC.

16.    Additionally, law enforcement searched the IRC and
found what appeared to be a remotely controlled improvised
explosive device ("IED") on a table.  At the time law
enforcement found it, the IED was armed and ready to detonate.
During a subsequent search of Farook's residence, law
enforcement found the smokeless powder that MARQUEZ previously
purchased while planning terrorist acts with Farook, as well as
several other components used to manufacture IEDs.

17.    On December 2, 2015, MARQUEZ worked from approximately
7:00 a.m. to 4:00 p.m. and was not at the IRC at the time of the
shooting.

18.    In later interviews with FBI Special Agents, MARQUEZ
stated that he was not involved in the shooting at the IRC.

## IV. STATEMENT OF PROBABLE CAUSE

### A.    Background of MARQUEZ's Relationship with Farook

19.    MARQUEZ participated in an interview with FBI Special
Agents from December 6 through December 16, 2015.  Each day,
MARQUEZ was advised of and signed a written waiver of his
Miranda rights.[1]  I know the following facts based on listening

---

[1] The agents told Marquez when they first met him that he was not
under arrest and was free to leave, but the agents wanted him to
(footnote cont'd on next page)

to portions of the recordings of the interview, conversations I had with FBI Special Agents who participated in the interview, review of documents, my knowledge of the investigation to date (including that conducted by local law enforcement), as well as my review of reports of witness interviews conducted pursuant to this investigation.

20.   In approximately 2005, MARQUEZ moved to Riverside from El Monte, California.

21.   Shortly after MARQUEZ moved to Riverside, he met Farook in the garage of Farook's residence.  Farook lived next door to MARQUEZ on Tomlinson Avenue (the "Tomlinson Address").

22.   After their initial meeting, Farook introduced MARQUEZ to Islam.  In or around late 2005, MARQUEZ visited a Mosque in Corona, California.

23.   During this time, MARQUEZ and Farook discussed the Tablighi Jamaat movement and MARQUEZ began to pray more frequently at Farook's residence.

24.   In or around early 2009, Farook informed MARQUEZ about his interest in enlisting as a member of the United States Armed Forces.  Farook told MARQUEZ he was disgruntled with the

---

know that he had the right not to talk to them and to have a
lawyer.  Later that day Marquez raised with the agents the issue
of him talking to a lawyer, but ultimately decided he wanted to
keep talking to the agents.  Each subsequent day of the
interviews he waived in writing his right to have counsel
present when speaking with the agents.

Israeli-Palestinian conflict and voiced concern over "non-contentious objectors."

25.   I know from my training and experience that on or about November 5, 2009, Nidal Malik Hasan, a U.S. Army major and psychiatrist, shot and killed 13 people and injured more than 30 others at Fort Hood, near Killeen, Texas.   MARQUEZ stated that after the Fort Hood shooting, in the context of joining the U.S. military, Farook expressed disdain towards Muslims in the military who killed other Muslims.

26.   In 2010, MARQUEZ listened to "The Hereafter," which is a series of lectures by al-Aulaqi.[2]   In late 2010, MARQUEZ began looking into the ideas of Imran Hosein, an Islamic Scholar, who

---

[2] The following is based on my training and experience and review of documents filed in other cases.  Al-Aulaqi was a dual citizen of the United States and Yemen, and an Islamic lecturer and leader of Al-Qaeda of the Arabian Peninsula ("AQAP"), a Yemen-based terrorist group that has claimed responsibility for terrorist acts against targets in the United States, Saudi Arabia, Korea and Yemen since its inception in January 2009. Al-Aulaqi played a key role in setting the strategic direction of AQAP, recruited individuals to join AQAP, facilitated training at camps in Yemen in support of acts of terrorism, and helped focus AQAP's attention on planning attacks on U.S. interests. For example, al-Aulaqi helped to prepare Umar Farouk Abdulmutallab, the individual who attempted to detonate an explosive device aboard a Northwest Airlines flight to Detroit on December 25, 2009, for his operation. Pursuant to a Presidential Executive Order, al-Aulaqi was designated by the United States as a "Specially Designated Global Terrorist" on July 12, 2010. Al-Aulaqi was reportedly killed in Yemen on September 30, 2011.

Al-Aulaqi's lectures have inspired numerous terrorist plots against Western targets. For example, participants in the 2005 London subway bombings; the 2006 plot to detonate truck bombs in Ontario, Canada; the 2010 Times Square bombing; and the 2012 plot to bomb the New York Federal Reserve all had listened to or viewed al-Aulaqi lectures prior to their participation in those attacks.

espoused ideas about living in a Muslim commune ruled by Sharia law.

27.   In early 2011, MARQUEZ continued to listen to additional lectures and materials by al-Aulaqi, such as the "Umar Ibn Al-Khattab: His Life and Times."

28.   Later in 2011, Farook provided MARQUEZ with more radical Islamic materials.   Around that time, MARQUEZ spent most of his time at Farook's residence, where he read, listened to lectures and watched videos involving radical Islamic content, including Inspire Magazine, the official publication of AQAP, "Defense of Muslim Lands," by Shaikh Abdullah Azzam, and videos produced by Al-Shabaab, Al-Qa'ida's affiliate in Somalia.

29.   In August 2011, Farook informed MARQUEZ of his interest in joining AQAP in Yemen.

### B.   MARQUEZ and Farook Conspired to Attack Riverside City College and State Route 91

30.   In or around late 2011, MARQUEZ and Farook discussed plans to use firearms and explosives to carry out attacks in the Southern California area.   MARQUEZ admitted that the attacks were designed to maximize the number of casualties that could be inflicted.   During his interview with law enforcement, MARQUEZ described at least two "ideas" for violent attacks that he planned with Farook, including attacks involving firearms and explosives on Riverside City College ("RCC") and State Route 91 ("SR-91").

31.   Attack on RCC.   In his interview with law enforcement, MARQUEZ described how he and Farook planned an attack at RCC,

where they had both previously been students. MARQUEZ and
Farook identified RCC as a possible location for an attack, in
part, because they were familiar with the campus.

      a.   Records obtained by law enforcement as part of
this investigation establish that MARQUEZ and Farook were
enrolled as students at RCC: MARQUEZ was registered as a student
at RCC from 2009 to 2011, and from 2013 to 2015; and Farook was
registered as a student at RCC from approximately 2004 to 2010.

      b.   I know from open source information that RCC is a
community college located near downtown Riverside, California
(http://rcc.edu/about/Pages/About-US.aspx).  I know from the
same source that RCC enables prospective students to receive
financial aid through the United States Department of
Education's Free Application for Federal Student Aid
(http://rcc.edu/services/studentfinancialservices/Pages/FINANCIA
L-AID-HOME.aspx).

    32.   MARQUEZ said that he and Farook specifically discussed
attacking the library or cafeteria area of the RCC.  MARQUEZ and
FAROOK discussed attacking these areas because they wanted to
maximize casualties.  Specifically, MARQUEZ and Farook planned
to start the attack by throwing pipe bombs into the cafeteria
area from an elevated position on the second floor.  Marquez and
Farook would determine where to throw a pipe bomb for maximum
casualties.  Marquez and Farook would position themselves to
escape without detection and would then conduct a follow on
attack at another location.

a.   In the presence of FBI Special Agents, MARQUEZ drew a diagram of the area on the college campus that he and Farook planned to attack and provided the aforementioned details using this diagram.

b.   As part of the interview with MARQUEZ, an FBI Special Agent reviewed a map of the RCC campus and confirmed that there is a parking lot adjacent to the cafeteria area as described by MARQUEZ.

33.  Attack on SR-91.  MARQUEZ told Special Agents that he and Farook also planned a "rush-hour" attack on SR-91.

a.   I am aware that SR-91 is a major transport route used to service the Greater Los Angeles area.

b.   I am also aware that SR-91 received federal funding for an improvement project through a Transportation Infrastructure Finance and Innovation Act loan from the United States Department of Transportation – Federal Highway Administration.

34.  Using Google maps, MARQUEZ identified for Special Agents the exact location where he and Farook planned to carry out their attack on SR-91.

a.   I have reviewed a printout from Google maps of the specific location MARQUEZ identified for Special Agents.

35.  MARQUEZ stated that he and Farook chose this particular location on SR-91 because of the location's lack of exits.  According to MARQUEZ, the lack of exits would increase the number of targets in the eastbound lanes during afternoon rush hour traffic.

a.   FBI Special Agents confirmed that the specific section of SR-91 that MARQUEZ identified during his interview has no exits in either the eastbound or westbound lanes.

36.   MARQUEZ admitted that prior to the attack, he would first deploy to the hills south of the freeway as an overwatch for Farook.  Farook then would start the attack by throwing pipe bombs into the eastbound lanes of SR-91.  Both MARQUEZ and Farook believed that the exploding pipe bombs would disable and stop traffic.

a.   FBI Special Agents confirmed that this portion of the freeway has a hill, as MARQUEZ described during this interview.

37.   After deploying the explosive devices, Farook planned to move among the stopped vehicles, shooting his rifle into them, and killing people.  MARQUEZ stated that he planned to shoot into the stopped vehicles from his position on the hills while watching for any approaching law enforcement or emergency responders.  According to MARQUEZ, his priority was to shoot law enforcement personnel before shooting life-saving personnel.

38.   MARQUEZ stated that Farook did not discuss the plotting with others.

C.   MARQUEZ and Farook Purchased Firearms and Explosives In Preparation for the Attacks

39.   During his interview, MARQUEZ admitted that he and Farook agreed in or about October 2011 to acquire firearms to execute their planned attacks on RCC and SR-91.  MARQUEZ looked at the advertisement of a local sporting goods retailer and

11

MARQUEZ and Farook decided that MARQUEZ should be the one to acquire the firearms because he would draw less attention to their plans.  Specifically, MARQUEZ admitted that he would purchase the firearms because his appearance was Caucasian, while Farook looked Middle-Eastern.

40.  In late 2011 and early 2012, on two occasions, MARQUEZ purchased firearms, namely, AR-15 rifles, for Farook from two separate stores of a local sporting goods retailer.  Based on a review of documents obtained by Special Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the sporting goods retailer is registered as a Federal Firearms Licensee ("FFL") with the ATF.

a.   <u>The Smith and Wesson Rifle</u>.  I reviewed documents that ATF Special Agents obtained from the sporting goods store reflecting that on November 14, 2011, MARQUEZ purchased a Smith and Wesson, model M&P-15 Sport, 5.56 caliber rifle, bearing serial number SN77510 (the "Smith and Wesson Rifle").  MARQUEZ stated he purchased this rifle for Farook in order to carry out their attacks.

i.   On the accompanying purchase documentation, specifically, an ATF Form 4473, MARQUEZ's name, address, and date of birth are handwritten into Section A of this form, which provides the following admonition: "Section A – Must Be Completed Personally By Transferee (Buyer)".  In addition, the top of the first page of the form states:

> WARNING: You may not receive a firearm if prohibited
> by Federal or State law.  The information you provide
> will be used to determine whether you are prohibited
> under law from receiving a firearm.  Certain

violations of the Gun Control Act, 18 U.S.C. Section 921 et.seq., are punishable by up to 10 years imprisonment and/or up to $250,000 fine.

     ii.  The NOTICES, INSTRUCTION AND DEFINITIONS section of the form instructs that the buyer must "personally complete Section A of the form and certify (sign) that the answers are true, correct, and complete."

     iii. Question 11(a) of Section A of the same form states as follows:

> Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person.  If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.**

(Emphasis in original.)  In response to question 11(a), MARQUEZ checked the box indicating "Yes."

     iv.  One of the supporting documents for the Smith and Wesson Rifle is a form titled "Firearms Purchase Checklist," which appears to have MARQUEZ's signature and a handwritten check mark next to the statement, "I am purchasing this firearm for my or my immediate family's personal use.  The dealer has explained to me that the straw purchase of a firearm is illegal and I affirm that I am not purchasing this firearm for anyone other than myself."  The form is dated November 25, 2011.[3]

---

[3]  Pursuant to California law, there is a 10-day waiting period for purchasing firearms, which explains why the below described invoice and bank records reflect a November 14, 2011 date.

b.    Additionally, the sporting goods store provided the following documents in conjunction with MARQUEZ's purchase of the Smith and Wesson Rifle:

i.    A photocopy of MARQUEZ's California Driver's License ("CDL"), which contains his photograph, date of birth, the Tomlinson Address, and other identifying information for MARQUEZ.  Handwritten on this photocopy are MARQUEZ's telephone number and a listed amount of "$659.98."

ii.    A photocopy of an invoice, dated November 14, 2011, which indicates that MARQUEZ purchased the Smith and Wesson Rifle for $659.98, which, after fees and taxes, totaled $741.52.

c.    Bank records from MARQUEZ's bank accounts for the time period of November 1, 2011 to November 30, 2011 demonstrate point of sale ("POS") withdrawals related to the purchase of the Smith and Wesson Rifle on November 14, 2011 for $742.52, and on November 25, 2011 for $29.52.  The address of the sporting goods store appears on the invoice, as well as the November 14 and the November 25, 2011 POS transactions.

d.    Bank records from MARQUEZ's and Farook's accounts appear to corroborate the movement of money from Farook to MARQUEZ for the purchase of the Smith and Wesson Rifle.  For example, Farook's bank records show a November 11, 2011 withdrawal of $400 and a November 13, 2011 withdrawal for $500.  MARQUEZ's bank records show a November 14, 2014 deposit of $834.

e.    Farook's Spreadsheet.  On December 3, 2015, law enforcement searched Farook's residence and seized a thumb drive

14

that was later determined to belong to Farook.  On the thumb
drive, in a folder marked "marriage," Special Agents found a
spreadsheet that appears to detail expenses between October 29,
2011 and January 2, 2012.  [AGENT NOTE: the last date listed in
this spreadsheet is January 2, 2011.  Judging from the time
period covered on the spreadsheet, and the sequential order in
which the dates are listed, I believe that this is a
typographical error and the correct date should be January 2,
2012].  I have reviewed this spreadsheet, which lists the
following information:

      i.    Three columns entitled "Date," "Item," and
"Cost";

      ii.   The "Items" column appears to list purchases
for items such as firearms, firearms rentals, firing range
expenses, 9mm and .223 ammunition, and AR-15 magazines.  [AGENT
NOTE: .223 caliber ammunition is generally interchangeable with
5.56mm ammunition.]

      iii. The entry for November 13, 2011 appears to
list an $890 expense for a rifle.

      f.    The Oracle Rifle.  I reviewed records that ATF
Special Agents obtained from the sporting goods store reflecting
that on February 22, 2012, MARQUEZ purchased a DPMS, model A-15,
5.56 caliber rifle, bearing serial number FH108002 (the "Oracle
Rifle").  MARQUEZ stated he purchased this rifle for Farook in
order to carry out their attacks.

      i.    On the purchase documentation, specifically,
an ATF Form 4473, MARQUEZ's name, the Tomlinson Address, and

date of birth are handwritten into Section A of this form, which provides the following admonition: "Section A – Must Be Completed Personally By Transferee (Buyer)." The top of the first page of the form states:

> WARNING: You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. Section 921 et.seq., are punishable by up to 10 years imprisonment and/or up to $250,000 fine.

    ii. The NOTICES, INSTRUCTION AND DEFINITIONS section of the form instructs that the buyer must "personally complete Section A of the form and certify (sign) that the answers are true, correct, and complete."

    iii. Question 11(a) of the same the form states:

> Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you.**

(Emphasis in original.) In response to question 11(a), MARQUEZ checked the box indicating "Yes."

    iv. As with the Smith and Wesson Rifle documents, one of the supporting documents for the purchase appears to have MARQUEZ's signature and a handwritten check mark next to the statement, "I am purchasing this firearm for my or my immediate family's personal use. The dealer has explained to me that the straw purchase of a firearm is illegal and I affirm that I am not purchasing this firearm for anyone other than myself." The form is dated February 22, 2012.

g.    In addition, the sporting goods store provided the following documents in conjunction with MARQUEZ's purchase of the Oracle Rifle:

i.    A photocopy of MARQUEZ's CDL, which contains his photograph, date of birth, the Tomlinson Address, and other identifying information for MARQUEZ.  "FH108002" – the serial number for the Oracle Rifle – is handwritten on the document.

ii.    Additionally, an invoice for the purchase, dated February 11, 2012, had the title "LAYAWAY" at the top of the document.  This invoice indicates that MARQUEZ purchased the Oracle Rifle for $669.98, which, after fees and taxes, totaled $758.75.

iii. Bank records from MARQUEZ's bank accounts for the time period of February 1, 2012 to February 29, 2012 show a February 11, 2012 POS withdrawal to the FFL of $758.75.

iv.    Bank records from MARQUEZ's and Farook's accounts appear to corroborate the movement of money from Farook to MARQUEZ for the purchase of the Oracle Rifle.  For example, Farook's bank records show a January 29, 2012 withdrawal of $500 and a January 31, 2012 withdrawal for $500.  MARQUEZ's bank records show a January 31, 2012 deposit of $600 and a February 5, 2012 deposit of $400.

41.    The Smokeless Powder: MARQUEZ admitted to law enforcement that in or around 2012, he purchased a container of smokeless powder in furtherance of his and Farook's plans to create bombs and commit mass killings.

17

a. As described below, law enforcement seized a bottle of smokeless powder during a search of Farook's residence after the December 2, 2015 shootings at the IRC.

b. Subsequent forensic testing by the FBI Laboratory, Explosives Unit determined the smokeless powder seized at Farook's residence to be chemically and physically consistent with the smokeless powder recovered from the IED left at the IRC on December 2, 2015.

c. MARQUEZ identified the bottle of powder seized at Farook's residence as the same bottle that he purchased to make IEDs as part of his plans to commit terrorist attacks with Farook.

42. <u>Ammunition and Gear</u>: Records from an online retailer of ammunition reflect that on or about November 29, 2011 — 15 days after MARQUEZ purchased the Smith and Wesson Rifle — Farook purchased 500 rounds of .223 ammunition. An ATF Special Agent has reviewed the records of the purchase and has determined that the particular caliber of the ammunition purchased by Farook can be used in the Smith and Wesson Rifle.

43. Records from an online retailer of weapons parts and equipment reflect that on or about December 26, 2011, MARQUEZ purchased several AR-15 components from the retailer, including an AR-15 bullet button wrench and a magazine release button.

a. The purchase was in the amount of $22.05. The purchase amount was billed to MARQUEZ at a residence in Riverside, California, while the items were shipped to MARQUEZ at a different address in Corona, California. The associated

18

customer email address for the account used to make the purchase order was MARQUEZ's email "enriquemarquezjr@yahoo.com."

b. An ATF Special Agent reviewed the firearms components MARQUEZ bought on December 26, 2011. California law does not permit rifles, including the Smith and Wesson Rifle, to modify the bullet button for rapid release of ammunition magazines. According to the ATF Special Agent, components like the AR-15 bullet button wrench and a magazine release button can be used to alter rifles, like the Smith and Wesson Rifle, to allow for rapid release of ammunition magazines.

44. Records reflect that on or about August 22, 2012, Farook purchased two firearm components for use in AR-15 rifles from an online retailer, including: (1) an AR-15 Push Button Pivot Pin; and (2) an AR-15 Quick Detach Sling.

45. During his interview, MARQUEZ admitted that he watched online videos produced by a U.S.-based tactical equipment manufacturer on the following topics to prepare for the attacks:

a. pistols and carbines;

b. firearms tactics; and

c. how to use cover to walk around a corner while keeping a clear shooting angle.

**D. MARQUEZ and Farook Continue to Prepare for their Attacks**

46. In early to mid-2012, MARQUEZ admitted that he and Farook continued to discuss radical Islamic ideologies, and MARQUEZ reviewed radical online content.

19

47.   From February 2012 to mid-2012, MARQUEZ stated that he and Farook made multiple trips to gun ranges, including ranges in the Riverside and San Bernardino areas, in order to practice shooting and train for terrorist attacks.

48.   MARQUEZ said he distanced himself from Farook and ceased plotting with him after 2012 for a variety of reasons, including the arrest of Ralph Deleon and others on material support charges in November 2012.

**E.   December 2, 2015 Shooting Incident at the Inland Regional Center**

49.   Based on my knowledge of the investigation to date, I believe the following occurred.

50.   On December 2, 2015, at approximately 8:43-8:47 a.m. an individual subsequently identified as Malik searched social media for materials related to the Islamic State of Iraq and the Levant ("ISIL"), also referred to as the Islamic State ("IS"), or the Islamic State of Iraq and al-sham ("ISIS"), or Daesh. ISIL, formerly known as Al-Qa'ida in Iraq ("AQI", is a United States Department of State designated foreign terrorist organization and has been so since December 2004.

51.   At approximately 8:48 a.m. Farook arrived at the IRC located at 1365 South Waterman Avenue, San Bernardino, California.  At approximately 9:05 a.m. Farook entered an event at the IRC and placed an item on a table.

52.   At approximately 10:37 a.m., Farook left the IRC in a black SUV.

53. At approximately 10:58 a.m., a black SUV returned to the IRC that appeared similar to the vehicle driven by Farook when he left the IRC. At least one individual, who was believed to be dressed in black tactical gear, got out of the SUV and, shortly thereafter, opened fire and shot at numerous individuals both inside and outside the IRC, killing 14 people and injuring 22 others.

54. That same day, on December 2, 2015, at approximately 11:14 a.m., a post on a Facebook page associated with Malik stated, "We pledge allegiance to Khalifa bu bkr al bhaghdadi al quraishi." [AGENT NOTE: Based on my training and experience, I believe that Malik was referring to Abu Bakhr Al Baghdadi, who is the leader of ISIL].

55. Between approximately 3:00 p.m. to 4:00 p.m., law enforcement observed two individuals near an address located at Center Street in Redlands, California (the "Center Street Address") in a black SUV, bearing a Utah license plate, number X523RY. Law enforcement followed this SUV and pursued it after the SUV failed to yield. During the pursuit, the occupants of the SUV fired multiple rounds of ammunition at pursuing law enforcement personnel.

56. The black SUV then stopped at the corner of San Bernardino Avenue and Richardson Street in San Bernardino. While stopped, the occupants continued to shoot their weapons at law enforcement. Law enforcement officers returned fire and hit the occupants. The occupants of the black SUV died at the scene

as a result of gunshot wounds sustained in the shootout with law enforcement.

57.   Farook was identified as one of the deceased occupants of the SUV through a visual comparison to his CDL photograph, as well as his fingerprints.  Malik was identified as the other deceased occupant through fingerprints, as well as through documentation found in her immigration file.

58.   After the shootout, law enforcement personnel recovered four firearms and thousands of rounds of 5.56 mm ammunition near the black SUV.  The four firearms included the Smith and Wesson Rifle, the Oracle Rifle, and two semi-automatic handguns.

59.   Subsequent forensic testing of the expended 5.56 mm ammunition casings found at the IRC with those found near the black SUV determined that the Smith and Wesson rifle and the Oracle rifle were used in the attack at the IRC and the gunfight with law enforcement at the corner of San Bernardino Avenue and Richardson Street in San Bernardino.

**F.   Law Enforcement Finds an IED at the IRC Following the December 2, 2015 Shooting**

60.   When law enforcement personnel entered the IRC after the shooting, they found a black bag on a table in the room where the event had taken place.  Inside the bag, law enforcement personnel found what was later determined to be an IED.

a.   An ATF Explosives Enforcement Officer ("EEO") was present at both the IRC and the corner of San Bernardino Avenue

and Richardson Street in San Bernardino on December 2, 2015 several hours after the shooting had taken place.

   b.   At the IRC, the EEO saw the IED that was found inside the black bag.  This IED was composed of three galvanized steel pipe bombs.  The three pipe bombs had a green wire connected to them and were attached to a remote-control toy car to create a radio-controlled IED.

   c.   When the caps on each of the pipe bombs were removed, the EEO observed smokeless powder inside them.  The EEO recognized the smokeless powder to be explosive powder.

   d.   Inside the black SUV where Farook and Malik exchanged gunfire with law enforcement, the EEO also saw what was later confirmed to be a remote control for a radio-controlled toy car.

61.   An FBI Special Agent Bomb Technician confirmed that the IED found at the IRC was designed to detonate using an improvised initiator consisting of light bulbs cut from a string of Christmas tree lights.

62.   According to the Special Agent Bomb Technician, when the powder in an IED is ignited within the confinement of the steel pipe, a pressure-cooker effect is created that shatters the pipe causing steel fragments to project with force capable of causing serious bodily injury and death.

   G.   **MARQUEZ Purchased the Powder Used in the IED Recovered at the IRC and Conspired with FAROOK to Construct IEDs**

63.   I reviewed a Laboratory Report prepared by an FBI Explosives Chemistry Examiner (the "Examiner").

a.     In this report, the Examiner analyzed the smokeless powder that was contained in the IED found at the IRC and compared it to powder samples from a one-pound container of a name brand smokeless powder that was seized from Farook's residence.

b.     Based on his analysis, the Examiner concluded that the smokeless powder found at the IRC was chemically and physically consistent with the bottled powder found at Farook's residence.

c.     The Examiner's report also confirmed that the IED recovered at the IRC was switched "on" and set to detonate remotely from a distance, and discussed theories regarding why it malfunctioned and did not detonate as designed.

64.    The one-pound container of bottled smokeless powder recovered from Farook's residence was stamped with "1061311" and "4907."  An FBI Special Agent Bomb Technician examined the photograph of the container, and told me the following:

a.     the prefix "1" in "1061311" reflects that the container contained one (1) pound of smokeless powder;

b.     the ending "061311" represents the date the smokeless powder was manufactured, namely, June 13, 2011; and

c.     "4907" is the lot number for the smokeless powder in the container.

65.    In connection with this investigation, an FBI Special Agent Bomb Technician who interviewed MARQUEZ showed him a picture of the one-pound container of bottled smokeless powder

recovered from Farook's residence.[4]  After looking at the
photograph, MARQUEZ positively identified it as the powder that
he had purchased.[5]

    66.  Moreover, during the interview with law enforcement,
MARQUEZ made the following statements:

        a.  MARQUEZ confirmed that it was rifle powder.

        b.  MARQUEZ admitted that the purpose of the powder
was for constructing an explosive device.  MARQUEZ claimed the
powder was to build pipe bombs in support of the plots he and
Farook had planned.

        c.  During the interview, MARQUEZ also discussed
numerous other aspects of the construction of IEDs.  He
discussed with Farook the use of radio controlled devices,
including a radio controlled car, to activate IEDs, and the use
of remote controlled devices to achieve a safe separation
distance from the device when it went off.

        d.  MARQUEZ also described how he and Farook reviewed
Inspire Magazine's instructions on how to make an IED and

---

[4] During the interview, the powder is referred to at times
as "black" powder.  I spoke to a FBI Special Agent Bomb
Technician, who told me that "black powder" is a technically
different kind of powder than "smokeless powder."  Based on his
review of a photograph of the smokeless powder recovered from
the IED at the IRC, after it was rendered safe, the smokeless
powder recovered in this investigation appears to have a yellow
tint.  He also told me, however, that the term "black powder" is
often used generically when people discuss explosive powder,
much like someone might call a soda a "Coke," even if in fact it
were a different type of cola.

[5] Additional forensic testing of the bottle for fingerprints
made a preliminary determination that MARQUEZ's fingerprints
were not on the bottle.  Preliminary FBI laboratory results have
found fingerprints on the rifles and IED components, but no
positive matches to MARQUEZ.

MARQUEZ explained to Farook how to build a closed circuit that would create a "spark." MARQUEZ then stated that he obtained Christmas tree bulbs and that he believed the Christmas tree light string that was used in the IED recovered at the IRC was his.

67. An FBI Special Agent Bomb Technician has listened to the recordings of the above-described portions of the interview of MARQUEZ. Additionally, the Special Agent Bomb Technician has knowledge of the IED and IED components that were recovered from the IRC and the search of the shooters' residence. He told me that based on his training and experience and knowledge of the investigation, there are numerous similarities between the IED found at the IRC and the concepts, design, components, and construction of IEDs discussed with MARQUEZ during the interview, including the use of a remote (or radio) controlled detonating device, the use of a Christmas-tree-light-filament to initiate the device, the use of the powder contained in the bottle recovered from the shooters' residence, and the use of pipes to build an explosive. Finally, the FBI Special Agent Bomb Technician told me that he knows that Inspire Magazine contained written and photographic instructions on how to build an IED using pipes, powder, and Christmas-tree-light-filament in Inspire's Summer 2010 publication.

   **H.  MARQUEZ Posts to Social Media prior to the December 2, 2015 attack at the IRC**

68. During the course of this investigation, I reviewed a November 5, 2015, post to MARQUEZ's verified Facebook account.

The following thread appears on MARQUEZ's Facebook account between 9:15 p.m. and 9:17 p.m.:

> [MARQUEZ]: No one really knows me. I lead multiple lives and I'm wondering when its all going to collapse on M[e].
>
> [Facebook User]: incidentally
>
> [MARQUEZ]: Yeah.  My life turned ridiculous
>
> [Facebook User]: I think everyone leads multiple lives
>
> [MARQUEZ]: Involved in terrorist plots, drugs, antisocial behavior, marriage, might go to prison for fraud, etc.

### I.   MARQUEZ is at Work on December 2, 2015 and Calls 911 on December 3, 2015

69.  I have reviewed a closed-circuit television ("CCTV") surveillance video provided to the FBI by MARQUEZ's employer, which tracks MARQUEZ throughout his shift at work on December 2, 2015 (except between 12:54 p.m. and 1:59 p.m., a period of time not reflected in the video).  Specifically, the CCTV video depicts MARQUEZ clocking in at work at approximately 7:00 a.m., leaving work at the lunch hour (at approximately 11:56 a.m.), returning to work at approximately 12:54 p.m., and clocking out from work at approximately 4:00 p.m.  MARQUEZ does not work at the IRC.

70.  On December 3, 2015, hours after the shooting incident at the IRC, MARQUEZ called the 911 emergency telephone line.  I have listened to a recording of the 911 call.  The following is an excerpt of a draft transcript of the 911 call:

> 911:  And what's wrong?  Why do you feel like you want to kill yourself? What's going on?
>
> Marquez:  I don't know.  My neighbor.  He did the San Bernardino shooting.

911:  Your neighbor did what?

Marquez:  He did the San Bernardino shooting.

911:  Your neighbor was in the San Bernardino shooting? He died or what he was the shooter or what?

Marquez:  He was the shooter.

911: He was the shooter?

.  .  .

Marquez:  The fucking asshole used my gun in the shooting.

911:  You said he used your gun?

Marquez:  Yes.  Oh my god.

911:  How do you know it's your gun?

Marquez:  UI.  They can trace all the guns back to me.

911:  It wasn't.  How did he get your gun?

Marquez:  I couldn't have it at home because I have brothers and then I got moved and then I can't have it around UI.

911:  So you gave him your gun?

Marquez:  Only for safe storage.

911:  It was in storage?

Marquez:  Yeah.

911:  How did he get it out of storage?

Marquez:  It wasn't in storage.  To me, he was reliable enough for him for storage, like to store my gun.

911:  Oh, you had him store your gun?

28

Marquez:   Yeah.   And then he UI.   Why did he have to
do it?

911:   What was the guy's name that had your gun?

Marquez:   It's Syed Farook.

. . .

### J.   MARQUEZ Checks Into A Hospital Following the Shooting Incident

71.   On December 3, 2015, MARQUEZ entered the UCLA Harbor
Medical Center and went to the emergency room.

72.   MARQUEZ told medical personnel that his mother had
called him earlier stating that the ATF had been to her house
asking about MARQUEZ.   MARQUEZ stated that he does not normally
drink but had consumed approximately nine bottles of beer prior
to arriving at the emergency room because he was very upset.
The medical personnel also said that MARQUEZ appeared very
anxious and emotional.   MARQUEZ was referred to the psychiatric
ward.   MARQUEZ was later placed on an involuntary hold.

73.   While at the hospital, MARQUEZ told medical staff that
he knew "the guy from San Bernardino," that they have known each
other for eight years, and that they grew up together.   MARQUEZ
referred to his friend as "Farook."   MARQUEZ further stated,
"I'm involved," which the FBI special agent who spoke to the
medical staff understood to refer to the incident in San
Bernardino.

74.   According to medical staff, MARQUEZ stated that he
knew FAROOK and that they were close friends for approximately
eight years.   FAROOK moved away in 2012 and the two kept in
touch.

K.    Law Enforcement Searches MARQUEZ's Residence

75.    On December 5, 2015, the FBI executed a search warrant at MARQUEZ's residence, the Tomlinson Address.   During that search, the FBI seized a receipt for the February 22, 2012, purchase of the Oracle Rifle.

L.    Interviews with MARQUEZ's Family, Friends and Co-Workers

76.    I spoke with FBI Special Agents who interviewed MARQUEZ's mother ("A.C."), on December 5, 2015.   I have also reviewed a report of that interview.   Based on the foregoing, I learned the following:

a.    On December 4, 2015, she visited her son, MARQUEZ, at UCLA Harbor Medical Center.

b.    During the visit, she told her son to stop telling lies.   Her son told her that he bought two guns under his name for "Rizwan."   MARQUEZ also told A.C. that he did not know the "fucking asshole [FAROOK] was going to do that" and that he did not want FAROOK to be his friend anymore.

77.    I also spoke with FBI special agents who interviewed MARQUEZ's half-brother ("G.R.") on December 5, 2015, and read a report of that interview.   The Special Agents told me that G.R. told the Special Agents that his brother, MARQUEZ, told G.R. that MARQUEZ gave the guns to "Rizwan."

78.    On December 7, 2015, the special agent interviewed a witness who worked with MARQUEZ at a bar located in Riverside, California.   The witness identified MARQUEZ from a photograph and stated that he has known MARQUEZ for about one year.

According to the witness, MARQUEZ works as a security guard and sets up audio equipment for live music on Friday and Saturday nights.  During this interview, the witness stated that the only communication he knew about from MARQUEZ following December 2, 2015 was a Facebook post where MARQUEZ seemed to apologize to people and state "it was a pleasure knowing everyone."  The witness stated that he knew something was wrong when MARQUEZ did not show up for work on December 4, 2015.

    **M.**    **MARQUEZ Committed Immigration Fraud with his Marriage**

    79.  On November 29, 2014, MARQUEZ married M.C.  I have reviewed a copy of the marriage certificate between MARQUEZ and M.C.

    a.    Two witnesses signed the marriage certificate: T.F. and R.F.

    b.    Based on information obtained during the course of this investigation, I know that R.F. is Farook's brother and T.F. is M.C.'s sister.

    80.  M.C. is a Russian citizen.  I reviewed a December 3, 2015 report prepared by the U.S. Department of Homeland Security – Homeland Security Investigations ("HSI") indicating that M.C. entered the United States from Russia on July 2, 2009 on a J1 – exchange visitor visa, which was valid through September 30, 2009.

    81.  I spoke to an HSI Special Agent who explained to me the following:

    a.    USCIS maintains all files and records for an alien who has applied for any benefit in an immigration file,

commonly called an "A-file."  A Form I-130 is a "Petition for
Alien Relative."  In the case of a marriage between a United
States citizen and an alien, the Form I-130 is completed and
submitted to USCIS by the United States citizen on behalf of the
citizen's alien spouse.  The alien spouse completes and signs a
Form I-485, "Application to Register Permanent Residence or
Adjust Status," and submits this to USCIS concurrently with the
Form I-130.  The alien will also need a sponsor who will file a
FORM I-864, Affidavit of Support, accepting financial
responsibility for the alien.

      b.  Once USCIS receives these forms, the alien spouse
is allowed to remain legally in the United States until USCIS
adjudicates the petition, and USCIS will typically issue the
alien relative an employment authorization card that is valid
while the petition is pending.

      82.  I have reviewed a copy of the A-file for M.C., which
shows the following:

      a.  On July 17, 2015, MARQUEZ signed a Form I-130,
Petition for Alien Relative, indicating that he was married to
M.C. and was seeking resident status for her.  Included with the
petition was a copy of a License and Certificate of Marriage
from County of Riverside, California, indicating that MARQUEZ
and M.C. married on November 29, 2014, at the "Islamic Society
of Corona/Norco," in Corona, California.  MARQUEZ further
represented on the Form I-130 that his and M.C.'s address was on
Forum Way in Corona, California ("Forum Way Address").  MARQUEZ
signed the Form I-130 petition certifying "under penalty of

perjury under the laws of the United States of America, that the
foregoing is true and correct."

       b.   In addition to the Form I-130, MARQUEZ submitted
to USCIS a Form G-325A, Biographic Information, in which he
indicated that he had resided at the Tomlinson Address from July
2005 to November 2014, and that from November 2014 to "Present
Time," he lived at an address on Forum Way in Corona,
California.

    83.   USCIS scheduled MARQUEZ and M.C. for an interview on
December 3, 2015.  USCIS noted on a form titled "Adjudication
Outcome," "12/3/15 No Show – DENIED I-130/I-485," and issued a
"DECISION" letter to M.C. on December 3, 2015, stating that
USCIS had denied her Form I-485 application.

    84.   During an interview with law enforcement on
December 13, 2015, MARQUEZ admitted that he was paid to enter
into a sham marriage with M.C. for the purpose of getting her
immigration benefits.  MARQUEZ stated that R.F. informed MARQUEZ
that M.C. was having problems with her immigration status and
needed to get married in order to stay in the United States.
MARQUEZ stated that he agreed to enter into a sham marriage with
M.C. so that she could obtain legal status to remain in the
United States.  In return, M.C. offered to pay MARQUEZ $200 per
month.  MARQUEZ also stated that he lived at the Tomlinson
Address, including during the period of his marriage, and that
he did not live at the Forum Way Address.  Additionally, MARQUEZ
stated that M.C. lived at an address on Plum Drive in Ontario,

California with her boyfriend, who is also the father of her child.

85.   I have reviewed bank records from Wells Fargo that reveal that on November 15, 2014, MARQUEZ and M.C. opened a joint bank account.  I have reviewed monthly statements for the account from November 17, 2014 through November 30, 2015.  The statements reveal that $200 in cash deposits were made into the account every month during that time frame, except July 2015, which supports MARQUEZ's statement that he was paid $200 a month for the immigration scheme.

86.   I also reviewed photographs of MARQUEZ's cellular phone that displayed messages using an Internet messaging application.  The messages are additional evidence of MARQUEZ's sham marriage with M.C. and efforts to defraud USCIS. Specifically, MARQUEZ communicates with a cellular number that I recognize as belonging to M.C.  M.C. states that she is at "home" and MARQUEZ asks if he can come over.  MARQUEZ states that he is "just a little anxious and want to talk more about the Interview."  M.C. responds, "Omg!! Enrique I'm the one freaking out here!!! Relax I'll see u Monday and we'll talk." The conversation continues and M.C. states that he should "relax" and states "[i]f they decline me its my problem not yours."  MARQUEZ states that he had a list of questions he thought might be asked at the interview and continued, "[t]he only reason why we're anxious is because we haven't hung out that much."  They appear to be coordinating their responses to questions and issues that may arise during the interview,

34

including employment and insurance information.  MARQUEZ also communicates with another person about the interview, and states that if they do not pass, M.C. will get deported and he will face "fines and imprisonment for fraud."

87.  I also reviewed reports by FBI Special Agents who interviewed M.C. at the Plum Drive Address on December 7, 2015. M.C. stated that she resided with MARQUEZ and her young daughter at the Forum Way Address, where they lived with T.F. and R.F. since about March 2015, because they could not afford their own place.  She admitted that the Plum Drive Address, where she was interviewed, is the home of O.R. whom she described as her "ex-boyfriend" and also the father of her daughter.

88.  I reviewed open source documents from a social networking website, however, that showed pictures of M.C. and O.R. with their daughter and appearing as a couple. Additionally, O.R.'s profile described him as married to M.C. and M.C.'s profile listed her last name as being the same as O.R.'s last name.

89.  I also reviewed reports of interviews conducted by FBI Special Agents of MARQUEZ's family members, including his mother, brother, and father.  Each of these family members told the interviewing agents that MARQUEZ lived with them at the Tomlinson Address, but would not always stay there, and that he shared a room with his brother.  Additionally, when FBI Special Agents executed a search at the Tomlinson Address, pursuant to a search warrant, they found items belonging to MARQUEZ in the room MARQUEZ's mother stated that MARQUEZ shared with his

brother.   Moreover, each of these family members told interviewing agents that they did not know MARQUEZ was married prior to speaking with MARQUEZ while he was at UCLA Harbor Medical Center following the shooting.

## V.   CONCLUSION

90.   Based on the foregoing, I believe there is probable cause to believe that MARQUEZ violated:   (1) Title 18, United States Code, Section 2339A(a) (conspiring to provide material support to terrorists); (2) Title 18, United States Code, Section 922(a)(6) (false statement in connection with acquisition of firearms from a licensed firearms dealer); and (3) Title 18, United States Code, Section 1546 (fraud and misuse of visas, permits, and other documents).

/S/
_____
JOEL T. ANDERSON
Special Agent,
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 17th day of December, 2015.

**SHERI PYM**
_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE