TRACY L. WILKISON
Attorney for the United States,
Acting Under Authority Conferred by
28 U.S.C. § 515
PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Division
CHRISTOPHER D. GRIGG (California Bar No. 220243)
Assistant United States Attorney
Chief, Terrorism and Export Crimes Section
MELANIE SARTORIS (California Bar No. 217560)
DEIRDRE Z. ELIOT (California Bar No. 145007)
Assistant United States Attorneys
Terrorism and Export Crimes Section
    3403 Tenth Street
    Suite 200
    Riverside, California 92501
    Telephone: (213) 894-5429
            (213) 894-5615
            (714) 338-3599
    Facsimile: (213) 894-7631
            (714) 338-3561
    E-mail:   christopher.grigg@usdoj.gov
              melanie.sartoris@usdoj.gov
              deirdre.eliot@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>        v.<br><br>ENRIQUE MARQUEZ, JR.,<br><br>     Defendant. | No. CR 15-00093-JGB<br><br>GOVERNMENT'S POSITION REGARDING SENTENCING; VICTIM STATEMENTS; EXHIBITS<br><br>Hearing Date: April 30, 2018<br>Hearing Time: 2:00 p.m.<br>Location:    Courtroom of the Hon. Jesus G. Bernal |

    The United States of America, by and through its counsel of record, hereby submits its position regarding sentencing for defendant Enrique Marquez, Jr.

1    The government's position regarding sentencing is based on the

2   attached sentencing memorandum and exhibits thereto,[1] the victims'

3   statements and allocution, the files and records in this case, the

4   United States Probation Office's Presentence Investigation Report and

5   recommendation letter, the Government's Objections to the Presentence

6   Report, and such further evidence and argument as the Court may

7   permit.

8   Dated: April 9, 2018          Respectfully submitted,

9                                 TRACY L. WILKISON
                                  Attorney for the United States,
10                                Acting Under Authority Conferred by
                                  28 U.S.C. § 515
11
                                  PATRICK R. FITZGERALD
12                                Assistant United States Attorney
                                  Chief, National Security Division
13

14                                 /s/ Melanie Sartoris
                                  CHRISTOPHER R. GRIGG
15                                DEIRDRE Z. ELIOT
                                  MELANIE SARTORIS
16                                Assistant United States Attorneys

17                                Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

18

19

20

21

22

23

24

25

26

27  ───────────────────────

28      [1] The government lodged Exhibits 1 and 2 concurrently herewith.
    Additionally, some of the Victim Statements and Exhibits are filed
    concurrently herewith under seal.

                                      2

# TABLE OF CONTENTS

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES ...................................................... iii

GOVERNMENT'S SENTENCING MEMORANDUM ......................................... 1

I.    SUMMARY OF GOVERNMENT'S SENTENCING POSITION .................... 1

II.   THE OFFENSE CONDUCT ........................................... 4

      A.    Background ............................................. 5

      B.    Defendant and Rizwan Planned an Attack at RCC ........... 7

      C.    Defendant and Rizwan Planned a "Rush Hour Attack on
            SR-91 ................................................. 7

      D.    Defendant Purchased Firearms and Explosives and Gave
            them to Rizwan to Further Attacks ..................... 8

            1.    Defendant Purchased the Smith & Wesson Rifle
                  for Rizwan ..................................... 9

            2.    Defendant Purchased the Oracle Rifle
                  for Rizwan .................................... 11

            3.    Defendant Researched Making Bombs and Purchased
                  Smokeless Powder to Make Explosives and Gave It
                  to Rizwan ..................................... 13

            4.    Defendant and Rizwan Purchased Ammunition and
                  Gear .......................................... 14

            5.    Defendant and Rizwan Continue to Prepare for
                  their Attacks Until in or about November 2012 ...... 14

            6.    Defendant Boasted about His Prior Involvement in
                  Terrorist Plotting, Including in 2015 ............. 15

      E.    The Firearms and Explosives Defendant Purchased were
            Used in the December 2, 2015 San Bernardino Terrorist
            Attack ................................................ 21

      F.    Defendant Committed Immigration Fraud .................. 24

III.  SENTENCING ANALYSIS ......................................... 25

      A.    The Guidelines Calculations ........................... 25

i

DESCRIPTION                                                                    PAGE

       1.   The Terrorism Enhancement Applies To All Counts .... 27

          a.   Count One: The Material Support Conviction
               (18 U.S.C. § 2339A) ........................... 27

          b.   Count Two: The Firearms False Statement
               Conviction (18 U.S.C. § 922(a)(6)) ............ 33

   B.   The Court Should Consider the Victims' Statements
       Pursuant to the Federal Rules of Criminal Procedure,
       18 U.S.C. § 3553, and the Crime Victims' Rights Act ..... 35

   C.   The § 3553 Factors Support a Sentence of 25 Years
       Imprisonment and Lifetime Supervision ................... 38

       1.   The Need for the Sentence Imposed to Reflect the
           Seriousness of the Offense, Promote Respect for
           the Law, and Provide Just Punishment Requires a
           25-Year Term of Imprisonment ...................... 40

       2.   Defendant's History and Characteristics ............ 42

       3.   A 25-Year Term of Imprisonment is Necessary to
           Provide Adequate Deterrence to Criminal Conduct
           and to Protect the Public ...................... 44

       4.   The Recommended Sentence Will Avoid Unwarranted
           Sentencing Disparities ........................... 45

IV.   CONCLUSION ................................................ 46

DESCRIPTION                                                          PAGE

## TABLE OF AUTHORITIES

Cases

Callanan v. United States,
  364 U.S. 587 (1961) ...................................... 42

In re Fisher,
  640 F.3d 645 (5th Cir. 2011) ............................. 37

In re Stewart,
  552 F.3d 1285 (11th Cir. 2008) ........................... 37

Kenna v. U.S. Dist. Court for C.D. Cal.,
  435 F.3d 1011 (9th Cir. 2006) ............................ 36

United States v. Awan,
  607 F.3d 306 (2d Cir. 2010) ......................... 28, 29, 34

United States v. Carty,
  520 F.3d 984 (9th Cir. 2008) ............................. 25

United States v. Chandia,
  675 F.3d 329 (4th Cir. 2012) ............................. 29

United States v. Dominguez,
  951 F.2d 412 (1st Cir. 1991) ............................. 35

United States v. El-Mezain,
  664 F.3d 467 (5th Cir. 2011) ............................. 29

United States v. Felix,
  561 F.3d 1036 (9th Cir. 2009) ............................ 29

United States v. Graham,
  275 F.3d 490 (6th Cir. 2001) ......................... 29, 34

United States v. Haften,
  881 F.3d 543 (7th Cir. 2018) ............................. 28

United States v. Jayyousi,
  657 F.3d 1085 (11th Cir. 2011) ...................... 28, 29, 40

United States v. Jimenez-Recio,
  537 U.S. 270 (2003) ...................................... 42

United States v. Meskini,
  319 F.3d 88 (2d Cir. 2003) ............................... 40

United States v. Rabbinowich,
  238 U.S. 78 (1915) ....................................... 42

DESCRIPTION                                                      PAGE

United States v. Ressam,
    679 F.3d 1069 (9th Cir. 2012) ..............................  40

United States v. Tankersley,
    537 F.3d 1100 (9th Cir. 2008) ..............................  29

Statutes and Other Authorities

18 U.S.C. § 844 ................................. 5, 27, 28, 29

18 U.S.C. § 921 ......................................... 9, 11

18 U.S.C. § 922(a)(6) ............................... 1, 26, 33

18 U.S.C. § 2332b(g)(5) ............................ 28, 30, 34

18 U.S.C. § 2339A ............................ 1, 26, 27, 28, 29

18 U.S.C. § 3553 .................... 4, 35, 38, 39, 44, 45

18 U.S.C. § 3771 ............................... 4, 36, 46

Federal Rule of Criminal Procedure 32 ....................... 37

Federal Rule of Criminal Procedure 60 ....................... 37

U.S.S.G. § 2A1.1(a) ..................................... 26, 27

U.S.S.G. § 2K1.4(c)(1) .................................. 26, 27

U.S.S.G. § 2K2.1 ....................................... 26, 33

U.S.S.G. § 2X2.1 ....................................... 26, 27

U.S.S.G. § 3A1.4 ........................... 26, 28, 29, 33, 34

U.S.S.G. § 3E1.1 ........................................... 26

## GOVERNMENT'S SENTENCING MEMORANDUM

**I.   SUMMARY OF GOVERNMENT'S SENTENCING POSITION**

On February 16, 2017, defendant Enrique Marquez, Jr. ("defendant") entered guilty pleas pursuant to a written plea agreement (the "Plea Agreement") to Count One of the Indictment, charging him with conspiring with Syed Rizwan Farook ("Rizwan") to provide material support to terrorists, in violation of 18 U.S.C. § 2339A(a), and Count Two of the Indictment, charging him with false statements in connection with the acquisition of a firearm he obtained for Rizwan, in violation of 18 U.S.C. § 922(a)(6). Defendant's conviction results from his conspiracy with Rizwan to unlawfully procure firearms and explosives to commit terrorist acts, including mass killings, in Riverside, California. (*See* Plea Agreement for Def. Enrique Marquez, Jr. ("Plea Agreement"), filed Feb. 14, 2017, CR 65,[1] Ex. A; Presentence Investigation Report ("PSR"), filed Oct. 2, 2017, CR 72, at ¶¶ 14-25.)[2]

Defendant's plotting with Rizwan included terrorist attacks on Riverside City College ("RCC") and California State Route 91 ("SR-91"). Defendant strategized with Rizwan to conduct the attacks in a way that would inflict the maximum possible harm and loss of human life. In order to carry out their deadly terrorist attacks, defendant purchased for Rizwan a Smith & Wesson, model M&P-15 Sport, 5.56 caliber rifle bearing serial number SN77510 ("the Smith & Wesson

---

[1] "CR" refers to the Clerk's Record and is followed by the docket number.

[2] Defendant was charged in a five-count Indictment. (CR 12.) In exchange for defendant's agreement to plead to Counts One and Two pursuant to the Plea Agreement, the government agreed to dismiss the remaining three counts at the time of sentencing. (Plea Agreement ¶ 3(c).)

1  rifle"); and a DPMS, model A-15, 5.56 caliber rifle bearing serial
2  number FH108002 ("the Oracle rifle") and made false statements when
3  buying the weapons.  These firearms were capable of inflicting death,
4  grievous harm, and devastating injuries.  Defendant and Rizwan also
5  researched how to manufacture bombs, relying in part on information
6  contained in an online publication produced by al-Qa'ida in the
7  Arabian Peninsula ("AQAP"), a designated foreign terrorist
8  organization.  In furtherance of the terrorist plots, defendant
9  purchased a bottle of explosives powder to make bombs and provided it
10 to Rizwan.

11      Defendant ultimately chose not to carry out the RCC and SR-91
12 attacks after learning of the Inland Empire arrests of Ralph Deleon
13 and others on terrorism charges.  Defendant also began to
14 disaccociate from Rizwan.  Despite the fact that he knew Rizwan
15 adhered to a terrorist ideology, however, he did not take any actions
16 to retrieve the weapons or explosives that he had provided to Rizwan
17 in furtherance of their terrorist plotting.  Nor did he alert the
18 authorities about Rizwan's plans or possession of the firearms and
19 explosives.

20      Defendant's and Rizwan's RCC and SR-91 plots provided the
21 framework for a subsequent, devastating terror attack carried out by
22 Rizwan and his wife, Tashfeen Malik ("Malik") a few years later.  On
23 December 2, 2015, armed with defendant's Smith & Wesson and Oracle
24 rifles, Rizwan and Malik opened fire on innocent people at the Inland
25 Regional Center ("IRC") in San Bernardino for work.  Rizwan also
26 planted an improvised explosive device ("IED") on a table in the IRC.
27 The bomb was in the "on" position, set to detonate remotely, and
28 contained defendant's explosives powder.

1   When the gunfire at the IRC ceased, the death toll stood at
2   fourteen and at least twenty-two others were injured.   Countless
3   others suffered psychologically and personally from witnessing the
4   fear and trauma inflicted by defendant's weapons, which he placed in
5   the hands of a killer, motivated by violent extremist ideology.
6   Rizwan and Malik were killed a few hours later during a shootout with
7   law enforcement, which wounded one officer.   Responding personnel
8   recovered defendant's Smith & Wesson and Oracle rifles by the
9   attackers' bodies and defendant's explosives powder in the bomb at
10  the IRC.   Defendant's weapons and explosives traumatized the victims
11  of the IRC shooting, their loved ones, and the community.   They
12  caused death and injury, and risked the lives of other innocent
13  people, including law enforcement officers.   At the time, the San
14  Bernardino attack was the deadliest terrorist attack in the United
15  States since September 11, 2001.   It remains the largest mass murder
16  in the history of the Central District of California.

17  Defendant did not, however, conspire with Rizwan and Malik to
18  conduct the IRC attack and was at work on December 2, 2015 during the
19  IRC attack.   He also did not commit the terrorist acts he planned
20  with Rizwan, and appears to have distanced himself from Rizwan.   He
21  has expressed remorse for his prior criminal acts, and assisted the
22  IRC investigation by agreeing to a lengthy interview with law
23  enforcement in the critical weeks following the attack.   In
24  consideration of these facts, along with other personal mitigating
25  factors set forth in the PSR, the government submits that a 25-year
26  sentence is fair and just.

27

28

Accordingly, the government concurs with the Probation Office's recommended sentence and submits that, pursuant to 18 U.S.C. § 3553(a), a sentence of 300-months-imprisonment, which consists of consecutive sentences of 180 months on Count One and 120 months on Count Two, followed by a lifetime term of supervised release, along with the other terms and conditions recommended by the Probation Office, including drug and mental health treatment, is reasonable and appropriate. (*See* United States Probation Office Letter, filed October 2, 2017 ("PSR Letter"), CR 71, at 1-3, 7-9.) The government also requests the Court to order restitution to the victims of defendant's crimes, with the restitution amounts to be determined at a deferred restitution hearing. *See* 18 U.S.C. § 3771(a)(6).[3]

## II.   THE OFFENSE CONDUCT

As set forth in the Plea Agreement and the PSR, beginning on an unknown date and continuing up to and including at least November 2012, there was an agreement between Rizwan and defendant to attack RCC and SR-91. Pursuant to the planned attacks, defendant and Rizwan agreed to provide material support and resources, including weapons, explosives, and themselves, knowing and intending these resources would be used to conduct the attacks. (PSR ¶ 14; Plea Agreement Ex.

---

[3]   The PSR asserts that "[r]estitution is not an issue in this case." (PSR ¶ 130.) The government disagrees. Although defendant's resources are limited, as described below, the government submits that as a result of the December 2, 2015 attack at the IRC, numerous persons were "directly and proximately harmed" by defendant's criminal actions. 18 U.S.C. § 3771(e)(2). Accordingly, these persons are statutorily entitled to restitution. *See* 18 U.S.C. § 3771(a)(6). The government therefore requests a deferred restitution hearing.

1  A, at 1.)  The attacks were designed to maximize the number of
2  casualties.  (PSR ¶ 14.)[4]

3      Defendant purchased from separate locations of a licensed
4  firearms dealer (the "firearms seller") two rifles for Rizwan: the
5  Smith & Wesson and Oracle rifles.  In connection with the purchase of
6  these rifles, defendant knowingly made material false statements that
7  the rifles could be lawfully sold to defendant, when in fact Rizwan
8  paid defendant to purchase the rifles for him.  Defendant also
9  researched bomb-making and provided Rizwan with explosive powder and
10 other material to create bombs.  (PSR ¶ 15-16; Plea Agreement, Ex. A
11 at 1-2.)

12      **A.   Background**

13      In approximately 2005, defendant moved to a home next door to
14 Rizwan in Riverside, California.  (PSR 13; Plea Agreement, Ex. A at
15 1.)  In late 2005, Rizwan introduced defendant to Islam and began
16 educating defendant about religion.  (Affidavit to Criminal Complaint
17 ("Compl."), filed Dec. 12, 2015, CR 1, ¶ 5; *see* PSR ¶ 77(i)-(k).)
18 During this time, defendant began to pray more frequently at Rizwan's
19 residence and, in 2007, defendant converted to Islam.  (Compl. ¶¶ 6,
20 23.)  Shortly thereafter, Rizwan introduced defendant to radical
21 Islamic ideology, which included expressing disdain towards Muslims
22 serving in the United States military who killed other Muslims,
23 discussing extremist views on Islam, reading and listening to
24 lectures, and watching videos containing extremist content.  (*Id.*)

25

26

27  ───────────────
28      [4] If they had occurred, these attacks would have been violations
    of 18 U.S.C. § 844(f)(1) (RCC attack), and 18 U.S.C. § 844(i) (SR-91
    attack).  (Plea Agreement Ex. A, at 1.)

Defendant and Rizwan listened to and discussed the extremist propaganda espoused by the now-deceased radical Islamic lecturer Anwar al-Awlaki ("al-Awlaki").  (Compl. ¶ 26.)  Al-Awlaki was a member and leader of AQAP, a Yemen-based terrorist group that has claimed responsibility for terrorist acts against targets in the United States and elsewhere.  From 2010 through 2011, defendant listened to lectures and materials by al-Awlaki, such as the "The Hereafter" series of lectures and "Umar Ibn Al-Khattab: His Life and Times."  (*Id.* at ¶¶ 26-27.)  In 2011, Rizwan provided defendant with more extremist materials.  Around that time, defendant spent most of his time at Rizwan's residence, where he read, listened to lectures, and watched videos involving extremist content, including "Inspire" magazine, the official publication of AQAP, "Defense of Muslim Lands" by Shaikh Abdullah Azzam, and videos produced by Al-Shabaab, another designated foreign terrorist organization in Somalia.  (Compl. ¶ 28.)  Shaikh Abdullah Azzam is considered the father of the global jihad movement.  In August 2011, Rizwan informed defendant of his interest in joining AQAP.  (Compl. ¶ 29.)

Beginning in approximately 2011, defendant and Rizwan began planning to commit terrorist acts in the Southern California area using firearms and explosives.  (Compl. ¶ 7.)  Defendant and Rizwan designed these attacks to maximize the number of casualties.  (PSR ¶ 14.)  In order to facilitate these attacks, defendant purchased the Smith & Wesson and Oracle rifles.  (PSR ¶ 15.)  Defendant also researched bomb-making and provided Rizwan with explosive powder and other material to create bombs.  (PSR ¶ 16; Plea Agreement, Ex. A at 2.)

**B.   Defendant and Rizwan Planned an Attack at RCC**

With respect to the RCC attack, defendant and Rizwan identified the RCC as a possible location for an attack, in part, because they were familiar with the campus.  Defendant and Rizwan were each enrolled as students at RCC: defendant was registered as a student at RCC from 2009 to 2011; and Rizwan was registered as a student at RCC from approximately 2004 to 2010.  (PSR ¶¶ 17-18; Plea Agreement, Ex. A at 2.)  Defendant and Rizwan specifically targeted the library or cafeteria area of RCC because they wanted to maximize casualties. (Compl. ¶¶ 30, 32.)  As part of their plot, defendant and Rizwan planned to start an attack by throwing pipe bombs into the cafeteria area from an elevated position on the second floor.  Defendant and Rizwan would position themselves prior to the attack to escape the cafeteria area without detection, and then agreed to conduct a follow-on attack at another location at RCC.  (PSR ¶ 18; Plea Agreement, Ex. A at 2.)[5]

**C.   Defendant and Rizwan Planned a "Rush Hour" Attack on SR-91**

In addition to the RCC plot, defendant and Rizwan schemed to attack SR-91 during "rush hour" traffic.  In furtherance of their scheme, defendant and Rizwan chose a particular location on SR-91 with no readily available exits or off-ramps.  (PSR ¶ 19; Plea Agreement, Ex. A at 2.)  Defendant and Rizwan selected this location because the lack of exits would increase the number of targets in the eastbound lanes during afternoon rush hour traffic.  (Compl. ¶ 35.)

---

[5] Defendant was interviewed by the Federal Bureau of Investigation ("FBI") in the days following the San Bernardino terror attack.  The interview was recorded.  A brief excerpt of a video clip of defendant discussing this planned attack with investigators is filed herewith as Exhibit 1.

Prior to the attack, defendant intended to deploy to the hills south of the freeway as an over-watch for Rizwan.  Rizwan then would start the attack by throwing pipe bombs into the eastbound lanes of SR-91. Both defendant and Rizwan believed that the exploding pipe bombs would disable and stop traffic.  As part of the plan, Rizwan would move among the stopped vehicles, shoot his rifle into them, and kill people.  (PSR ¶¶ 19-20; Plea Agreement, Ex. A at 2.)  Additionally, defendant planned to shoot into the stopped vehicles from his position on the hills, while also watching for any approaching law enforcement or emergency responders.  (Plea Agreement, Ex. A at 2-3; see PSR ¶ 20.)  As part of the plan, defendant's priority was to shoot law enforcement personnel before shooting emergency medical personnel.  (Compl. ¶ 37.)[6]

### D.    Defendant Purchased Firearms and Explosives and Gave Them to Rizwan to Further Attacks

Defendant and Rizwan took definitive steps to execute their planned attacks.  (Compl. ¶ 39.)  In late 2011 and early 2012, defendant purchased firearms for Rizwan, namely, the Smith & Wesson and Oracle rifles, from two separate stores.  Defendant purchased the firearms for Rizwan, rather than Rizwan purchasing them himself, because they believed defendant could purchase them more easily than Rizwan and would receive less scrutiny than Rizwan.  (PSR ¶¶ 21-25; Plea Agreement, Ex. A at 3-5.)  In November 2011 and February 2012, before defendant purchased the Smith & Wesson and Oracle rifles, respectively, Rizwan paid defendant cash for them.  Defendant

---

[6] A brief excerpt of a video clip of defendant discussing this planned attack with investigators is attached hereto as Exhibit 2. Both video excerpts demonstrate that defendant describes the intended loss of life in a cold and calculating manner.

deposited the cash into his bank account.   (*See* PSR ¶ 25; Plea

Agreement, Ex. A at 5; Ex. 3 at 2; Ex. 4.)

       1.   <u>Defendant Purchased the Smith & Wesson Rifle for Rizwan</u>

On November 14, 2011, defendant purchased the Smith & Wesson

rifle for Rizwan.   On the purchase documentation, specifically, an

ATF Form 4473, defendant's name, address, and date of birth are

handwritten into Section A of this form, which provides the following

admonition: "Section A – Must Be Completed Personally By Transferee

(Buyer)."   In addition, the top of the first page of the form states:

> WARNING: You may not receive a firearm if prohibited by
> Federal or State law.   The information you provide will be
> used to determine whether you are prohibited under law from
> receiving a firearm.   Certain violations of the Gun Control
> Act, 18 U.S.C. Section 921 et.seq., are punishable by up to
> 10 years imprisonment and/or up to $250,000 fine.

The NOTICES, INSTRUCTION AND DEFINITIONS section of the form

instructs that the buyer must "personally complete Section A of the

form and certify (sign) that the answers are true, correct, and

complete."

Question 11(a) of Section A of the same form states as follows:

> Are you the actual transferee/buyer of the firearm(s)
> listed on this form?   Warning: You are not the actual buyer
> if you are acquiring the firearm(s) on behalf of another
> person.   If you are not the actual buyer, the dealer cannot
> transfer the firearm(s) to you.

In response to question 11(a), defendant checked the box indicating

"Yes."

One of the supporting documents for the Smith & Wesson rifle is

a form titled "Firearms Purchase Checklist," which defendant signed

on November 25, 2011.   Defendant signed this form as an affirmation

of the following statement: "I am purchasing this firearm for my or

1   my immediate family's personal use.  The dealer has explained to me

2   that the straw purchase of a firearm is illegal and I affirm that I

3   am not purchasing this firearm for anyone other than myself."  (Plea

4   Agreement, Ex. A at 3-4; see PSR ¶ 22-24.)  In fact, contrary to

5   defendant's false statements above, defendant purchased the Smith &

6   Wesson rifle for Rizwan and defendant acted as a straw purchaser when

7   acquiring the weapon.  (See PSR ¶ 15; Plea Agreement, Ex. A at 3.)

8       Bank records from defendant's and Rizwan's bank accounts

9   corroborate that defendant purchased the Smith & Wesson rifle from

10  the firearms seller and that Rizwan reimbursed defendant for it.  For

11  example, Rizwan's bank records show a November 11, 2011 cash

12  withdrawal of $400 and a November 13, 2011 cash withdrawal of $500.

13  Defendant's bank records show a November 14, 2011 cash deposit of

14  $834, and a point of sale ("POS") withdrawal from the firearms seller

15  of $742.52 for the purchase of the rifle.  (See Ex. 3 at 2; Ex. 4;

16  Compl. ¶ 40(c)-(e).)

17      Additionally, investigators recovered a thumb drive from

18  Rizwan's residence, following the IRC attack, which had a file titled

19  "Expenses."  A tab in the file called "marriage" contained a

20  spreadsheet detailing purchases of ammunition and shooting expenses

21  in 2011, and hidden cells, which reflected the purchase of firearms,

22  magazines, and ammunition.  The spreadsheet reflects a cost of "890"

23  dollars for a "rifle" on November 13, 2011.  (See Ex. 5)  As noted

24  above, Rizwan withdrew $900 in cash from his account between November

25  11, 2011 and November 13, 2011, and defendant deposited $834 into his

26  account and purchased the Smith & Wesson rifle for Rizwan on November

27  14, 2011.  (See Ex. 3 at 2; Ex. 4; Compl. ¶ 40(c)-(e).)  When

28  investigators asked defendant about the information contained on the

spreadsheet, he confirmed he was either aware of or present for the purchase of many of the items on the list, including the rifle.  He also acknowledged in writing that he was "aware they would be used in a future terror attack."  (Ex. 5 at 1.)

Additional banking and other records obtained throughout the investigation also confirmed that defendant and Rizwan purchased these items.  For example, investigators obtained a purchase invoice for Rizwan for $187.85 in ammunition purchased on November 29, 2011, which matches one of the entries on Rizwan's expense sheet.  (*Compare* Ex. 5, *and* Ex. 6; *see also* Ex. 3 at 2-3 (reflecting Rizwan's purchases of ammunition and gear and payments to shooting ranges in November 2011).)

2.   Defendant Purchased the Oracle Rifle for Rizwan

On February 22, 2012, defendant purchased the Oracle rifle for Rizwan in order to carry out their attacks.  On the purchase documentation, specifically, an ATF Form 4473, defendant's name, address, and date of birth are handwritten into Section A of this form, which provides the following admonition: "Section A – Must Be Completed Personally By Transferee (Buyer)."  As with the Smith & Wesson rifle, the top of the first page of the form states:

> WARNING: You may not receive a firearm if prohibited by Federal or State law.  The information you provide will be used to determine whether you are prohibited under law from receiving a firearm.  Certain violations of the Gun Control Act, 18 U.S.C. Section 921 et.seq., are punishable by up to 10 years imprisonment and/or up to $250,000 fine.

The NOTICES, INSTRUCTION AND DEFINITIONS section of the form instructs that the buyer must "personally complete Section A of the form and certify (sign) that the answers are true, correct, and complete."

11

1   Question 11(a) of the same the form states:

2   Are you the actual transferee/buyer of the firearm(s)
    listed on this form? Warning: You are not the actual buyer
3   if you are acquiring the firearm(s) on behalf of another
    person. If you are not the actual buyer, the dealer cannot
4   transfer the firearm(s) to you.

5 In response to question 11(a), defendant again checked the box

6 indicating "Yes."

7   One of the supporting documents for the purchase of the Oracle

8 rifle is a form titled "Firearms Purchase Checklist," which defendant

9 signed on February 22, 2012. Defendant signed this form as an

10 affirmation of the following statement: "I am purchasing this firearm

11 for my or my immediate family's personal use. The dealer has

12 explained to me that the straw purchase of a firearm is illegal and I

13 affirm that I am not purchasing this firearm for anyone other than

14 myself." (Plea Agreement, Ex. A at 4-5; see PSR ¶ 22-24.) Once

15 again, contrary to defendant's false statements above, defendant

16 purchased the Oracle rifle for Rizwan and defendant acted as a straw

17 purchaser when acquiring the weapon. (See PSR ¶ 15; Plea Agreement,

18 Ex. A at 3.)

19   Bank records from defendant's and Rizwan's bank accounts reflect

20 that defendant purchased the Oracle rifle from the firearms seller

21 and that Rizwan paid defendant for it. For example, Rizwan's bank

22 records show a January 29, 2012 cash withdrawal of $500, and a

23 January 31, 2012 cash withdrawal of another $500. (Ex. 7 at 3.)

24 Defendant's bank records show a January 31, 2012 cash deposit of $600

25 and a February 5, 2012 cash deposit of $400. (Ex. 8; Ex. 9 at 1.)

26 Defendant's bank records show a POS withdrawal from the firearms

27 seller of $758.75 on February 11, 2012, for the purchase of the

28 rifle. (Ex. 9 at 1; see also Compl. ¶ 40(g).)

3.   Defendant Researched Making Bombs and Purchased
     Smokeless Powder to Make Explosives and Gave It to
     Rizwan

In connection with the RCC and SR-91 plots, defendant discussed with Rizwan the use of radio-controlled devices, including a radio-controlled car, to activate IEDs, as well as the use of remote-controlled devices to achieve a safe separation distance from the device when it went off.  Defendant and Rizwan reviewed "Inspire" magazine's instructions on how to make an IED and defendant explained to Rizwan how to build a closed circuit that would create a "spark." Defendant obtained Christmas tree lightbulbs for the specific purpose of manufacturing an igniter for the IEDs that he and Rizwan intended to use during their planned attacks.  (Plea Agreement, Ex. A at 5-6.)

In or around 2012, defendant purchased a container of smokeless powder in furtherance of his and Rizwan's plans to create bombs and commit mass killings.  (Compl. ¶ 41; Plea Agreement, Ex. A at 6; see PSR ¶¶ 16, 54.)  During the investigation into the December 2, 2015 terrorist attack at the IRC, law enforcement seized a bottle of smokeless powder from Rizwan's residence, as well as several other components used to manufacture IEDs.  Defendant identified the bottle of powder seized at Rizwan's residence as the same bottle that he purchased to make IEDs as part of his plans to commit terrorist attacks with Rizwan.  (See PSR ¶ 54; Plea Agreement, Ex. A at 7.) Subsequent forensic testing by the FBI Laboratory, Explosives Unit determined the smokeless powder seized at Rizwan's residence was chemically and physically consistent with the smokeless powder recovered from the IED left at the IRC on December 2, 2015.  (Plea Agreement, Ex. A at 7; Compl. ¶ 41.)

4.   Defendant and Rizwan Purchased Ammunition and Gear

On or about November 29, 2011 — fifteen days after defendant purchased the Smith & Wesson rifle — Rizwan purchased 500 rounds of ammunition for use with the Smith & Wesson rifle.  (See Ex. 3 at 3; Exs. 5 and 6.)  On or about December 26, 2011, defendant purchased several firearms components from an online retailer, including a bullet button wrench and a magazine release button.  (Exs. 10 and 11.)  Defendant purchased these items to alter the Smith & Wesson Rifle to allow for rapid release of ammunition magazines.  (See Compl. ¶¶ 42-43.)

On or about August 22, 2012, Rizwan purchased from an online retailer two firearm components for use with rifles like the Smith & Wesson rifle, including: (1) a Push Button Pivot Pin; and (2) a Quick-Detach Sling.  (Ex. 12 at 2; Ex. 13; Compl. ¶ 44.)

5.   Defendant and Rizwan Continue to Prepare for their Attacks Until in or about November 2012

Defendant and Rizwan continued to discuss extremist ideologies, and defendant reviewed radical online content, through mid-2012.  (Compl. ¶ 46.)  From February 2012 to mid-2012, defendant and Rizwan made multiple trips to gun ranges, including ranges in the Riverside, San Bernardino, and Los Angeles areas, in order to practice shooting and train for terrorist attacks.  (Compl. ¶ 47; Plea Agreement, Ex. A at 6.)  Defendant also watched online videos produced by a U.S.-based tactical equipment manufacturer on the following topics to prepare for the attacks: pistols and carbines, firearms tactics, and how to use cover to walk around a corner while keeping a clear shooting angle.  Defendant ceased plotting with Rizwan to attack the RCC and SR-91 in or about November 2012.  (Plea Agreement, Ex. A at 6.)

14

That same month, defendant was in a conversation online with "R" who asked, "guys.  if one wants to kill themself but would rather avoid the whole killing yourself thing what does said person do"? (Ex. 14.)  Defendant coldly responded, "commit mass homicide until shot dead."  (*Id.*)  In that same conversation, defendant stated, "it's how the modern suicide bomber works now," "[g]ive the detonator to the head guy," "adn [sic] send the pawn to the heavily populated area."  (*Id.*)

### 6.   Defendant Boasted about His Prior Involvement in Terrorist Plotting, Including in 2015

Defendant did not retrieve the weapons or explosives powder that he had purchased, or take any actions to protect the public from the fact that he had provided these items to Rizwan, who he knew to be motivated by extremist ideology and to have been plotting terrorist attacks.  The investigation uncovered that during the course of various conversations with others, defendant referred to his prior terrorist plotting, discussed his purchase of weapons and ammunition, and noted the influence of AQAP's al-Awlaki.

For example, following his withdrawal from Rizwan, in December 2013, defendant bragged online about his past "affiliation" with terrorists, sharing a link to a web posting about four men who were arrested in Southern California in 2012 on terrorism charges, and claiming that he "personally knew" two of them.  (Ex. 15 at 1-2.)[7]

---

[7] When asked about this claim by the FBI following the IRC attack, however, defendant denied knowing them.

15

On January 1, 2015, defendant boasted online, "I was close to being nabbed by the fbi," and shared a link to an FBI press release about the four men arrested in 2012 on terrorism charges.  (Ex. 16 at 1.)  Defendant wrote, "hahahaha" and acknowledged that he is serious. (*Id.*)  Again, he claimed to have "personally" known one of the terrorists.  (*Id.* at 2.)  He stated, "I was lonely back in 2005" and "[t]hey made me feel as if I were part of their grou[p]," "[t]hey made me feel as if I belonged."  (*Id.* at 3.)  He also described visiting the "mosque anwer Al awlaki used to do the lectures at," and opined that "[h]e was widely admired in the socal Muslim community" "[u]ntil the USA labeled him as a terrorist."  (*Id.*; *see* Ex. 21 at 3-6 (discussing al-Awlaki).)[8]  In response to disbelief from others on the chat string, defendant stated "I'm not trolling," "I'm telling you," "[m]y life is f[expletive]ing ridiculous," "[t]hat's why I am jaded as f[expletive]."  (Ex. 16 at 4.)  Defendant declared, "Sh[expletive] f[expletive]ing happens and I just don't give a f[expletive]."  (*Id.*)

On January 9, 2015, defendant stated, "[t]here are 4 main schools of thought in the sunni sect."  (Ex. 19 at 1.)  He admitted, "[o]f course, once I was done reading the works of Ibn Taymiyyah," "[y]ou sort of ascend and disregard the other schools."  (*Id.*; *see*

---

[8] When he was interviewed following the December 2, 2015 IRC attack, defendant also told the FBI that he had gone to San Diego with Rizwan (and to visit Rizwan) on multiple occasions.  He also stated that he and Rizwan went to the mosque where al-Awlaki had been an Imam.  Although it is unclear if this was the same visit, defendant's and Rizwan's bank records reflect that they were in San Diego at the same time in September 2011.  Defendant's bank statement for September 2011 shows transactions in San Diego, including the purchase of a Greyhound Bus ticket and a hostel stay reservation through Expedia (Ex. 17); Rizwan's bank records for that same month also reflect an Expedia purchase, as well as payments for parking, and food in San Diego (Ex. 18).

Ex. 21 at 2 (explaining "Ibn Taymiyya called for violent revolution against Muslim rulers (for not governing according to a fundamentalist interpretation of Islamic law) and the non-Muslim powers who supported them. . . . Modern jihadist groups actively read and disseminate the writings of these individuals, among others, as the basis for their violent call to arms.").)

Defendant also explained, "I've listened to various anwar Al awlaki s [sic] lectures" and described the AQAP leader as "very charismatic and accurate in his portrayal of the prophet and sahaba." (Ex. 19 at 2.)  Defendant described al-Awlaki's lectures as "[v]ery appealing."  (Ex. 19 at 2; see Ex. 21 at 3-6 (discussing al-Awlaki).) He also referenced terrorist Adam Gadahn (id.), an American citizen raised in California who became an al-Qa'ida spokesperson (Ex. 21 at 3-4).

Weeks later, on January 29, 2015, defendant admitted "stockpiling" various weapons ("2 AR 15 rifles, 1 llama government 9mm handgun, and a Springfield XD9"), "like 50 30round mags," and "loads of ammo."  (Ex. 20.)  He denied being a "terrorist," and said he was "stockpiling" for purposes of "[s]elling to the Pakistanis actually;"[9] "Idk something about fisabilillah" "[a]nd they always have that damned index finger pointing upward."  (Ex. 20.)  These statements in 2015 illuminate defendant's knowledge of the continued danger posed by supplying firearms and ammunition to Rizwan. "Fisabillilah" refers to fighting or engaging in violent jihad for the sake of God.  (Ex. 21 at 1.)  The gesture of raising of one's index finger towards the heavens to symbolize the "'oneness' of God,

---

[9] Rizwan was of Pakistani descent.

17

1    or *tawhid*" is a "well-understood mainstay of jihadist propaganda."

2    (*Id.* at 2 (discussing *tawhid*).)   Thus, years after the RCC and SR-91

3    terrorist plots, defendant admits that the weapons and ammunition he

4    stockpiled and provided to Rizwan were destined for a terrorist

5    purpose.

6       On February 9, 2015, defendant again bragged about his

7    connection to the men arrested in 2012 on terrorism charges, sharing

8    another link to an article on the arrest.   (Ex. 22 at 1.)   He claimed

9    that at the time, he was "shunned by many of my friends at the time"

10   "[b]ecause they believed I worked for the government."   (*Id.*)   When

11   asked why his friends would think that, defendant replied, "Religious

12   extremism/terrorism," "[p]eople were afraid that I was an informant

13   inciting acts of terrorism in the religious community."   (*Id.*)

14      In a WhatsApp conversation on August 6, 2015, defendant stated

15   "I might get imprisoned as a terrorist."   (Ex. 23 at 1.)   In an

16   apparent reference to the firearms defendant purchased for and

17   transferred to Rizwan, defendant discussed the need to "retrieve

18   certain items because they're under my name."   (*Id.*)   Defendant

19   stated, "[t]here's a lot you guys don't know" "[a]bout me," "[w]hich

20   is probably why I'm depersonalized all the time."   (*Id.*)   He

21   discussed being "Muslim for a decade" and stated "I may have been

22   part of an extremely fundamental group."   (*Id.*)   When asked, "[l]ike

23   women should be homebound and death to America type sh[expletive]"?

24   (*Id.*)   Defendant replied, "Yeah," "[a]lso, killing ourselves was

25   justified."   (*Id.*)   Again, he shared a link to a news story about the

26   arrest of four men on terrorism charges in the Inland Empire in 2012.

27   (*Id.* at 2.)   He stated, "[i]nitially, it was pretty peaceful," but

28   "[o]ver time, I was exposed to the more extreme material."   (*Id.*)

Referring to the RCC and SR-91 terrorist plots and the weapons cache defendant and Rizwan amassed in furtherance of their plan, defendant said, "I'm surprised I didn't go through with the plans I had back then." (*Id.*)  Defendant admitted, "[w]e actually stockpiled."  (*Id.*)  Long after the 2011 and 2012 terrorist plots, defendant further discussed his ability to rationalize "getting rid of people" and removing them from "[e]veryone's life."  (*Id.* at 4.)

On November 5, 2015, defendant made the following statements using his Facebook account: "No one really knows me.  I lead multiple lives and I'm wondering when its all going to collapse on M[e]."  (Ex. 24.)  Defendant continued, "My life turned ridiculous" "[i]nvolved in terrorist plots, drugs, antisocial behavior, marriage, might go to prison for fraud, etc."  (Ex. 24; *see also* Compl. ¶ 68.)

Furthermore, the investigation revealed that as late as September 2015, defendant maintained an interest in explosives and researched bomb-making components.  (*See* Ex. 27.)  On December 31, 2014, defendant remarked, "Just embed tiny bearings in the explosives" "[a]nd those are your projectiles;" "F[expletive]ers are gonna shoot past 3k fps" "[a]nd penetrate a lot of sh[expletive]."  (Ex. 25.)  Thereafter, on February 2, 2015, defendant stated, "I need to learn how to weld pipes together without setting off the explosive contents."  (Ex. 26.)  On April 9, 2015, defendant conducted google searches for "southern california terrorism" and "anwar al-awlaki's death."  (Ex. 27 at 1.)  On September 21, 2015, defendant conducted Google searches for "bomb fuel oxidizer" and "bomb fuel trigger."  (*Id.* at 1-2.)  The same day, defendant boasted that "[w]hen I create my bomb, it will be undefuseable."  (Ex. 28.)

In addition, investigators found various materials on defendant's electronic devices recovered following the December 2, 2015 attack, including, for example:

1.    "Martial Arts – How to Kill,"

2.    "Pressure Points – Military Hand to Hand Combat Guide,"

3.    "How to Make Bombs Book 2,"

4.    "How to Kill Someone with Your Bare Hands,"

5.    "The Terrorist's Handbook,"

6.    "Military Field Manuals,"

7.     Anwar al-Awlaki's "The Hereafter, Volume 2,"

8.    "WMD Facilitator Guide," and

9.    "Anarchists Cookbook."

(Ex. 29 at 1-6, 10.)

"The Hereafter" is a series of sermons Anwar al-Awlaki recorded before 2002 while living in the United States.  (Ex. 21 at 3.)  While not a call to arms, the lecture series addresses "the legitimacy of (violent) jihad in Islam, criticizing those who would condemn jihad for the sake of God (jihad fisabillilah) while supporting wars fought for material gain."  (*Id.*)  Al-Awlaki remains a source of inspiration to "English speaking adherents to violent jihadist ideas."  (*Id.*) This charismatic leader has "featured prominently in the radicalization processes of many Americans" tried in federal courts and inspired "three of the 9/11 hijackers, Major Nidal Hassan, Dzhokhar Tsarnaev, and Umar Farouk Abdul Mutallab."  (*Id.*)

Indeed, many of al-Awlaki's speeches and sermons are explicit in their call to arms.  Prior to his death in September 2011, "al-Awlaki and AQAP encouraged American Muslims to do one of two things: emigrate from the United States where it is not possible to practice

'true' Islam to a place where that is possible, such as jihadist fronts in Afghanistan, Somalia, or Yemen; or, to wage violent jihad in the United States." (*Id.*)  In his "Message to the American People," al-Awlaki instructed that jihad against America is binding on every able Muslim.  (*Id.* at 5.)  It seems that defendant and Rizwan took al-Awlaki's messages to heart.  Within weeks of al-Awlaki's death in September 2011, defendant purchased the first firearm for Rizwan, the Smith & Wesson rifle.

Investigators also seized books from defendant's residence, which included writings of Ibn Taymiyya, a scholar who advocated violent revolution against Muslim rulers not governing according to a fundamentalist interpretation of Islamic law and non-Muslim powers that supported them.  (*See* Ex. 30 at 2-3 (listing books seized from defendant's residence); Ex. 19 at 1 (defendant discussing having read "the works of Ibn Taymiyyah," noting "[y]ou sort of ascend and disregard the other schools"); Ex. 21 at 2 (Expert Statement discussing Ibn Taymiyya).)

### E.  The Firearms and Explosives Defendant Purchased were Used in the December 2, 2015 San Bernardino Terrorist Attack

On the morning of December 2, 2015, Rizwan and Malik shot and killed 14 people and wounded at least 22 other people at the IRC in San Bernardino, California.  (PSR ¶ 52; Plea Agreement, Ex. A at 6.) Most of the injured and deceased victims were gathered at the IRC for an office training event.  One victim worked at a coffee shop near the event, and was killed outside while on a work break.  Rizwan, a County of San Bernardino employee who attended the training event, placed an item on a table in the IRC before leaving the event and returning to carry out the attack.  (Compl. ¶¶ 51-52.)

1    Later that day, law enforcement encountered Rizwan and his wife,
2  Malik, driving in Redlands, California.   Rizwan and Malik engaged in
3  a firefight with law enforcement officers that ended with Rizwan's
4  and Malik's deaths and the wounding of a law enforcement officer.
5  (PSR ¶ 52; Plea Agreement, Ex. A at 6-7.)   From the scene of the
6  shootout, law enforcement officers recovered four firearms: the Smith
7  & Wesson rifle and the Oracle rifle that defendant purchased for
8  Rizwan in 2011 and 2012, and two semi-automatic handguns.   (PSR ¶ 53;
9  Compl. ¶ 58; Plea Agreement, Ex. A at 7.)[10]   Subsequent forensic
10  testing of the ammunition casings found at the IRC and at the
11  shootout scene with law enforcement determined that the Smith &
12  Wesson rifle and the Oracle rifle were used in the attack at the IRC
13  and the firefight with law enforcement.   (PSR ¶ 53; Plea Agreement,
14  Ex. A at 7.)

15    Additionally, law enforcement searched the IRC and found on a
16  table a black bag containing an IED.   (PSR ¶ 54; Plea Agreement, Ex.
17  A at 7.)   This IED was composed of three galvanized steel pipe bombs,
18  filled with smokeless explosive powder.   (Compl. ¶ 60; Plea
19  Agreement, Ex. A at 7.)   The three pipe bombs were attached to a
20  remote-control car to create a radio-controlled IED.   At the time law
21  enforcement found it, the IED was armed and ready to detonate.
22  Inside the vehicle where Rizwan and Malik exchanged gunfire with law
23  enforcement, law enforcement recovered the remote control for the
24  radio-controlled IED.   (Compl. ¶ 60.)   This same method of remote
25  detonation using a radio-controlled car and the use of

26

27  _____

28  [10] Photographs of defendant's Smith & Wesson and Oracle rifles
    taken at the shootout scene are attached hereto as Exhibits 31-32,
    respectively.

remote-controlled devices to achieve a safe separation distance from an exploding device were topics discussed by defendant and Rizwan in connection with the RCC and SR-91 plots.  (*See* Plea Agreement, Ex. A at 5.)

On December 3, 2015, law enforcement seized a bottle of smokeless powder during a search of Rizwan's residence, which was later determined by an FBI Explosives Chemistry Examiner (the "Examiner") to be chemically and physically consistent with the IED Rizwan left at the IRC.  (Plea Agreement, Ex. A at 7.)  The Examiner also confirmed that the IED recovered at the IRC was switched "on" and set to detonate remotely from a distance.  (Compl. ¶ 63.) Defendant subsequently identified the bottle of powder seized at Rizwan's residence as the same bottle that he purchased in 2012 and gave to Rizwan.  (PSR ¶ 54; Plea Agreement, Ex. A at 7.)  Defendant further admitted that the purpose of the smokeless powder was to build pipe bombs in support of the plots for the RCC and SR-91 attacks.  (Compl. ¶ 66.)[11]

Defendant was at work on December 2, 2015, during the San Bernardino terrorist attack, and was not one of the shooters at the IRC or involved in the subsequent shootout with police.  (PSR ¶ 55; Plea Agreement, Ex. A at 7.)  Defendant asserted that he had withdrawn from Rizwan in or around November 2012 and did not have prior knowledge of the attack.  (PSR ¶ 55; Plea Agreement, Ex. A at 7-8.)  During an interview with the FBI on December 6, 2015, however, defendant admitted that he "could have done something about it."

---

[11] A photograph of defendant's explosives powder taken from Rizwan's residence and used in the IED at the IRC is attached hereto as Exhibit 33.

After news reports of the attack were released, defendant called 911 stating that his firearms were used in the attacks and went to the emergency room at UCLA Harbor Medical Center, where he was referred to the psychiatric ward and admitted for evaluation.   (Plea Agreement, Ex. A at 7.)   Upon his release from the hospital on December 6, 2015, and continuing through December 16, 2015, defendant agreed to participate in an interview with FBI Special Agents. During this time, defendant provided information to law enforcement about Rizwan, as well as information about defendant's prior relationship and planning with Rizwan as described herein.   (Plea Agreement, Ex. A at 7-8.)

### F.   Defendant Committed Immigration Fraud

From 2014-2015, defendant, also engaged in a scheme to commit immigration fraud in order to obtain citizenship for Mariya Chernykh, a Russian national, and the sister of Rizwan's brother's wife.[12] Chernykh paid defendant $200 a month to enter a fraudulent marriage with her and submitted documents signed under oath and under penalty of perjury to United States Citizenship and Immigration Services, so that she could obtain status in the United States.   (*See* PSR ¶ 56; Compl. ¶¶ 79-89.)   Defendant was charged in Counts Four and Five of the Indictment for his participation in this scheme.   (Indictment, CR 12, at 5-7.)[13]

---

[12] Chernykh and two others were charged in a separate Indictment and have plead guilty for their roles in this conspiracy.   *See United States v. Chernykh, et al.*, CR No. 16-292-JGB (C.D. Cal. April 27, 2016).   (*See* PSR ¶ 10.)

[13] The government agreed to dismiss these counts at sentencing in the Plea Agreement.   Pursuant to the agreement, however, defendant agrees that the Court may consider the dismissed charges when determining the sentence to be imposed.   (*See* Plea Agreement ¶ 3(c).)

## III.  SENTENCING ANALYSIS

### A.  The Guidelines Calculations

All sentencing proceedings must begin by calculating correctly the applicable United States Sentencing Guidelines range.  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*).  The advisory Guidelines are "the starting point and the initial bench mark and are to be kept in mind throughout the process."  *Id.* 520 F.3d at 991 (internal quotation marks and citation marks omitted).

In the Plea Agreement, the parties agreed that the applicable base offense level for Count One is 43, and the base offense level for Count Two is 12.  (See Plea Agreement ¶ 14; PSR ¶ 5.)  The government submits that a 12-level terrorism adjustment applies to both counts, making the respective adjusted offense levels 55 and 32.[14]  In light of the defendant's agreement to plead guilty and agreement to be interviewed by law enforcement following the December 2, 2015 attack (*see* PSR ¶¶ 28, 49, 50), the government recommends and hereby moves for defendant to receive a three-level adjustment for acceptance of responsibility, making the total offense level 52 (which is outside of the Sentencing Table's highest offense level of 43).  With a criminal history category of VI, absent the statutory maximum term of 25-years-imprisonment on both counts, the applicable advisory guideline range would be life imprisonment.

---

[14] In the Plea Agreement, the parties reserved "the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate." (Plea Agreement ¶ 14; *see also* PSR ¶ 6.)

1    The Probation Office calculates a Total Offense Level of 42, and
2    a Criminal History Category of VI.  (PSR at 4.)  Under the PSR's
3    calculation, absent the statutory maximum term of
4    25-years-imprisonment, the applicable advisory guideline range would
5    be 360 months to life imprisonment.  (*See* PSR Letter at n.1.)

6    The government submits that the parties' agreed upon base
7    offense level calculations are accurate and separately filed an
8    objection to the PSR's guidelines' calculation on October 16, 2017.
9    (CR 75.)  Under either offense level calculation, however, because of
10   the statutory maximum sentence of 25 years imprisonment, the
11   applicable advisory guideline sentence for defendant is 300-months-
12   imprisonment and up to a lifetime term of supervision.

13   The government submits that defendant's advisory sentencing
14   guideline range should be calculated as follows:

15   Violation of 18 U.S.C. § 2339A(a):

16   | Base Offense Level: | 43 | [U.S.S.G. § 2A1.1(a), |
17   | | | 2K1.4(c)(1), 2X2.1] |
     | Terrorism Adjustment: | +12 | [U.S.S.G. § 3A1.4(a)] |
18   | Total Offense Level: | 55 | |

19   Violation of 18 U.S.C. § 922(a)(6):

20   | Base Offense Level: | 12 | [U.S.S.G. § 2K2.1(a)(7)] |
21   | Terrorism Adjustment: | +12 | [U.S.S.G. § 3A1.4(a)] |
     | Total Offense Level: | 24 | |
22
23   | Acceptance of Responsibility: | -3 | [U.S.S.G. § 3E1.1] |

24   | Total Offense Level: | 52 | |

25   | Criminal History Category: | VI | [U.S.S.G. § 3A1.4(b)] |

26   Advisory Sentencing Guideline Range:  Life Imprisonment
27   Because the defendant's firearms purchase was connected to
28   defendant's and Rizwan's criminal objective and plan to provide

material support to terrorism, the government concurs with the PSR's grouping of Counts One and Two.   (PSR ¶ 37.)

        1.   The Terrorism Enhancement Applies To All Counts

            *a.*   *Count One: The Material Support Conviction (18 U.S.C. § 2339A)*

Appendix A of the Sentencing Guidelines references U.S.S.G. § 2X2.1 for violations of 18 U.S.C. § 2339A.   Section 2X2.1 instructs that the offense level is the same as the underlying offense, that is "the offense defendant is convicted of having materially supported." U.S.S.G. § 2X2.1, comment. (n.1).   In this case, the underlying offense is 18 U.S.C. § 844, governed by U.S.S.G. § 2K1.4(c)(1), which provides that the most analogous guideline from Chapter Two, Part A applies if "the offense was intended to cause death or serious bodily injury."   The parties agree that the most analogous guideline in Chapter Two, Part A, Offenses Against the Person, is the guideline for First Degree Murder.   Therefore, the parties have stipulated in the Plea Agreement that the applicable guideline for the material support conviction (Count One) is U.S.S.G. § 2A1.1(a).   The corresponding base offense level is 43.   U.S.S.G. § 2A1.1(a).   (Plea Agreement ¶ 14.)

The government agrees with the PSR that a 12-level terrorism adjustment applies[15] and that defendant's criminal history category is

---

[15] In its analysis of the adjustment, the PSR cites only to section 844(i), and omits 2339A.   (PSR ¶¶ 41, 48.)   The government submits that 2339A applies to both the PSR's deemed "pseudo" counts, and that the enhancement applies under both theories, as they related to the scheme to provide material support to terrorists, in violation of 2339A.   In any event, because the PSR found the enhancement applied to at least one of the "pseudo" counts subsumed in Count One, it appropriately applied the 12-level adjustment to Count One in its Guideline analysis.   (See PSR at 4, ¶ 41.)

VI, because Count One was a federal crime of terrorism.[16]   (PSR ¶¶ 41,

62.)   *See* U.S.S.G. § 3A1.4.   The term "federal crime of terrorism"

has the meaning given that term in 18 U.S.C. § 2332b(g)(5).   (*Id.*)

*See* USSG § 3A1.4, comment. (n.1).   Section 2332b(g)(5) states, in

pertinent part, "the term 'Federal crime of terrorism' means an

offense that- (A) is calculated to influence or affect the conduct of

government by intimidation or coercion, or to retaliate against

government conduct; and (B) is a violation of- (i) section . . .

844(i) (relating to arson and bombing of property used in interstate

commerce) . . . 2339A (relating to providing material support to

terrorists)."

Application of the terrorism adjustment in U.S.S.G. § 3A1.4(a)

does not require a finding that the defendant was personally

motivated by a desire to influence or affect the conduct of

government, or to retaliate against government conduct.   Rather, the

government need only prove that the offense was calculated to

influence or affect the conduct of government by intimidation or

coercion, or to retaliate against government conduct.   *See United*

*States v. Awan*, 607 F.3d 306, 316-18 (2d Cir. 2010) (holding that

government need not show defendant was personally motivated to

influence government, only that he intended to promote a crime

calculated to have such an effect); *United States v. Haften*, 881 F.3d

543, 545 (7th Cir. 2018) (affirming that the terrorism adjustment

applied, stating "[a]ll that matters is that [defendant] did, in

fact, commit a crime calculated to retaliate against the

government."); " *United States v. Jayyousi*, 657 F.3d 1085, 1114-15

---

[16] The sentencing range would be the same even if defendant's
criminal history category was category I.

28

(11th Cir. 2011) (holding that terrorism adjustment, § 3A1.4, applies when purpose of defendants' activity is calculated to promote a terrorism crime regardless of defendants' personal motivations); *accord United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011) (citing with approval *Awan* and *Jayyousi*); *see also United States v. Chandia*, 675 F.3d 329, 340-41 (4th Cir. 2012) (affirming application of terrorism adjustment where the court reasonably inferred that defendant intended to advance the terrorist organization's purpose based on defendant's knowledge about the terrorist organization).

The applicable federal crime of terrorism here is conspiring to provide material support or resources, including weapons, explosives, and personnel, including themselves, knowing and intending that they were to be used in preparation for, and in carrying out, violations of 18 U.S.C. § 844, all in violation of 18 U.S.C. § 2339A.  Clearly, the offense of conviction "involved" a violation of Section 2339A.[17] Moreover, defendant's actions providing two rifles, explosive powder, rapid release firearm components, ammunition, and components for an IED igniter, in preparation for a deadly attack were "calculated to

---

[17] "The preponderance of evidence standard is generally the appropriate standard for factual findings used at sentencing." *United States v. Felix*, 561 F.3d 1036, 1045 (9th Cir. 2009).  The government recognizes that under current Ninth Circuit law, however, it must prove the application of U.S.S.G. § 3A1.4 by clear and convincing evidence.  *See United States v. Tankersley*, 537 F.3d 1100, 1106 & n.5 (9th Cir. 2008) (assuming, without deciding, that "clear and convincing" standard of proof applies to determination of facts underlying application of U.S.S.G. § 3A1.4).  The government submits it has done this.  However, for purposes of preserving its position on appeal, and due to the circuit split on this issue, the government argues that the standard of proof for all sentencing factors should be proof by a preponderance of the evidence.  *See, e.g., United States v. Graham*, 275 F.3d 490, 517 n.19 (6th Cir. 2001) (holding that the preponderance of the evidence standard of proof applies for determining facts for the application of U.S.S.G. § 3A1.4).

1   influence or affect the conduct of government by intimidation or

2   coercion," and "to retaliate against government conduct."[18]   *See* 18

3   U.S.C. § 2332b(g)(5)(A).

4        Defendant and his partner Rizwan were inspired to act after

5   listening to the extremist views espoused by the radical Islamic

6   lecturer al-Awlaki, who before his death was a revered leader of the

7   foreign terrorist organization AQAP.   AQAP has claimed responsibility

8   for terrorist acts against targets in the United States and

9   elsewhere.   Al-Awlaki's lectures have inspired numerous terrorist

10  plots against Western targets.   For example, participants in the 2005

11  London subway bombings; the 2006 plot to detonate truck bombs in

12  Ontario, Canada; the 2010 Times Square bombing; and the 2012 plot to

13  bomb the New York Federal Reserve all had listened to or viewed

14  al-Awlaki lectures prior to their participation in those plots or

15  attacks.   (Compl. ¶ 26.)

16       There can be little dispute that al-Qa'ida-affiliated

17  organizations engage in terrorist activity to influence the conduct

18  of government by intimidation or coercion or to retaliate against

19  government conduct.   Al-Qa'ida and AQAP are enemies of the United

20  States.   It is uncontroverted that al-Qa'ida and its affiliates:

21  (1) harbor destructive intentions towards the United States and other

22  governments; (2) promote violent acts against military personnel and

23  civilians in order to influence government conduct; and (3) believe

24  that such attacks are justified retaliation against governments whose

25

26       [18] Official membership in a designated foreign terrorist
    organization is not required.   Indeed, "Al-Awlaki argued that
27  individuals could participate actively in all aspects of violent
    jihad without traditional membership in a group, and that doing so is
28  an individual duty due to the actions of the U.S. Government."   (Ex.
    21 at 4.)

military forces are or have been in the Middle East, or whose fundamental values are antithetical to the subjugation of all people to Sharia law as espoused by the terrorist organizations and their leaders.   (*See* Ex. 21 at 1-3.)

AQAP's intentions towards the United States and other Western countries are made clear in the lectures and materials consumed by defendant and Rizwan.   From 2010 through 2011, defendant listened to lectures and materials by al-Awlaki, such as the "The Hereafter" series of lectures and "Umar Ibn Al-Khattab: His Life and Times."   In 2011, Rizwan provided defendant with more extremist materials. Around that time, defendant spent most of his time at Rizwan's residence, where he read, listened to lectures, and watched videos involving extremist content.   These materials included "Inspire" magazine, the official publication of AQAP, "Defense of Muslim Lands" by Shaikh Abdullah Azzam, and videos produced by Al-Shabaab, another designated foreign terrorist organization in Somalia.   (Compl. ¶¶  26-28; *see* Ex. 21 at 2-6.)

Defendant admitted that he and Rizwan reviewed "Inspire" magazine, the official publication of AQAP.   (Compl. ¶ 28; *see* Ex. 21 at 5.)   Inspire's regular content is a virtual how-to guide for aspiring jihadists.   (*See* Ex. 21 at 5.)   Defendant and Rizwan gleaned information regarding how to manufacture IEDs from the pages of "Inspire" magazine.   (Compl. ¶ 66.)   Defendant taught Rizwan how to build a closed circuit that would create a "spark."   (*Id.*)   Rizwan asked defendant how to use encryption as described in AQAP's online publication.

Corroborating defendant's own admissions, all of this
information was readily available to the aspiring jihadists.  Issue 1
of "Inspire" magazine "featured a section, called 'Open-Source
Jihad,' which included two articles.  The first, a now infamous
article titled, 'Make a bomb in the kitchen of your mom,' featured
high quality photographs and simple instructions on how to make an
improvised explosive device using easily obtainable materials."  (Ex.
21 at 5.)  The second article "provided instructions on how readers
can use encryption software to send and receive messages securely."
(*Id.* at 5-6.)  Just as defendant described, the end of the magazine
"encouraged readers to use the Asrar al-Mujahideen software to
communicate with the editors of Inspire and AQAP's media arm."  (*Id.*)
Issue 8 of "Inspire" included an open-source Jihad article featuring
"the use of remote control detonation of improvised explosive
devices."  (*Id.* at 6.)  That issue, released in the Fall of 2011 when
defendant and Rizwan were engaged in plotting attacks on a civilian
population, also contained an article written by al-Awlaki "titled
'Targeting the Populations of Countries that are at War with the
Muslims,' expounding on the legitimacy of terrorist violence against
civilian populations. (*Id.*)

The continued influence of radical Islamic ideology is evidenced
by Rizwan's professed desire to join AQAP and Malik's social media
searches on the morning of the attack for materials related to the
Islamic State of Iraq and the Levant ("ISIL"), also known as the
Islamic State of Iraq and al-Sham ("ISIS"), and the Islamic State.
(Compl. ¶ 50.)  Furthermore, investigation has revealed that Malik
swore allegiance to the leader of ISIL, Abu Bakr al-Baghdadi, on
December 2, 2015.  (Compl. ¶ 54; *see* Ex. 21 at 6 (describing the

significance of an "oath of allegiance (*bai'yah*)" made in relation to a terrorist attack in support of ISIL, "[t]he oath of allegiance is significant and binding, as extending this oath is how an individual violent jihadist swears loyalty to a group and it leader").)  On that date, Rizwan and his new partner, Malik, conducted at the time the deadliest terror attack in the United States since September 11, 2001, and the largest mass murder in this District.

Indeed, reflecting on his life on November 5, 2015, defendant admitted having been involved in terrorist plotting.  Defendant made the following statements using his Facebook account: "No one really knows me.  I lead multiple lives and I'm wondering when its all going to collapse on m[e]."  Defendant continued, "My life turned ridiculous" "[i]nvolved in terrorist plots, drugs, antisocial behavior, marriage, might go to prison for fraud, etc."  (Ex. 24; Compl. ¶ 68.)

> *b.    Count Two: The Firearms False Statement*
> *Conviction (18 U.S.C. § 922(a)(6))*

The applicable guideline for defendant's conviction pursuant to 18 U.S.C. § 922(a)(6) is U.S.S.G. § 2K2.1.  *See* U.S.S.G. App. A.  In the Plea Agreement, the parties agreed that the corresponding base offense level is 12.  (Plea Agreement ¶ 14 (citing U.S.S.G. § 2K2.1(a)(7)).)  The terrorism adjustment in U.S.S.G. § 3A1.4(a) applies here as well because defendant's firearms false statement offense is a felony that was intended to promote a federal crime of terrorism.  *See* U.S.S.G. § 3A1.4.  Specifically, when defendant purchased the Smith & Wesson rifle for Rizwan, defendant intended to promote a federal crime of terrorism – the conspiracy to provide material support or resources, including weapons.

1    It is important to note that the plain language of U.S.S.G.

2  § 3A1.4 does not require the offense of conviction to be a federal

3  crime of terrorism; rather, the plain language of U.S.S.G. § 3A1.4

4  applies to offenses that were intended to promote a federal crime of

5  terrorism.  *See Graham*, 275 F.3d at 516 (construing the word

6  "involved" in USSG § 3A1.4 to mean "included," and explaining that

7  the phrase "intended to promote" in U.S.S.G. § 3A1.4 must mean

8  something different from the word "involved").  Thus, in *Awan*, the

9  Second Circuit upheld the application of the terrorism adjustment to

10  a conviction for money laundering because the money-laundering

11  offense was intended to promote a federal crime of terrorism.  607

12  F.3d at 316.  The Second Circuit instructed that under the "intended

13  to promote" prong of U.S.S.G. § 3A1.4(a), "so long as the defendant's

14  offense was intended to encourage, further, or bring about a federal

15  crime of terrorism as statutorily defined, the defendant does not

16  have to commit an offense listed in Section 2332b(g)(5)(B), and the

17  defendant's offense need not itself be 'calculated' as described in

18  § 2332b(g)(5)(A)."  *Id.* at 315.  Thus, the terrorism adjustment

19  applies to the firearms count, and, pursuant to U.S.S.G. § 3A1.4(a),

20  increases the total offense level to 24.[19]

21

22

23

24

25

26    [19] Upon determining that Count Two grouped with Count One, and
"[i]n grouping the counts, the offense level is derived from

27  Pseudo-Count 2, the count with the highest offense level," the
Probation Officer did not include a separate Guidelines analysis for

28  Count Two in the PSR.  (*See* PSR ¶¶ 37, 117(b).)

**B.    The Court Should Consider the Victims' Statements Pursuant to Federal Rules of Criminal Procedure, 18 U.S.C. § 3553, and the Crime Victims' Rights Act**

The government submits statements made by some of the victims concurrently herewith.[20]  These are the victim statements received by the government to date.  The government anticipates additional victims may submit written statements in advance of sentencing and is informed that some want to provide oral statements during the sentencing hearing.  The government will file with the Court additional written statements received in advance of the sentencing hearing.  The Court should consider these statements because they are relevant to the factors the Court is to consider at sentencing pursuant to 18 U.S.C. § 3553(a)(2), and also appropriate pursuant to the Crime Victims' Rights Act ("CVRA").

As set forth more fully below, the victim impact statements speak to one of the factors the Court is to consider at sentencing pursuant to 18 U.S.C. § 3553(a)(2).  Defendant purchased weapons for Rizwan and planned for he and Rizwan to use them to shoot innocent people.  Rizwan did just that on December 2, 2015 using defendant's weapons, resulting in 14 people killed and an untold number of people injured, terrorized, and traumatized.  The statements filed and/or presented orally at the sentencing hearing directly address "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  *See* 18 U.S.C. § 3553(a)(2); *see generally United States v. Dominguez*, 951 F.2d 412, 417 (1st Cir. 1991) (rejecting

---

[20]    Victim statements are filed herewith as lettered Exhibits.  Although many of the statements are filed herewith under seal, some of the victims requested their statements not be sealed.

1   defendant's argument that the sentencing court incorrectly considered
2   a victim impact statement prior to the CVRA, noting "[t]he district
3   court, however, has wide power to consider information relevant to
4   the circumstances of both crime and criminal.").

5   The CVRA, codified at 18 U.S.C. § 3771, also provides that a
6   victim has a right to be "reasonably heard at any public proceeding
7   in the district court involving release, plea, sentencing, or any
8   parole proceeding."  18 U.S.C. § 3771(a)(4).  As the Ninth Circuit
9   has observed, the CVRA

> was enacted to make crime victims full participants in the
> criminal justice system.  Prosecutors and defendants
> already have the right to speak at sentencing; our
> interpretation puts crime victims on the same footing.  Our
> interpretation also serves to effectuate other statutory
> aims: (1) to ensure that the district court doesn't
> discount the impact of the crime on the victims; (2) to
> force the defendant to confront the human cost of his
> crime; and (3) to allow the victim "to regain a sense of
> dignity and respect rather than feeling powerless and
> ashamed."

*Kenna v. U.S. Dist. Court for C.D. Cal.*, 435 F.3d 1011, 1016 (9th
Cir. 2006) (citing Jayne W. Barnard, "Allocution for Victims of
Economic Crimes," 77 Notre Dame L. Rev. 39, 42 (2001)).

For purposes of the CVRA, a "[c]rime victim" is defined as "a
person directly and proximately harmed as a result of the commission
of a Federal offense."  18 U.S.C. § 3771(e)(2)(A).[21]  "The CVRA's
'directly and proximately harmed' language imposes dual requirements
of cause in fact and foreseeability.  A person is directly harmed by
the commission of a federal offense where that offense is a but-for
cause of the harm.  A person is proximately harmed when the harm is a

---

[21] The Act also provides that a family member or other
appropriate person may "assume the crime victim's rights" when the
victim is incapacitated or deceased.  18 U.S.C. § 3771(e)(2)(B).

reasonably foreseeable consequence of the criminal conduct." *In re Fisher*, 640 F.3d 645, 648 (5th Cir. 2011). "Under the plain language of the statute, a party may qualify as a victim, even though it may not have been the target of the crime, as long as it suffers harm as a result of the crime's commission." *In re Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008).

Federal Rule of Criminal Procedure 32(i)(B) further provides, "[b]efore imposing sentence, the court must address any victim of the crime who is present at sentencing and must permit the victim to be reasonably heard." Similarly, Federal Rule of Criminal Procedure 60(a)(3) provides that "[t]he court must permit a victim to be reasonably heard at any public proceeding in the district court concerning . . . sentencing involving the crime."

As set forth in the government's previously-filed objections regarding relevant conduct, the harm that Rizwan caused during the IRC attack resulted from defendant's crimes. (*See* Government's Objections at 7-11.) The persons killed, injured, and traumatized by Rizwan on December 2, 2015, were "directly and proximately harmed" by defendant's purchasing of firearms for Rizwan and planning that they be used to shoot at people in a terrorist attack. In 2011 and 2012, defendant purchased firearms for a killer, planning for them to be used to commit terror attacks against innocent persons. Although defendant walked away from that conspiracy, he did not retrieve his weapons. Those weapons, purchased to further the terrorist plotting defendant did with Rizwan, were used by Rizwan and Malik a few years later to attack people at the IRC. As defendant and Rizwan had planned, Rizwan used the weapons to kill and injure innocent people in furtherance of a violent extremist agenda. Rizwan's attack and

1   the damage it caused was the direct and proximate result of his prior

2   plotting with defendant.

3        The PSR reflects that "[t]he victim of this offense is a

4   societal interest."  (PSR ¶ 26.)  Indeed, defendant's actions

5   affected society and jeopardized public safety.  This provides

6   another ground for the Court to consider the victim impact

7   statements, which were submitted by members of society who have a

8   profound basis upon which to speak about the impact that defendant's

9   actions had upon their lives.

10        The government submits the victim statements in support of its

11   position at sentencing, and respectfully requests the Court to

12   consider them.

13   **C.   The § 3553 Factors Support a Sentence of 25 Years**
        **Imprisonment and Lifetime Supervision**

14

15        As described above, the Sentencing Commission has determined

16   that a lifetime imprisonment sentence is appropriate for defendant's

17   crimes.  His Guideline's range is off the sentencing charts, making

18   it one of the highest Sentencing Guideline ranges of any defendant

19   ever prosecuted by the United States Attorney's Office for the

20   Central District of California.  This is not accidental – it reflects

21   the seriousness of defendant's crimes.  The dangers posed by persons

22   conspiring to commit terrorism by bombing and shooting people in the

23   United States based on extremist ideology cannot be overstated.

24   Here, both defendant's intent (planning the mass murder of innocent

25   people) and the consequences of his conduct (14 people died, at least

26   22 people were injured, and numerous others were traumatized and

27   placed in danger) were extremely grave.  The Sentencing Guideline

28

1  range of life does not overstate the culpability for the crime of
2  conspiracy to commit terrorism.

3      Here, the statutory maximum sentence is 300 months (25 years),
4  which is also the sentence recommended by the government and the
5  Probation Office.  This is significantly below the otherwise
6  applicable Sentencing Guideline range.  It also is significantly
7  below the 50-year sentence that defendant would have received under
8  the Sentencing Guidelines if he had been convicted on all five counts
9  in the Indictment.  Nonetheless, the 25-year sentence is the
10 appropriate sentence in this instance because it accounts for the
11 fact that defendant walked away from the SR-91 and RCC plots, appears
12 to have withdrawn from Rizwan, and did not himself commit the attack
13 at the IRC.  Defendant has also expressed genuine remorse for his
14 prior criminal acts, accepted responsibility, and assisted the IRC
15 investigation by agreeing to a lengthy interview with law enforcement
16 in the critical time following the attack.  In its recommended
17 sentence, and agreement in the Plea Agreement to dismiss the
18 remaining counts in the Indictment, the government has accounted for
19 these facts, along with other personal mitigating factors set forth
20 in the PSR.  The government agrees that a sentence of a term of
21 imprisonment of 300 months and a lifetime of supervised release (with
22 the terms and conditions recommended by the Probation Officer,
23 including drug and mental health treatment) is necessary to
24 effectuate the purposes of sentencing set forth in § 3553(a).

25
26
27
28

1     1. The Need for the Sentence Imposed to Reflect the
2      Seriousness of the Offense, Promote Respect for the
       Law, and Provide Just Punishment Requires a 25-Year
3      Term of Imprisonment

4   As discussed above, the conduct in this case was very serious

5 and implicated the national security interests of the United States.

6 The applicable Guideline's range of life imprisonment and up to a

7 lifetime of supervised release illustrates the seriousness of the

8 offense here.   Terrorism offenses represent a particularly grave

9 threat "because of the dangerousness of the crime and the difficulty

10 of deterring and rehabilitating the criminal."   *United States v.*

11 *Meskini*, 319 F.3d 88, 92 (2d Cir. 2003).   Thus, Congress and the

12 Sentencing Commission were right to conclude "that terrorists and

13 their supporters should be incapacitated for a longer period of

14 time."   *Id.*; *see also United States v. Ressam*, 679 F.3d 1069, 1090

15 (9th Cir. 2012) (reversing a substantively unreasonable sentence,

16 stating, "[t]errorists, even those with no prior criminal behavior,

17 are unique among criminals in the likelihood of recidivism, the

18 difficulty of rehabilitation, and the need for incapacitation.")

19 (quoting *Jayyousi*, 657 F.3d at 1117).

20   Defendant's actions, purchasing weapons and ammunition,

21 researching and purchasing explosives, and plotting with Rizwan to

22 conduct terrorist attacks in the United States are serious.   Although

23 he did not follow through with the attacks, he left the weapons and

24 explosives in the hands of Rizwan, who did and with devastating

25 results.   Defendant did nothing to undo the dangerous situation he

26 fostered through his criminal acts or to prevent Rizwan from using

27 the weapons he purchased to carry out a terrorist attack on innocent

28 people in San Bernardino while they were at work.   Leaving carnage

behind at the IRC, Rizwan and Malik with defendant's weapons loaded, drove around the streets of San Bernardino and engaged in a fire fight with law enforcement, further risking the lives of countless others.   The pain and devastation expressed in the statements of the numerous victims of the December 2, 2015 attack and their loved ones, and the harm to public safety, demonstrate the seriousness of defendant's crimes.

Additionally, after withdrawing from Rizwan in 2012, even up through 2015 defendant maintained an interest in bomb-making, and boasted on his social media accounts about having been a "terrorist" and having knowledge of bombs.  On December 31, 2014, defendant remarked, "[j]ust embed tiny bearings in the explosives" "[a]nd those are your projectiles;" "F[expletive]ers are gonna shoot past 3k fps" "[a]nd penetrate a lot of sh[expletive]."  (Ex. 25.)  On February 2, 2015, defendant stated, "I need to learn how to weld pipes together without setting off the explosive contents."  (Ex. 26.)  He repeatedly shared links to online reports about terrorists where were arrested in the Inland Empire in 2012, whom he claimed to have known. On April 9, 2015, defendant conducted google searches for "southern california terrorism" and "anwar al-awlaki's death."  (Ex. 27.)   On September 21, 2015, defendant conducted Google searches for "bomb fuel oxidizer" and "bomb fuel trigger."  (*Id.*)  That same day, defendant boasted, "[w]hen I create my bomb, it will be undefuseable."  (Ex. 28.)  Although defendant may have ceased terrorist plotting, his interest in bombs and his prior acts remained in the forefront of his mind.

1     The tragic aftermath of defendant's conspiracy to commit

2    terrorist acts with Rizwan starkly illustrates that the crime of

3    conspiracy is a "distinct evil" that

4        [p]oses a "threat to the public" over and above the threat
          of the commission of the relevant substantive crime – both
5        because the "[c]ombination in crime makes more likely the
          commission of [other] crimes" and because it "decreases the
6        probability that the individuals involved will depart from
          their path of criminality."

7

8    *United States v. Jimenez-Recio*, 537 U.S. 270, 274-75 (2003) (quoting

9    *Callanan v. United States*, 364 U.S. 587, 593-94 (1961); citing *United*

10    *States v. Rabbinowich*, 238 U.S. 78, 88 (1915) (conspiracy "sometimes

11    quite outweigh[s], in injury to the public, the mere commission of

12    the contemplated crime")).

13          2.   Defendant's History and Characteristics

14     Although the defendant does not have any known criminal

15    convictions, defendant's violation of federal law was not isolated.

16    Over a span of several years, defendant plotted with Rizwan to

17    conduct multiple terrorist attacks.  Their schemes were devised to

18    maximize the number of casualties, targeting students on campus,

19    people in their cars on their way home from work, and first

20    responders.  Through the course of this plotting, defendant

21    researched bomb-making and weapons tactics.  He purchased firearms

22    for Rizwan and falsely declared in the ATF paperwork that they were

23    for defendant.

24     After withdrawing from the plots with Rizwan, defendant did not

25    bother to take any steps to retrieve the weapons or explosives,

26    although he could have.  For approximately two years, he remained

27    Rizwan's neighbor.  He maintained occasional contact with Rizwan and

28    a close connection with Rizwan's family members.  This connection was

sufficiently close that he agreed to a marriage fraud scheme with Rizwan's brother's wife's sister, so that she could obtain status in the United States.   Defendant is not only willing to violate United States terrorism and firearms laws, but, motivated by personal profit ($200 a month), defendant willingly defrauded the United States government through his immigration fraud scheme.

Defendant describes himself as leading multiple lives.   He attributed his interest in terrorism as stemming from a feeling of isolation and a need to belong.   He could rationalize killing people, and boasted about his affiliation with terrorists.

In many ways, defendant's upbringing is typical.   Although he does not appear to have had a meaningful relationship with his father, he described a working-class upbringing in Southern California, where his basic necessities were met.   (PSR ¶¶ 73, 76.) He shares a "close" relationship with his mother and two half-brothers.   (*Id.*)   He attended Riverside Community College from 2009-2010, where he took computer classes.   (PSR ¶ 96.)   He has been employed, including working in loss prevention at a retailer and cleaning tables and dishwashing at a restaurant.   (PSR ¶¶ 100-01.) The government recognizes, however, that defendant has mitigating personal factors, including reporting physical abuse as a child and other difficulties he experienced in his early years, and his current and past mental health conditions.   (*See* PSR ¶¶ 74, 77, 82, 85.) Defendant also has expressed remorse for his conduct, accepted responsibility in the case, and cooperated with the government by agreeing to a lengthy interview with the FBI following the December 2, 2015 attack, and providing consent to the FBI to examine his digital devices.

A substantial sentence and a lifetime of supervision, along with the terms and conditions recommended by the Probation Officer, is particularly appropriate given defendant's personal factors, including his history of mental health and drug abuse issues, his ongoing fascination with explosives and terrorism, and his attribution of social isolation and lack of a father figure to explain his willingness to mobilize toward violent jihad with his friend and neighbor, Rizwan.  With these facts in mind, the government submits that a 25-year term of imprisonment is reasonable and strikes an appropriate balance with the remaining § 3553(a) sentencing factors discussed below.

> 3.  A 25-Year Term of Imprisonment is Necessary to Provide Adequate Deterrence to Criminal Conduct and to Protect the Public

In the terrorism context, the need to deter adherents of violent jihad and violent extremist ideologies from dangerously crossing the line between radicalization (merely embracing extremist doctrine) and mobilization and preparation toward violent action, whether individually or as part of a conspiracy, is stronger than in almost any other type of criminal case.  The need is particularly acute where, as here, defendant chose to arm and equip another person bent on committing violence.  Although defendant may have decided that he personally no longer wanted to commit terrorist acts, he did nothing to alert law enforcement of Rizwan's violent jihad mindset.  It was with cold indifference that he left the weapons and explosives with his coconspirator and mass murderer.  In this context, a lengthy sentence is required to provide adequate deterrence to criminal conduct and to protect the public.

The government's recommended sentence affords a measure of deterrence to others contemplating supporting violence in the name of their beliefs.  It would message others that if they choose to arm a terrorist, they will be held accountable.  In contrast, a lesser sentence would undermine public safety, promote disrespect for the United States firearms and anti-terrorism laws, and provide inadequate deterrence and protection of the public by sending a message to this defendant and others that such egregious conduct will not be severely punished.

### 4.    The Recommended Sentence Will Avoid Unwarranted Sentencing Disparities

The application of the statutory maximum penalty limitations of twenty-five years reduces the guideline range to 300 months (25 years).  (PSR ¶ 115.)  This sentence is significantly below the otherwise applicable guideline range of life in prison.  It also is significantly below the fifty-year sentence defendant would have faced if Counts Three, Four, and Five were not to be dismissed pursuant to the Plea Agreement.  Nonetheless, this reduction in defendant's likely sentence is not unwarranted for the reasons discussed above.  Particularly given the effect of the Plea Agreement on defendant's possible sentence and ultimate guideline range, the government concurs with the Probation Office's assessment that there are no identified factors warranting a departure or a variance from the recommended 25-year sentence.  (PSR ¶¶ 131-32.)

Accordingly, the recommended sentence also is sufficient but not greater than necessary to achieve the objectives set forth in 18 U.S.C. § 3553.

## IV.   CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose the sentence recommended by the Probation Office: a sentence of 300 months, followed by a lifetime of supervised release (with the terms and conditions recommended by the Probation Office, including drug and mental health treatment), and a special assessment of $200.  The government also requests the Court to order restitution to the victims of defendant's crimes, with the restitution amounts to be determined at a deferred restitution hearing.  See 18 U.S.C. § 3771(6).

Dated: April 9, 2018                 Respectfully submitted,

                                     TRACY L. WILKISON
                                     Attorney for the United States,
                                     Acting Under Authority Conferred by
                                     28 U.S.C. § 515

                                     PATRICK R. FITZGERALD
                                     Assistant United States Attorney
                                     Chief, National Security Division


                                      /s/ Melanie Sartoris
                                     CHRISTOPHER R. GRIGG
                                     DEIRDRE Z. ELIOT
                                     MELANIE SARTORIS
                                     Assistant United States Attorneys

                                     Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

# EXHIBIT A

**Sartoris, Melanie (USACAC)**

| | |
|---|---|
| **From:** | Mark Sandefur ~~████████████████~~ |
| **Sent:** | Wednesday, July 12, 2017 2:31 PM |
| **To:** | Stafford, Allison (USACAC) |
| **Subject:** | Julie's Victim Impact Statement |

Julie's Victim Impact Statement.
Victim: Julie M. Sandefur
USAO Number: 2015R02427
Court Docket Number: 15-CR-00093


Daniel Kaufman was a friendly, generous, gregarious person who touched many lives during his time here on earth.
He had a loving spirit, and when he talked to you, you felt as you were the most important person in the world.
Daniel gave me the confidence to become who I am today, urging me to get out more, talk to people and make friends.
Around the house, I literally could count on him to do anything I asked him to. He was a full partner in the care of our home.
Daniel loved animals, nursing sick kittens and abandoned chicks all the time.
Daniel and I had a close, loving relationship. He was my baby, and I miss him every day. He said he would take care of my husband and me when we grew old, (and MEANT it.)
I will feel the loneliness and loss for the rest of my life.
My husband and I no longer travel, having no one to whom we can trust the running of the house and the care of the animals.
Our home no longer feels like a home. Without our "sunshine," it is a collection of rooms that are empty and sad. The depth of my loneliness is unimaginable.

# EXHIBIT B

**Sartoris, Melanie (USACAC)**

| | |
|---|---|
| **From:** | Mark Sandefur <​██████████████████> |
| **Sent:** | Wednesday, July 12, 2017 2:30 PM |
| **To:** | Stafford, Allison (USACAC) |
| **Subject:** | Victim Impact Statement from Mark Sandefur |

VICTIM IMPACT STATEMENT
Larry Daniel Kaufman

Victim: Mr. Mark M. Sandefur
USAO Number: 2015R02427
Court Docket Number: 15-CR-00093


Victim Impact Statement

**To the Judge:**
I think it's safe to assume that the Victim Statements you will receive, whatever the case, will call for a longer sentence. A sentiment one can get used to due to its constant and persistent theme. There are a few things here, however, that are unique to the situation. I would like to point some of these factors out:

DIRECTIONS FROM THE ATTORNEY GENERAL
U.S. Attorney General Jeff Sessions issued new instructions for DOJ prosecutors to pursue "the most serious penalties in all cases," certainly this is an exemplary case to which this should apply.

TERRORISM
This crime is rare in our county, and our country, and deserves special attention from the bench.

SENTENCING
I implore you to consider sentencing this monster to a facility befitting the severity of the crime. You will choose to impose a specific length to his

confinement, but please do not send him to anything short of an ugly cell somewhere distant from anything that might provide him any comfort.

**To the officers of the court:**
The world is not as nice a place now that Daniel is gone. Hundreds of peoples live have been affected by his loss. His job at the IRC, where he removed Special Needs students from the welfare rolls by teaching them a trade, has never been reestablished. People at the Renaissance Fair are no longer educated about history or entertained by his antics. His menagerie of rescued animals miss him, and others, who would have been saved by him, have perished. His friends are still suffering PTSD and are clinically depressed. His loved ones are facing a life greatly divergent from what had been planned. People who depended on him for things other that money are suffering.

**To the convict:**
You had planned several terrorist attacks. Bought weapons. Surveyed the territory you had chosen for terror.  Chose locations where the greatest damage could be achieved. Seen the people you wanted to kill. Perhaps in some twisted fantasy- some make-believe world you imagined how this would all play out. It was only a coincidence that stopped you and your partner from destroying a college. From unleashing hell on a freeway. Who knows what other truly evil ideas you considered,  then discarded as not damaging enough. That wouldn't cause enough death to satisfy you. On December Second that changed. That's when the guns you bought changed from your fantasy world to reality. The first time your guns were used for real was to kill my son. The first bullets tore through his body and he died. The first victim of all your plans, and practice, and plots, was Daniel. A truly innocent person.

I will receive only a small comfort knowing to are suffering in jail.

May you never have a day of peace. Never.

**EXHIBIT C**

July 21, 2017

**Victim:  Ryan Reyes**

**USAO Number:  2015R02427**

**Court Docket Number:  15-CR-00093**

## VICTIM IMPACT STATEMENT

I want to start by saying that I am no stranger to adversity, bullying, intolerance and hate.  I have faced these things head on from an early age, as did Daniel Kaufman.  I completely understand the pain, the frustration, the anger and the desire for things to change.  I empathize with the feelings of injustice and hypocrisy.  However, there is no excuse for someone to resort to violence and death to create that change.  There is no logical way that it can be justified as an end to the means.

The choices and actions that Enrique Marquez, Jr made were, and continue to be, vile, unconscionable and unforgiveable in my eyes.  Even if Mr. Marquez had changed his personal belief system and views, he did nothing to right his wrongs, which may have effectively prevented the events of December 2nd, 2015 from taking place.  Rather than accepting the consequences for his actions that he knew were wrong, he chose to be a self-serving coward that has caused even more pain and suffering for many more than just himself.  It is very little comfort knowing that the consequences will be far more severe, not in regards to his prison term, but in regards to after he has served his time.  The consequences will follow him long after that, to the day he takes his final breath.

It is important to note that the ONLY thing I ever wanted was a simple, quiet life.  I have never had and continue not to have any desire for fame or fortune or praise.  A loving husband and a small place to call our own, both of us enjoying what we do for a living, even if it meant we were poor; that is all I wanted.

I could very easily fill more than 300 pages detailing the personal impact of the events and aftermath of December 2nd, 2015.  I will try my best to keep this short as I know that there are others that have chosen to share the impact that these events have had on them as well.

After dealing with several losses that left me extremely hesitant at starting a romantic relationship, I met Daniel Kaufman.  Much to my surprise and far exceeding any of my expectations, Daniel showed me how to love and be loved again.  I was finally truly happy again.  I looked forward to each day instead of dreading them.  I found someone that was everything to me.  The traits that I lack were found within him and the traits he lacked, reside within me.  As a couple, we could tackle anything that was thrown at us that neither one could have taken on alone; we were unstoppable.  Our relationship naturally progressed to talks of our future together.  We began taking the steps to fulfill our plans of living together, which would then be quickly followed by marriage.  There was even the consideration of raising children together after we were married for a year, something that I would not have considered with the majority of my past relationships due to incompatible views on how to raise a child.  Life was good; until December 2nd, 2015.

A day that started like any other quickly turned into my worst nightmare. Chaos, worry, stress, anger, pain, shock, brief relief, a false sense of hope, frustration, disappointment; all things that took place within a single day. Then, 22 hours later, complete and total devastation when I was given the news that Daniel had been one of the fourteen people that was killed. Then there was the knowledge that he was the only casualty that was not a County employee; that just because he happened to be on his lunch break and outside at the time is the only reason why he was killed. He had nothing to do with whatever triggered the shooters and had nothing to do with the event that the County was having at the Inland Regional Center that day.

I lost the man I wanted to marry and spend the rest of my life with. I lost the man I wanted to start a family with, which extends to far greater losses than just the children we would have had by creating the loss of potential Grandchildren, Nieces/Nephews and Cousins for both of our families. Aside from the potential children we would have had, there is the very tangible loss that both families have suffered with Daniel gone. He is considered a member of my family, so it is not just his family that lost a Son, Brother, Uncle, Nephew and Cousin, but mine as well. My (now 5 year old) Nephew still talks about missing Daniel.

There has been a financial impact due to the loss of Daniel's income. This has also led to legal battles in obtaining the needed support from Daniel's Worker's Compensation since we had not yet gotten married. In other words, because we were being smart, responsible and respectful of what a marriage means, my dependency on Daniel's income and our very relationship (which was far more meaningful, true and valid than say, a sham marriage where someone is paid to marry someone else to get them citizenship) is being viewed as nothing. It is disgusting that a sham marriage should hold more meaning than a relationship that would have been a marriage had one of the people not been brutally murdered, which is obviously not something anyone plans for.

Within these major losses, there is the very direct impact to my own personal wellbeing and mental state. Although I was already diagnosed with Post Traumatic Stress Disorder (PTSD) prior to meeting Daniel, I was starting to make some major progress in my recovery thanks to my relationship with Daniel. The fact that Daniel was taken from me and the method in which he was taken, not only caused any progress I had made to immediately come to an end, it caused a total and complete relapse. My PTSD has also progressively gotten worse as time has passed.

To understand the impact of that, one would need to know exactly what PTSD does to someone. During a tragic event, it is normal to have sleeping problems, shock, anger, nervousness, fear, depression and even guilt. For most people, these things lessen and eventually resolve themselves over time. For someone with PTSD (which cannot be properly diagnosed until months or even years after an event), these feelings do the exact opposite. Instead of lessening, they continue to increase in frequency and intensity, becoming so strong that they keep the person from living a normal life. They cannot function as well as before the event occurred.

There is no cure for PTSD, there is only treatment for the various symptoms and various forms of therapy and psychotherapy in the hopes that the PTSD will eventually resolve itself, or at least become less intense over time. Unresolved PTSD has negative long-term effects on those that suffer from it. They are at a greater risk of heart disease, digestive disorders and are 6 times more likely to commit suicide than people without PTSD. The symptoms of PTSD vary slightly from person to person as it depends on the type of trauma that the person was exposed to and what effects it triggered in them. PTSD is basically your brain and body being stuck in "fight or flight" mode.

My PTSD has manifested itself and worsened in the following ways:  trouble falling and staying asleep; headaches; stomach pain; nausea; diarrhea; increased blood pressure; excessive nervousness (being more "jumpy"); excessive emotions, which include:  angry outbursts, irritability, emotional break downs resulting in uncontrollable crying; severe and recurring major depression; nightmares; night terrors; flashbacks; hallucinations; anxiety and panic attacks, which causes excessive sweating, increased heart rate, rapid breathing, muscle tension and feelings of claustrophobia; problems with concentration; feelings of detachment and isolation from family and friends, loss of interest in being social and in activities I used to enjoy (these things have led to it being difficult for me to maintain relationships with people who were or are trying to get close to me); avoidance; it is harder for me to communicate and to trust people in general; and an increase in suicidal thoughts and feelings.

Since my PTSD and severe and recurring major depressive disorder, cause the problems that they do, I have to deal with feelings of inadequacy, uselessness, hopelessness and general failure since I am unable to work.  This, of course, only makes all of the problems worse, including having to stress about the most basic of financial needs being met, such as having gas or transportation to the many appointments I find myself having to make with my primary care physician, my other doctor that is a specialist, my therapist and my psychiatrist.

I cannot even begin to imagine what the victims who were there and those that were physically injured have to go through.  Going by what I do know of their struggles, my issues seem to pale in comparison.  My heart goes out to them.

I feel a moral obligation to use this opportunity to bring to attention the impact on a broader perspective; to remind Mr. Enriquez and the Court that there are COUNTLESS indirect victims.  To point out that the number of hate crimes against Muslims has increased due to ignorance, fear and hate.  Rather than finding a productive way to combat such things, Mr. Enriquez and those like him, have chosen a path that just make it so much worse.  The people that practice TRUE Islam peacefully are victims here too, thanks to the events and aftermath of what took place on December 2nd, 2015.

Another group that has come under fire:  the law abiding citizens that value their 2nd Amendment Rights.  Although I personally feel there should be some changes made as to background checks and what types of weapons are considered legal, I do believe in the 2nd Amendment in general.  It is people like Mr. Enriquez who violate the law that cause even more problems for the people that are working to make sure the rights of the citizens of those that choose to have guns are protected as well as ensuring the protection of citizens that do not choose to own a gun.

Any immigrant that comes to this Country legally is also a potential victim.  Thanks to the actions and choices of people like Mr. Enriquez that will participate in sham marriages for money in order to bring someone to the Country, the future of immigration for those that are honest is potentially at stake.  What has been done can be used by those that would seek to deny entry to ALL immigrants as an example and reason for their viewpoint.  It gives credibility and validity to their claims.

In closing, I would like to express my thanks for the opportunity to share this information.  It is my hope that Mr. Enriquez counts his blessings and considers his prison term as his second chance, seeing as there are some countries that would immediately put him to death for the things he has been charged with.

**EXHIBIT D**

# VICTIM IMPACT STATEMENT

Victim: Mandy Pifer
USAO Number: 2015R02427
Court Docket Number: 15-CR-00093

Let me tell you about the impact, your victim Shannon Johnson, my best friend, a grandson, brother, nephew, and friend to hundreds of people, had on the world. When I'm finished, it's my hope that you will see that I am far from being the only person who continues to mourn the loss of Shannon.

I don't know what happened to you when you were a kid. I don't know the abuse and neglect you must have suffered which led you to get involved in Syed's ridiculous radical ideas. But, Shannon did not have it easy when he was a kid. At the age of 8, his father died trying to save a coworker. His mother remarried and life as Shannon knew it was over.

Shannon would spend hours alone, in the woods of Southeast, Georgia because he did not feel comfortable in his own skin. When he turned 16, he put 100,000 miles on his first car just by driving...he did not have destinations in mind. The road was his destination.

Shannon tried to escape his reality numerous times. What he didn't try to escape was his responsibility to be kind to people. In fact, when Shannon knew he hurt someone, for whom he cared, he would get physically sick. I can't tell you how many times I wished we had gotten into an argument on December 1, 2015. He might have called in sick the next day.

It is your fault that Shannon will NEVER:
- Live to retire. He just wanted to retire, live on a small income, and walk around shirtless as much as possible.

- See his best friend Maurico's son play in the starting lineup for the Cal Lutheran football team.
- Surprise his granny by showing up to her backdoor, in Jesup GA, unannounced.
- Meet his sister's children
- Go to another concert
- Go on another walk
- Tell another story about his crazy truck driving days
- Have "Johnson" tattooed across his chest in big black letters

I could go on and on, but it only causes me heartache when I think of the missed opportunities I, and others, have with Shannon.

I don't think you've ever been in love, real love.  I was in love with Shannon, and he was in love with me, and we fought back our feelings for a long time before giving into the inevitable.  Falling in love was very scary to me, because I know how the story ultimately ends:  One person will die and leave the other behind on earth.

Thanks to you, and your lack of self-esteem and self-love, my biggest fear came true.  However, death split Shannon and me apart much, much, much sooner than it was supposed to occur.  Because of your weaponry, happily ever after only lasted a very short time.  You stole the love of my life from me.

You stole one of the kindest men, on earth, away from us.  Shannon made those of us he loved, and he loved everybody, feel like we were the most beautiful people alive.  But, you took that from us.

It is your fault that my world got turned upside down, but it is my responsibility to ensure I walk upright again. Writing this to you has been cathartic, but this brings me no closure.  It's another box mark to check off on the "things to do after your soulmate has been gunned down" list.

I hope you take the time, while in prison, to educate yourself.  Study philosophy. Study Self-Esteem 101. Study Hinduism. Study trauma. It may be Syed's fault that the bullets came out of your guns, but it is your responsibility to change your life.

You're a small, little, man who has never experienced love, and I hope you never do. You don't deserve such a treat.

# EXHIBIT E

My son Harry ( Hal ) Bowman was murdered with 13 others on December 2, 2015.  Twenty two others were severely injured and countless others affected by the incident while attending a training session.
There is no way to explain how devastating this is to our family and to his daughters.

His girls will grow up not having the benefits of a Dad who loved them; who will not be there when they graduate from high school, college or live into adulthood.
Hal' s sister & brother and his family are deeply affected.  There are separate letters from each of them.
We have aunts, uncles, cousins- all who loved Hal, who feel the loss.

Especially there is me- his Mom.  I am a widow and depended on him for emotional support. Hal & I planned to take care of each other in the future.  My grief is unending.  I have suffered a mild heart attack and am in grief counseling, all brought on by the tragedy ( Dr. determined).  We all will never be the same.

No one affected by this incident will be the same.

Pleading guilty enables Marquez to only receive 25 yrs. in prison.  My feeling is this is too short.
The defendant knew getting guns & passing them on to someone who planned  destruction is against the law.  He knew the impact his actions would have on the victims.  He chose not to report the possibility of terrorist actions to the authorities.  I implore the court to sentence him to the full 25 yrs.
Lead by example so others will think hard about doing similar crimes.  Terrorism must be stopped.
Innocent people have suffered enough.



Thank you.

Marion Bowman
mother of Harry Bowman
murdered 12/2/2015

**EXHIBIT F**

**From:** Bowman, James <​̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶>
**To:** Marion Bowman <​̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶>
**Subject:** Hal
**Date:** Tue, Jun 20, 2017 12:10 pm

Thoughts on losing my brother:

Hal's murder has affected my life, and the lives of my children, in several ways. His death at the hands of Islamic terrorists and the manner of his death created great feelings of loss and anger in all of us. My children, who were in middle and high school (the same age as Hal's children) questioned why this had happened, worried for the future of their cousins, developed anxiety about travel (my daughter), and fell into acute depression (my son). Both went into counseling to deal with these issues and, in some manner, they are still dealing with the after effects.

In my own life, Hal's death has changed me ... in a permanent way. Hal was born a year and day before me and we spent all of our younger years together. We went to school together, played together, celebrated birthdays together ... we were almost like twins due to our closeness in age. Though we lived on opposites sides of the country and rarely got to see each other, we were always there with each other, in our concept of who we were. It was always Hal and Jamie for as long as I had been alive.

When Hal was killed, that changed, and the model of how life was supposed to progress changed, too. We were supposed to grow up, go off on own paths, have families, and eventually grow old sharing stories about our lives. That was shattered in San Bernardino, and I find myself now wondering constantly if I will ever get to see old age. I worry about the future and the future of my children, about whether something will happen to me and leave them fatherless like Hal's kids. I question the value and meaning of life if it can be so easily ended by someone with sick, personal agenda and access to automatic weapons. When you see someone murder so many people without care or thought, you lose faith in the future, to a certain extent, and you develop a cynicism about humanity. My life is at that point now, and I don't know how long it will remain there.

I think about Hal every day, and I miss my brother every day, and I know that that sense of loss will never leave me.

**EXHIBIT G**

To Whom it may concern:

You might think that the question: "How has my brother's death affected me?" would be easy, however it is a complicated question.  His death has affected multiple areas of my life....

First, I think about him all the time, we weren't close in a distance point of view with my living in OK and him living in CA.  We would speak on holiday's, birthday's and other life events, but now I think about him daily, what would Hal think, that person looks like Hal, etc.

Secondly, my anxiety has increased in all aspects.  I find myself nervous in crowds, listening for noises, looking around, not enjoying what I'm there for (i.e. a concert).  Anything outside my normal routine makes me more anxious, I like to be in my home base.  However, with my job which is constantly on the road, that makes it difficult.

Lastly, I no longer have my older brother.  I think how he has missed out on his girls growing older, getting married, etc.  How he will miss out on adventures, his plans for retirement and all the exciting things in life.

Sincerely,

Marya Bowman

**EXHIBIT 1**

# EXHIBIT

*DVD with excerpt of recording of interview of defendant discussing the RRC Plot, December 2015.*

(DVD MANUALLY FILED WITH THE COURT)

**EXHIBIT 2**

# EXHIBIT

*DVD with excerpt of recording of interview of defendant discussing the SR91 Plot, December 2015.*

(DVD MANUALLY FILED WITH THE COURT)

**EXHIBIT 3**

EXHIBIT FILED SEPERATELY

UNDER SEAL

**EXHIBIT 4**

EXHIBIT FILED SEPERATELY

UNDER SEAL

**EXHIBIT 5**

| Date | Item | Amount |
|---|---|---|
| ● 29-oct-11 | Llama Government 9mm / $25 Firearm Certificate / $25 background check fee | 373.24 |
| ● 09-Nov-11 | annies (ammo & case) | 54.39 |
| ● 10-Nov-11 | cheaper than dirt (mag's) | 135.34 |
| ● 11-Nov-11 | 9 mm ammo (big5) | 100 |
| ● 13-Nov-11 | rental (beretta 9 mm) | 11 |
| ● 13-Nov-11 | rifle | 890 |
| 16-Nov-11 | cheaper than dirt (ammo and targets) | 213.62 |
| 16-Nov-11 | 9 mm ammo (big5) | 120.68 |
| 17-Nov-11 | american shooting | 15 |
| ● 20-Nov-11 | walmart (ammo 9 mm, 3-250) | 192.56 |
| ● 20-Nov-11 | riverside range | 44.88 |
| ● 21-Nov-11 | 44mag (10 ar15 mags) | 123.1 |
| 27-Nov-11 | turners (gun case) | 53.86 |
| ● 29-Nov-11 | cheaperthandirt (ammo can and .223 ammo (500 rds) | 187.85 |
| 3-dec-11 | walmart (misc.) | 47.1 |
| ● 3-dec-11 | walmart (red dot) | 38.73 |
| 7-dec-11 | oempcworld | 30.77 |
| 11-dec-11 | riverside range | 44 |
| ● 13-dec-11 | misc. (red dot, tool, etc.) | 120 |
| 15-dec-11 | walmart (ammo) | 121.4 |
| 30-dec-11 | walmart (ammo) | 178.1 |
| 02-Jan-11 | riverside range | 105 |

| | |
|---|---|
| 19-oct-11 | 373.24 |
| 03-Nov-11 | 1540.03 |
| 17-Nov-11 | 602.25 |
| 2-dec-11 | 402 |
| 19-dec-11 | 685.1 |
| 4-Jan-12 | |

● = Aware or at purchase sites. 66

I voluntarily provided this information and aware
they would be used in a future terror attack

12-15-15

**EXHIBIT 6**

1    11/29/11    6996360A
COPY

SYED R FAROOK
TOMLINSON AVE
RIVERSIDE, CA  92503-3113

SYED R FAROOK
SAN DIEGO, CA  92126-5551

5154033      WEB/WEB                    /411-SSI                    Visa

0.0        0      FHD

See our Internet site for 25,000 Bargains!
www.CheaperThanDirt.com

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 0 | 1 ZAA-095 | Ammo Can .50 Caliber 11x7x6" Grade I Lever-Lock Lid Steel Flat Folding Carry Handle Stackable | 14.97 | -- | 14.97 |
| 1 | 0 | 1 AMM-2782 | Ammo 500 Round Box .223 Rem. BVAC FMJ 55 Grain 3139 fps Once-Fired Brass | 149.79 | -- | 149.79 |

MERCHANDISE INVOICE TOTAL $     164.76
SHIPPING & HANDLING $      23.09
INVOICE TOTAL $     187.85
WEB CARD: VS, APPR:001339 $    -187.85

**EXHIBIT 7**

EXHIBIT FILED SEPERATELY

UNDER SEAL

**EXHIBIT 8**

EXHIBIT FILED SEPERATELY

UNDER SEAL

**EXHIBIT 9**

EXHIBIT FILED SEPERATELY

UNDER SEAL

**EXHIBIT 10**

# SHIPPING METHOD: Standard

## RifleGear Receipt
### *** PLEASE PRINT RECEIPT OUT AND RETAIN IT FOR FUTURE REFERENCE ***

**Order Number   149841**

**Customer ID** ▓▓▓▓▓▓

**Order Date   12/26/2011 5:45:35 PM**

Bill To:
Enrique Marquez Jr
▓▓▓▓ Tomlinson Ave
Riverside, CA 92503
United States
▓▓▓▓▓▓▓▓▓▓
enriquemarquezjr▓▓▓▓▓▓▓▓

Ship To:
Enrique Marquez Jr

Corona, CA 92881
United States
▓▓▓▓▓▓

| Order Date: | 12/26/2011 5:45:35 PM | Locale/Currency: en-US / USD | |
|---|---|---|---|
| Payment Method: | CREDITCARD | Name On Card: | Enrique Marquez Jr |
| Card Type: | VISA | Card Number: | ****5809 |

| SKU. | Product | Quantity | Price | Ext Price |
|---|---|---|---|---|
| AP-ARBB-WRENCH | AR15 Bullet Button Wrench | 1 | $5.99 | $5.99 |
| LP0011 | Magazine Release Button | 1 | $2.00 | $2.00 |
| AP-ARBB-TOOL | AR15 Bullet Button Installation Tool | 1 | $5.99 | $5.99 |

Order Notes:
None

| | | |
|---|---|---|
| SubTotal: | | $13.98 |
| Shipping: | USPS First Class | $6.99 |
| Tax: | | $1.08 |
| Total: | | $22.05 |

1

USAO 00007597



Order Number: 149841
Order Date: 12/26/2011 5:45:35 PM
MaxMind Fraud Score: -1.00  Explanation
Customer ID:
IP Address:
Affiliate ID: 0
Customer EMail: enriquemarquezjr@yahoo.com
Order History: ☺☺
Order Total: $22.05
Subscription Added (in Days): 0
Locale Setting: en-US
Store Version: AspDotNetStorefront ML 8.0.1.2/8.0.1.2
Store: 1 - RifleGear

Payment Method: CREDITCARD
Card Type: VISA
Payment Gateway: AUTHORIZENET
AVS Result: Y
Transaction Type: CHARGE
Transaction State: CAPTURED
Transaction ID:
Authorized On: 12/26/2011 5:45:35 PM
Captured On: 12/27/2011 2:11:47 PM
Voided On:
Refunded On:
Frauded On:

Receipt E-Mail Sent On: 12/26/2011 5:45:35 PM

Shipping Method: USPS First Class

Shipping Status: Shipped via USPS First Class on 12/28/2011.Tracking
Numbers9400110200881246829609. Carrier Reported
Rate:. Carrier Reported Weight:.
Was Printed: Yes

Has Download Items: No
Has Distributor Items: No
Has Multiple Shipping Addresses: No
Has Gift Registry Items: No

Bill To: Enrique Marquez Jr
Tomlinson Ave
Riverside, CA 92503
UNITED STATES
9515000620

Ship To: Enrique Marquez Jr
Corona, CA 92881
UNITED STATES
9515000620

2

USAO 00007598

# EXHIBIT 11

EXHIBIT FILED SEPERATELY

UNDER SEAL

# EXHIBIT 12

EXHIBIT FILED SEPERATELY

UNDER SEAL

**EXHIBIT 13**

```
                                                1    08/22/12     7868745A
                                                          COPY


    SYED R FAROOK
    ████████ TOMLINSON AVE
    RIVERSIDE, CA   92503-3113



    5154033      WEB/WEB                /WEB         XX██████████4  Visa


                             ████████████         0.0       0    FHD

            Thank you for your order from www.CheaperThanDirt.com



  1     0     1 ARR-363      AR-15 Push Button Pivot Pin with      19.97  --      19.97
                             Sling Mount KNS Precision
                             .250" Diameter Spring Loaded
  1     0     1 ARR-270      AR-15 Quick Detach Sling Swivel       11.97  --      11.97
                             Leapers UTG
                             Solid Steel 1 1/4" Sling Loop
                             Picatinny Mounting Base
                                         MERCHANDISE INVOICE TOTAL  $      31.94
                                              SHIPPING & HANDLING   $      12.75
                                                   INVOICE TOTAL    $      44.69
                                     WEB CARD: VS, APPR:185216      $     -44.69
```

**EXHIBIT 14**

Nov 21 2012     Chats – derived from ORC021549.  User name 'Gman'
                is identifiable as Enrique Marquez Jr

R██████:          guys. if one wants to kill themself but would
                  rather avoid the whole killing yourself thing
                  what does said person do

Gman:             commit mass homicide until shot dead

D███████:         ^

W████████:        Runs away probably, trying to change the scenery
                  as much as they can

D███████:         I'm with !n

Gman:             on this one.

W████████:        gman's is good too

D████:            suicide by cop

D████████:        A darkness carried in the heart cannot be cured
                  by moving the body from one place to another.

D████████:        ;_;

L███:             Well wait, you want to die but you don't want to
                  do it by your own hand?

D███████:         I know that all too well.

B██████████:      Well butt, you butt to die but you don't want to
                  do it by your own hand?

Gman:             Loo: Pretty much

W████████:        Right d██████, but that never stops people from
                  trying, does it?

Gman:             it's how the modern suicide bomber works now

Gman:             Give the detonator to the head guy

Gman:             adn send the pawn to the heavily populated area

**EXHIBIT 15**

Dec 24 2013     Chats — derived from ORC021564.  User name 'Gman'
                is identifiable as Enrique Marquez Jr.

Gman:           My reason for my conversion to Islam is because I
                felt a strong sense of belonging in my brief
                initial exposure

R██:            yech

x██:            could you define this brief initial exposure

Gman:           Huh

X██:            did you go out to experience it, or do you have
                friends that are islamic?

Gman:            FRiends were muslim

R██:            then you found out about taqiyya

N██:            Well wait

Gman:           R██: Worse

n██:            Wait Wait

R██:            Gman, what can be worse than taqiyya?

Ha██:           fuck

H██:            its almost 5

N██:            What did you see in Christianity that was not
                satisfactory that you saw in Islam thats ab etter
                question

x██:            uh, catholocism*

n██:            Tha

Gman:            :?

Gman:           My affiliation with these guys
                http://www.military.com/video/operations-and-
                strategy/terrorism/4-socal-men-charged-in-terror-
                plot/1993238028001/

1

T⬛⬛⬛⬛⬛:      4 SoCal Men Charged in Terror Plot | Military.com

R⬛⬛⬛:        man i cat get enough of epic sax guy

X⬛⬛:         Gman  how comes you became affliated with those
             lot?

R⬛:          wtf dude

Gman:        I personally knew Ralph Deleon and Miguel

Gman:        I was questioned by the FBI

R⬛:          I KNEW IT GMAN

R⬛:          I asked you motherfucker....

Gman:        x⬛⬛: School

Gman:        The MSA meetings

H⬛⬛⬛⬛:       http://www.youtube.com/watch?v=K8fNkMZ3thI

Gman:        One of the fuckers was ballsy enough to print out
             the "Inspire" magazine

x⬛⬛:         Gman so you converted because you felt a sense of
             belonging when you met with islamic friends?

**EXHIBIT 16**

Jan 1 2015      Chats — derived from ORC021557.   User name
                'gmaosndeink' is identifiable as Enrique Marquez
                Jr.

Gmaosndeink:    Pfft

Gmaosndeink:    They've been protesting since 9/11

Gmaosndeink:    Fkn fgts

~m███████:      git rekt

A██████:        I see palestone bullshit on campus all the time

Gmaosndeink:    Same

At█████:        *Palestine

Gmaosndeink:    I used to be muslim

Gmaosndeink:    I was close to being nabbed by the fbi

Gmaosndeink:    Instead 4 other guys from the college were v&

~wh█████:       well, that's one thing. I don't blame them as
                much for that, because israel is such an asshole
                as well

~m███████:      tfw we're all on a list

Gmaosndeink:    http://www.fbi.gov/losangeles/press-
                releases/2012/four-mencharged-for-conspiracy-to-
                provide-material-support-to-
                terrorism#disablemobile

a██████:        oh shit

a█████:         you weren't joking

~wh██████:      hahahaha

~wh██████:      are you fucking serious gman

Gmaosndeink:    Yeah

Gmaosndeink:       I personally knew Ralph Deleon

~m███████:        lel

~w███████:        holy shit, you guys were dumb

~m███████:        we're all on a list for knowing gman

Gmaosndeink:       Fucker was waving an inspire magazine at an MSA
                   meeting at CSU SB

gmaosndeink:       My friend and I went to CAIR for legal advice

gmaosndeink:       Because we were associated with the guy

~w███████:        join al Qaeda and the Taliban in Afghanistan in
                   order to kill, among others, American targets,
                   announced Andr Birotte, Jr., the United States
                   Attorney in Los Angeles,

~w███████:        that plan doesn't even make sense

A███████:         loool

~w███████:        "aren't we already in Los Angeles?"

~w███████:        "shut up and just go with it"

~w███████:        "He'll come to us"

Gmaosndeink:       Then there was this fgt

Gmaosndeink:       http://www.ocweekly.com/2009-04-30/news/craig-
                   monteilh/

gmaosndeink:       I was working at ISOC and the Irvine masjid

gmaosndeink:       When that fucker was operating

gmaosndeink:       Wharrves yeah the fourth guy was in Pakistan
                   making contacts

~w███████:        gmaosndeink: what in the fuck possessed you to
                   become apaleoreligious borg subhuman

gmaosndeink:       So the other three could join

2

| | |
|---|---|
| gmaosndeink: | I was lonely back in 2005 |
| ~w███████: | you live in a land of tits and booze |
| Gmaosndeink: | They made me feel as if I were part of their grouo |
| gmaosndeink: | They made me feel as if I belonged |
| gmaosndeink: | When the 2012 shit happened |
| ~w███████: | yeah, I'm drinking and reading about europe and it's making me frustrated and edgy. I get that. |
| Gmaosndeink: | I began to drink |
| Gmaosndeink: | Also I visited the mosque anwar Al awlaki used to do the lectures at |
| D███████: | butts |
| Gmaosndeink: | He was widely admired in the socal Muslim community |
| a███████: | h |
| gmaosndeink: | Until the USA labeled him as a terrorist |
| gmaosndeink: | Then everybody for distanced from his lectures |
| ~v███████: | Until the USA labeled him |
| ~w███████: | yeah, it doesn't matter what stupid shit he says |
| Gmaosndeink: | My boss at the time told me to make a list of everyone asking for his lectures at the store |
| ~w███████: | people only backed off when there was danger |
| Gmaosndeink: | I used to work at an islamic bookstore |
| Gmaosndeink: | Wharrves yeah |
| Gmaosndeink: | But it didn't stop people from spreading his works in the masajid |
| a███████: | you're trolling |

~w█████:     I'm going to stop talking about this until I relax a little and stop having German thoughts about this problem

a█████:     theyre not german thoughts

a█████:     theyre german solutions

gmaosndeink:     I'm not trolling

~w█████:     lel

Gmaosndeink:     I'm telling you

Gmaosndeink:     My life is fucking ridiculous

Gmaosndeink:     That's why I am jaded as fuck

D█████:     bent dicks

Gmaosndeink:     Shit fucking happens and I just don't give a fuck

D█████:     crack open a beer and drink with moi

Gmaosndeink:     Did you know I had three people propose to me

A█████:     kek

4

# EXHIBIT 17

EXHIBIT FILED SEPERATELY

UNDER SEAL

**EXHIBIT 18**

EXHIBIT FILED SEPERATELY

UNDER SEAL

**EXHIBIT 19**

Jan 09 2015      Chats — derived from ORC021577.   User name
                 'gmaosndeink' is identifiable as Enrique Marquez
                 Jr.

Gmaosndeink:     There are 4 main schools of thought in the sunni
                 sect. I initially started off with hanafi but I
                 gradually began to accept the teachings from
                 Hanbali

Gmaosndeink:     Hanafi is widely followed in India, Pakistan, and
                 afghanistan

Gmaosndeink:     Hanbali isnt widely followed. The only variation
                 of it is wahhabism in Saudi arabis

Gmaosndeink:     Maliki and Shafi are followed somewhat in the
                 Arabic countries like Oman Yemen and stuff

Gmaosndeink:     I liked the Hanbali school of thought. It
                 required that you go back in islamic history and
                 follow a more pure version of Islam from the
                 sahaba and tabeen.

Gmaosndeink:     Of course, once I was done reading the works of
                 Ibn Taymiyyah

Gmaosndeink:     You sort of ascend and disregard the other
                 schools

Gmaosndeink:     And began to follow the ahlus Sunnah

Gmaosndeink:     Basically you form your own opinions and
                 interpretations of the classical works.

Gmaosndeink:     That's when I began to encounter the extremists

Gmaosndeink:     Fortunately, those fuckers toned down their
                 rhetoric after the 2012 incident

Gmaosndeink:     And they're practically pussies now

Gmaosndeink:     Is any of this interesting?

*1*

| | |
|---|---|
| Gmaosndeink: | I've listened to various anwar Al awlaki s lectures. He's very charismatic and accurate in his portrayal of the prophet and sahaba |
| Gmaosndeink: | He was very keen on expounding the various battles in islamic history |
| Gmaosndeink: | He has like 25 volumes on single subject, the hereafter |
| Gmaosndeink: | Very appealing. |
| Gmaosndeink: | I think his works are still widely revered in the community. |
| L▓▓▓▓: | http://animu.demeter.feralhosting.com/frideynight/ |
| Gmaosndeink: | But yeah. It was a crazy journey |
| Gmaosndeink: | Hey ▓▓▓▓ |
| ▓▓▓▓: | helo |
| Gmaosndeink: | I should write a memoir |
| Gmaosndeink: | Or something |
| L▓▓▓▓: | life of a drug dealer |
| Gmaosndeink: | Heh |
| Gmaosndeink: | Isn't it funny how my life is so ridiculous people jump to the troll conclusion |
| Gmaosndeink: | L▓▓▓▓ are you familiar with the mosque off brookhurst and the 22 |
| Gmaosndeink: | Like behind the 99 cent store |
| Gmaosndeink: | That's where I used to work |
| Gmaosndeink: | The guy that runs it. ▓▓▓▓ is a dick. |
| Gmaosndeink: | Its also the same.mosque where Adam ghadan used to attend |

**EXHIBIT 20**

Jan 29 2015    Chats – derived from ORC021577.  User name
'gmaosndeink' is identifiable as Enrique Marquez Jr.

| | |
|---|---|
| gmaosndeink | I just had to go pick it up from my boss' place. He gave me permission to use address for my stuff at the time. |
| gmaosndeink | I had 2 AR 15 rifles, 1 llama government 9mm handgun, and a Springfield XD9 sent there. |
| gmaosndeink | And like 50 30round mags |
| gmaosndeink | Also loads of ammo |
| gmaosndeink | Back when 223/556 was cheap. |
| n█████ | what the fuck Seth lol |
| a█████ | Gman u turrist |
| gmaosndeink | Wat |
| gmaosndeink | No |
| gmaosndeink | More like stockpiling so I can sell them |
| D███ | terrorismist |
| gmaosndeink | This was the time when 30round mags were going for like $6 a pop |
| gmaosndeink | They now go for double that |
| gmaosndeink | I can make a fucking profit. |
| D███ | terrorist confirmed |
| O██ | selling to the cartels? |
| 1█████████ | gip magazips |
| gmaosndeink | Selling to the Pakistanis actually |
| gmaosndeink | Idk something about fisabilillah |
| gmaosndeink | And they always have that damned index finger pointing upward. |

# EXHIBIT 21

**United States v. Enrique Marquez, Jr.**

**Expert Witness Statement**
**William Braniff**

I have been retained by the United States in relation to the San Bernardino terrorist attack and the ensuing investigation and prosecution, including <u>United States v. Enrique Marquez, Jr.</u>, No. CR 15-93-JGB.  In that capacity, I have reviewed various charging documents and discovery materials in <u>United States v. Enrique Marquez, Jr.</u>, No. CR 15-93-JGB, and provide this report to assist the Court in analyzing certain evidence and to give context to the following concepts, individuals, and organizations referenced by defendant Enrique Marquez, Jr., in connection with Syed Rizwan Farook and others:

Terrorist groups like al-Qa'ida, al-Qa'ida in the Arabian Peninsula (AQAP), and the Islamic State have created a lexicon based on terms otherwise associated with early Muslim history and the religion of Islam that describes their ideological worldview. These organizations associate themselves with key historical figures, events, scriptural passages, religious tenets and symbols from the Islamic faith as an attempt to garner legitimacy from other Muslims, and to communicate their belief in the righteousness of their behaviors. Their worldview is fundamentally based on their interpretation of the word *jihad*, which means "to struggle or strive." In traditional Muslim belief, the most important interpretation of the word jihad, or "the greater *jihad*," is to struggle or strive to live a more pious life. In violent extremist discourse, *jihad* refers primarily to violent *jihad*, which is traditionally understood to be the lesser *jihad* (lesser in importance). One who wages violent *jihad* is referred to as a holy warrior, or *mujahid* (plural: *mujahideen*), who fights for the sake of God (*jihad fisabillilah*). Jihadist propaganda and proponents of jihadist groups therefore often frame their efforts at recruitment and incitement to violence as a call to *jihad* for the sake of God.

The primary goal of most jihadist organizations is to recreate the political order as they believe it existed in early Islamic history, and especially during the reign of the Prophet Muhammad after 622 A.D. and during the rule of the first four successors (Caliphs) of the Prophet Muhammad. During this period of time, the leader of the Muslim spiritual community also served as the political leader and military commander of the Muslim community, which means that during the decades when Islam grew to become a world religion and the basis of a political empire, Islam was the organizing principle of that society. Modern jihadist groups seek to use violence to overthrow existing governments in the Muslim world and to replace them with a theocracy that governs according to their interpretation of Islamic law (*Sharia*). They see the establishment of their interpretation of *Sharia* as the way to make Islam the organizing principle of their societies once again.

Over the centuries, Muslim scholars have sought to interpret God's intent for mankind by reading the Qur'an, the central religious text of the Islamic faith believed to be the literal word of God as revealed to the Prophet Muhammad, along with the biographical stories of the sayings and deeds of the Prophet Muhammad and his companions. This challenging task of interpretation has resulted in a highly decentralized faith system; Islam, and especially Sunni Islam of which nearly 90% of the Muslim world

1

subscribes to, is a highly decentralized faith practiced in highly diverse ways across the world. For modern jihadist groups, this pluralist reality within traditional Sunni Islam is viewed as inherently sinful.

The jihadist logic behind the idea that there can only be one correct interpretation and practice of Sunni Islam is based on a maximalist understanding of the most important pillar of Islamic faith – monotheism (*tawhid*). Muslims, like Jews and Christians, believe that the God of Abraham is the one God; they reject polytheistic religions and the worship of idols. For jihadists, if there is only one true God, and that God is infallible, there must only be one correct way to serve that God. All other forms of worship are not just sub-optimal; they are a sinful violation of monotheism that is an affront to the sovereignty of God on earth. While in reality, Islamic jurisprudence is comprised of a diverse body of interpretation, jihadists argue that any Muslim community that does not interpret Sharia in the same way as they do is violating *tawhid*, a sin that warrants death. Similarly, any non-Muslim group is also an affront to monotheism and therefore a legitimate target of violence. In modern jihadist propaganda, this maximalist interpretation of monotheism which serves as the justification for terrorist attacks against other Muslims and non-Muslims is symbolized by raising one's index finger towards the heavens to represent the "oneness" of God, or *tawhid*. This symbolic gesture is a well-understood mainstay of jihadist propaganda.

To accomplish the goal of implementing and enforcing their interpretation of Islamic law, many jihadist organizations now believe that it is necessary to attack Western nations (sometimes referred to by jihadists as "the Far Enemy"), and especially the United States of America, because these Western nations support the national governments that jihadist groups believe to be illegitimate (the "Near Enemy"). This belief is a modern version of a religious legal opinion (*fatwa*), referred to as the Mardin *fatwa*, issued over seven centuries ago by a scholar named Ibn Taymiyya. Ibn Taymiyya called for violent revolution against Muslim rulers (for not governing according to a fundamentalist interpretation of Islamic law) and the non-Muslim powers who supported them. An Egyptian intellectual named Sayyid Qutb offered a similar call to violent revolution in the 1960s, primarily oriented at the near enemy, for the same reasons. Modern jihadist groups actively read and disseminate the writings of these individuals, among others, as the basis of their violent calls to arms.

In addition to using *tawhid* as the justification for using violence to establish fundamentalist theocratic governments, a second line of argumentation in support of violent *jihad* emerged during the context of the Soviet invasion and occupation of Afghanistan after 1979. In traditional Sunni Islam there are conditions under which martial jihad is believed to be legitimate. In the context of a war between a Muslim empire and a neighboring empire, a legitimate Caliph can raise an army to protect or expand the borders of the Muslim state. In addition, should a foreign power occupy a Muslim territory, traditional Sunni jurists have opined that it is an individual duty (*fard ayn*) of every Muslim to defend themselves and their community by raising arms. Modern jihadist groups have taken this concept, typically referred to as "defensive *jihad*," and expanded its historical interpretation, beginning with Abdullah Azzam in the 1980s.

Abdullah Azzam was a Sunni cleric of Palestinian descent who emerged as a key figure during the anti-Soviet jihad. His *fatwa*, "In Defense of Muslim Lands," argued that defensive jihad was not merely the individual duty of every Muslim citizen of Afghanistan, but instead was the individual duty of every Muslim everywhere. His rationale was that a Muslim's primary identity and allegiance was not defined by a modern nation-state, such as Afghanistan, but by one's membership in the global community of Muslims, or the Muslim nation (*umma*). If any Muslim community is attacked anywhere in the *umma*, it is the individual duty of all Muslims everywhere to fight back. In Defense of Muslim Lands remains a key document used to recruit participants into violent jihadist conflicts, and has been translated and disseminated across the globe.

Modern jihadist groups and ideologues, (including Adam Gadahn and Anwar al-Awlaki, discussed below) would take this logic even farther, arguing that because the United States is leading a war against Islam everywhere, any attack against American civilians or military targets at any time and in any location is an act of defense, and is therefore an individual duty incumbent upon every Muslim.

It is common practice for individuals who embark on violent *jihad* to adopt a *nom de guerre*, often referred to within jihadist organizations as a *kunya,* that symbolizes their chosen identity as a holy warrior, and which is typically a reference to one of the companions of the Prophet Muhammad. One such example is Khalid ibn al-Walid, a companion of the Prophet Muhammad and his successors (Caliphs) who served as the most significant military commander of the time whose victories helped establish the first Muslim state (Caliphate). For his military exploits he was also known as *Saifullah*, the Sword of God.

Some modern-day jihadists have adopted *Saifullah* as a *nom de guerre,* or have been honored with it by others, casting their participation in violence in the same light as the military campaigns that established Islam as a dominant political force. One famous example of this is provided by Omar ibn al-Khattab, an Arab jihadist who gained fame fighting against Russia during the Chechen wars after also training and fighting in Afghanistan and Tajikistan. Al-Khattab became an early pioneer and poster-child of jihadist videos, and has inspired many others to wage jihad.

Historical figures and jihadist military commanders are not the only role models for modern jihadists. On online chat forums and more recent social media applications, individuals may use other well-known jihadists as their avatar or screen name, conveying who they see as a role-model to emulate. For Americans who support violent jihadism, other Americans may serve as attractive options, such as Adam Gadahn.

Adam Gadahn was an American citizen raised in California who converted to Islam but failed to find the interpretation of Islam that he was seeking in the United States. He ultimately managed to join the al-Qa'ida organization where he would become a spokesperson for the group. He was featured in numerous English-language propaganda videos produced by al-Qa'ida's media arm, *As-Sahab*, including a 2005 video in which he threatened Los Angeles, California, with a terrorist attack. In various videos he described the American war on Islam, encouraged the legal purchase of firearms for the purposes of

terrorist attacks in the United States, praised attacks such as the Fort Hood attack conducted by Army Major Nidal Hassan in retaliation for the U.S. wars in Iraq and Afghanistan, and encouraged further attacks to punish the United States for its "failure to heed our demands." He was charged with treason in 2006 by the United States Government, as well as material support for a foreign designated terrorist organization.  He appeared regularly in al-Qa'ida videos until his death in January 2015.

Eclipsing Adam Gadahn, however, one of the most popular jihadist ideologues found online is the now-deceased American citizen, Anwar al-Awlaki.  Al-Awlaki, named by the U.S. Treasury Department as a specially designated global terrorist in 2010, joined al-Qa'ida in the Arabian Peninsula (AQAP) several years prior and used the organization as a platform to continue to disseminate hundreds of speeches and sermons that are widely available and consumed by English speaking adherents to violent jihadist ideas. One popular series of sermons recorded before 2002 while living in the United States, "The Hereafter," examines Islamic beliefs regarding Judgment Day, especially as it pertains to individual salvation or damnation. While not a call to arms, the lecture series does touch on political issues including the legitimacy of (violent) jihad in Islam, criticizing those who would condemn jihad for the sake of God (*jihad* fisabillilah) while supporting wars fought for material gain.

Many of his speeches and sermons are more explicit. Prior to his death in September 2011 as the result of a targeted air-strike, al-Awlaki and AQAP encouraged American Muslims to do one of two things: emigrate from the United States where it is not possible to practice "true" Islam to a place where that is possible, such as jihadist fronts in Afghanistan, Somalia, or Yemen; or, to wage violent jihad in the United States.

In fact, Anwar al-Awlaki has featured prominently in the radicalization processes of many Americans tried in U.S. courts. In Peter Bergen's book, United States of Jihad, published in 2016, Bergen states:

> "Of the 330 Americans charged with or convicted of involvement in jihadist terrorist activity since the 9/11 attacks, more than 80 (approx. 25%) were found to have Alwaki's writings or sermons in their possession or cited him as an influence, and a further 7 had corresponded with him or traveled to Yemen to meet him."

Among the many individuals who Awlaki influenced are three of the 9/11 hijackers, Major Nidal Hassan, Dzhokhar Tsarnaev, and Umar Farouk Abdul Mutallab.

Al-Awlaki argued that individuals could participate actively in all aspects of violent jihad without traditional membership in a group, and that doing so is an individual duty due to the actions of the U.S. Government. Further, he frequently reiterated the jihadist argument that American civilians are complicit in the crimes of the American government for their participation in democracy and the paying of taxes, echoing Usama bin Ladin's 1998 *fatwa* declaring war against the United States, in which bin Ladin states:

> ...The ruling to kill the Americans and their allies -- civilians and military -- is an individual duty for every Muslim who can do it in any country in which it is possible to do it, in order to liberate

4

the al-Aqsa Mosque and the holy mosque [Mecca] from their grip, and in order for their armies to move out of all the lands of Islam, defeated and unable to threaten any Muslim.

Al-Awlaki helped to produce and featured prominently in AQAP's English-language digital magazine, "Inspire." He authored the feature article, "May Our Souls Be Sacrificed for You," in the first edition of the magazine, published in the Summer of 2010. In that article he called for and justified the use of assassination by any Muslim against anyone who defamed the Prophet Muhammad, including many Westerners listed by name in the magazine. The issue also featured the transcript of a highly influential Awlaki speech from March 2010, "Message to the American People and Muslims in the West."

In Anwar al-Awlaki's March 2010 "Message to the American People," Awlaki makes the following statements:

> But America thought that it could threaten the lives of others, kill and invade, occupy and plunder, and conspire without bearing the consequences of its actions. 9/11 was the answer of the millions of people who suffer from American aggression, and since then, America has not been safe.
>
> ... We are not against Americans for just being American. We are against evil, and America as a whole has turned into a nation of evil. What we see from America is the invasion of two Muslim countries, we see Abu Ghuraib, Bagram and Guantanamo Bay. We see cruise missiles and cluster bombs, and we have just seen in Yemen the death of twenty-three children and seventeen women.
>
> We cannot stand idly in the face of such aggression, and we will fight back and incite others to do the same.
>
> ... However, with the American invasion of Iraq, and continued US aggression against Muslims, I could not reconcile between living in the US and being a Muslim, and I eventually came to the conclusion that Jihad against America is binding upon myself, just as it is binding on every other able Muslim.
>
> Nidal Hassan was not recruited by Al-Qaida. Nidal Hassan was recruited by American crimes, and this is what America refuses to admit. America refuses to admit that its foreign policies are the reason behind a man like Nidal Hassan, born and raised in the US, turning his guns against American soldiers. And the more crimes that America commits, the more Mujahideen will be recruited to fight against it.

In addition, the magazine featured a section, called "Open-Source Jihad," which included two articles. The first, a now infamous article titled, "Make a bomb in the kitchen of your mom," featured high quality photographs and simple instructions on how to make an improvised explosive device using easily obtainable materials. The second article, "How to use *Asrar al-Mujahideen*," provided instructions on

5

how readers can use encryption software to send and receive messages securely.  The third-to-last page of the magazine encouraged readers to use the *Asrar al-Mujahideen* software to communicate with the editors of Inspire and AQAP's media arm.

Issue 1 of Inspire was not an anomaly. In Issue 8 of Inspire Magazine, released in the Fall of 2011, Awlaki authored an article titled "Targeting the Populations of Countries that are at War with the Muslims," expounding on the legitimacy of terrorist violence against civilian populations. The Open-Source Jihad article in that issue featured the use of remote control detonation of improvised explosive devices.

In recent years, the Islamic State has risen to prominence as the most lethal and active jihadist organization, picking up many of the themes articulated by al-Qa'ida, al-Qa'ida in the Arabian Peninsula, and Anwar al-Awlaki. It is led by Abu Bakr al-Baghdadi, a member of the organization dating back to the mid 2000's, who declared himself to be the Caliph in July 2014 during a sermon in Mosul. This occurred days after the organization declared the reestablishment of the Caliphate, which it also refers to as the Islamic State. The declaration of the Islamic State has inspired individuals to travel to Iraq and Syria as foreign fighters, as well as to conduct attacks in the name of the Islamic State outside of Iraq and Syria. For those who are not formally part of the organization itself, but who subscribe to the ideology and seek to advance the aims of the organization, they will often articulate an oath of allegiance (*bai'yah*) in a public setting, such as via social media, so that others will understand the motivation for their violent attack should they be killed in the act. The oath of allegiance is significant and binding, as extending this oath is how an individual violent jihadist swears loyalty to a group and its leader, vowing to carry out the dictates of that group until either the group's leader dies or the individual is killed.

# William Braniff

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

## Objective

· Public-service driven leadership within and intellectual contribution to the field of terrorism and counterterrorism

## Education

**MASTERS DEGREE | MAY 2006 | JOHNS HOPKINS SCHOOL OF ADVANCED INTERNATIONAL STUDIES**

· Major: Strategic Studies
· Minor: International Economics

**BACHELORS OF SCIENCE |MAY 1999 | UNITED STATES MILITARY ACADEMY AT WEST POINT**

· Major: Arts, Philosophy and Literature
· Minor: Computer Science

## Skills & Abilities

| | | |
|---|---|---|
| **LEADERSHIP** | **RELATIONSHIP BUILDING** | **TEACHING** |
| **DELEGATION** | **COLLABORATION** | **PUBLIC SPEAKING** |

## Experience

**EXECUTIVE DIRECTOR | PROFESSOR OF THE PRACTICE | NATIONAL CONSORTIUM FOR THE STUDY OF TERRORISM AND RESPONSES TO TERRORISM (START) | FEBRUARY 2012 – CURRENT DAY**

· Leads the largest terrorism research, education and training center in the country, comprised of 70 full-time staff, 40 hourly employees, and 100 undergraduate and graduate student interns
· Grew the organization from 22 employees and 18 interns, and an annual budget of $4.5M to an annual budget of $12.8 M in four years
· Collaborate with and oversee approximately 50 researchers active in the international research consortium working on multi-year projects related to the human causes and consequences of terrorism and extremist violence
· Serve as the primary liaison to START's government partners, including DHS, DOJ, DOD, DOS, FBI, NCTC
· Architect and prime mover of START's "transition" strategy intended to optimize the relevance of START's research for practitioners and policy-makers through education, training, media and public speaking engagements
· Briefed the President of the United States, the Secretary of Defense, two Secretaries of Homeland Security, testified before Congress on three occasions, and serve as an expert witness in federal terrorism trials
· Teaches two undergraduate courses, including the first course in the country on Countering Violent Extremism, as well as a Massive Open Online Course that has enrolled over 50,000 students globally

**DIRECTOR OF PRACTITIONER EDUCATION | COMBATING TERRORISM CENTER | SEPTEMBER 2007-FEBRUARY 2012**

· Responsible for the development and execution of a counterterrorism curriculum for multiple government entities engaged in the counterterrorism mission, to include the FBI, CIA, DHS ICE, DoD, and state, local and tribal law enforcement
· Grew the Practitioner Education Program from $1.1M to $3.4M per year in four years
· Led the FBI-CTC Collaborative, a multi-million dollar educational initiative delivering 23 semesters of counterterrorism education per fiscal year (900 hours of instruction for over 3000 students at 64 events across the nation) to the FBI along with a text book and additional educational materials
· Managed a team of approximately 25 academicians and retired practitioners
· Served as a West Point Instructor for the Terrorism Minor program in the Department of Social Sciences, as well as one of three primary instructors for the CTC's Practitioner Education Program

**FOREIGN AFFAIRS SPECIALIST | NATIONAL NUCLEAR SECURITY AGENCY | JUNE 2006-SEPTEMBER 2007**

· Foreign Affairs Specialist for the Office of International Nuclear Material Protection and Cooperation
· Responsible for strategic planning and sustainability issues regarding nuclear counter-terrorism programs at nuclear facilities within the Former Soviet Union
· Within 8 months in the office as a Nonproliferation Graduate Program Fellow, promoted to serve as the Special Assistant to the Director and Deputy Director (Senior Executive Service positions)

**ARMOR OFFICER | UNITED STATES ARMY | MAY 1999-MAY 2004**

· Company Commander: Responsible for the daily operations of and long term planning for an organization of fifty-five military and ten civilian personnel, as well as fifteen rifle and pistol ranges on which my company trained 10,000 initial entry soldiers annually
· Supervised the construction of a multi-million dollar indoor marksmanship training center and developed a plan to implement training at the facility
· Armor Battalion Scout Platoon Leader: Selected over thirty Lieutenants in the battalion to lead a thirty-three person reconnaissance platoon composed of ten combat vehicles and equipment valued at over $1.5 million; Served as the battalion's expert on reconnaissance and security operations
· Armor Company Executive Officer: Supervised and led a sixty-five person tank company as second-in-command; As the company's logistics expert, was responsible for the maintenance of a combat vehicle fleet valued over $35 million and including 14 M1A1 Abrams Main Battle Tanks
· Armor Company Platoon Leader: Led a sixteen person tank platoon for six months of training and a six month peacekeeping deployment in Kosovo; Worked independently with international organizations and foreign military units to foster a secure environment in a sector totaling over seventy square kilometers and inhabited by 1500 Albanian and Serbian Kosovars

8

## Selected Publications

*Terrorism and Political Islam*, eds. William Braniff, Christopher Heffelfinger, and Erich Marquardt, Combating Terrorism Center, 2008.

*Terrorism and Political Islam: A Desk-Side Reference for Political, Missionary, and Militant Organizations*, eds. William Braniff, Christopher Heffelfinger, and Erich Marquardt, Combating Terrorism Center, 2009.

"Anticipating al-Qa'ida's Next Strategic Evolution" in *Understanding Jihadism: origins, evolution, and future perspectives*, eds. Brynjar Lia and Qandeel Siddique, Norwegian Defense Research Establishment, June 2009.

Bill Braniff and Assaf Moghadam, "Al Qaeda's Post-9/11 Evolution: An Assessment," in *Terrorism and Counterterrorism: Understanding the New Security Environment, Reading and Interpretations*, eds Russel Howard, Reid Sawyer, and Natasha Bajema, 4th edition, 2011.

Bill Braniff, & Assaf Moghadam. "Towards Global Jihadism: Al-Qaeda's Strategic, Ideological and Structural Adaptations since 9/11," in *Perspectives on Terrorism* [Online], 5.2 (2011): 11 June 2012.

William Braniff, "Beyond al-Qa'ida," START Discussion Point, November 2012.

"5 Questions with William Braniff on the State of al-Qaeda," War on the Rocks, February 2014.

William Braniff, "CVE: An Idea Whose Time has Come," START Discussion Point, September 2014.

William Braniff and Ryan Pereira, "A Tale of Two Caliphates," Multi-Method Assessment of ISIL, A Strategic Multilayer Assessment Periodic Publication, December 2014.

Stevan Weine and William Braniff, "Law Enforcement-Focused Best Practices to Prevent Violent Extremism," Research START Brief, 2015.

Stevan Weine and William Braniff, "Community-Focused Best Practices to Prevent Violent Extremism," Research START Brief, 2015.

Stevan Weine and William Braniff, "Report on the National Summit on Empowering Communities to Prevent Violent Extremism," Office of Community Oriented Policing Services, 2015.

William Braniff, "Communities Must Work Together to Combat Extremism," *Room for Debate*, The New York Times, June 2015.

Sheehan Kane and William Braniff, "Taking the Sinai Province of the Islamic State Seriously Without Helping it Destabilize Egypt," START Discussion Point, August 2015.

William Braniff, "Apple, the FBI, Extremists and Strategic Soft Targeting," War on the Rocks, March 30, 2016.

Stevan Weine and William Braniff, "Empowering Communities to Prevent Violent Extremism: A Report on the August 2014 National Summit," *The Handbook of the Criminology of Terrorism*, Wiley Press, November 2016.

## Selected Presentations

Anticipating al-Qa'ida's Next Strategic Evolution," Understanding Jihadism Conference, Oslo, Norway, March 2009.

"Frameworks for Understanding Domestic Islamist Plots," National Collaboration and Development Course, Pennsylvania, 2010.

Radicalization in the Salafi-Jihad," National Counterterrorism Center, Virginia, January 2010.

"Evolution of the Salafi-jihad," World Affairs Council, Norfolk, Virginia, March 2010.

"Conceptual Frameworks for Understanding al-Qa'ida," Council on Foreign Relations, Atlanta, Georgia, April 2010.

"Understanding al-Qa'ida," Committee on Foreign Relations, Indianapolis, Indiana, June 2010.

"Al-Qa'ida in Context," Joint Forces Staff College, Norfolk, VA, July 2010.

"Understanding the Enemy," National September 11th Museum and Memorial Lecture Series, New York, New York, June 2010.

"Economic Jihad: Al-Qa'ida's Attrition Strategy," Wal-Mart Home Office, Bentonville, Arkansas, July 2010.

"Introduction to START Data, Methodology and Finding," National Science and Technology Council's Subcommittee on Human Factors, March 2012.

Congressional Testimony to House Committee on Homeland Security Subcommittee on Oversight and Management Efficiency, "Why Can't DHS Better Communicate with the American People?" May 2013.

Congressional Testimony to House Armed Services Committee, "The State of Al-Qaeda, its Affiliates, and Associated Groups: View from Outside Experts," February 2014.

"Countering Violent Extremism," National Counterterrorism Center, April 2014.

Congressional Testimony to House Armed Services Committee, "The State Islamic Extremism," February 2015.

"An Empirical Approach to Countering Violent Extremism," White House Summit on Countering Violent Extremism, February 2015.

"Radicalization and Foreign Fighters," United Nations Counter Terrorism Executive Directorate, February 2015.

"How Research Can Contribute to Understanding CVE and Foreign Fighters," Global Counterterrorism Forum Foreign Fighter Working Group Meeting, February 2015.

"CVE: The Ends, Not the Means," International Institute for Counterterrorism, Israel, September 2015.

"The Dynamic Terrorist Threat: Competition, Innovation and Mobilization," Panel Presentation, Transportation Security Administration Conference, June 2016.

"U.S. National Security Policy with respect to ISIS," Davidson College Summer in Washington Program, July 2016.

## Selected Media Appearances

"FBI takes counterterrorism classes, National Public Radio, July 2008.

"Exploring 9/11: The World Before and After," National September 11th Museum and Memorial Webcast on Al-Qa'ida's ideology, 2008, and on the death of Osama bin Laden, 2011.

"Al-Qaida Media Blitz has Some on Alert," National Public Radio, April 2009.

"Assessing Somalia's Terror Threat," International Relations and Security Network, December 2009.

KCUR *Up to Date* interview with Steve Kraske on the threat posed by al-Qaeda, Kansas City, Missouri, April, 2010.

"In Attack, Al Qaeda-Linked Somali Group Expands Reach," Wall Street Journal, July 2010.

"Choosing From the Many Lessons of Sept. 11," an expert panel discussion, New York Times, June 4, 2012.

"Death of al-Libi is a crippling blow," AFP article, June 5, 2012.

"Drones could destabilize Pakistan," AFP video, June 6, 2012

Terrorism and Violent Crime," CSPAN's Washington Journal, April 2013.

"Maryland Voices React to Boston Marathon Bombing," Maryland Morning (NPR WYPR Baltimore), April 2013.

"Public Safety: The Measures Taken To Keep Crowds Safe," Talk of the Nation (NPR), April 2013.

"Social Media Shapes Boston Bombings Response," National Geographic, April 2013.

"Response to Boston Marathon Attack," Fox News, April 2013.

"Boston attack underscores growing threat of IEDs in America," Fox News, April 2013.

"ISIS and Religious Justification," CNN, September 2014.

"Who's Worse? ISIS or al-Qaeda," CNN, September 2014.

"State Department Uses Islamic State Propaganda to Fight Militants," Voice of America, September 2014.

"A Deadly Shooting in Tennessee and the Threat of Domestic Terrorism," the Diane Rehm Show (NPR), July 2015.

"Shootings at a Planned Parenthood Clinic in Colorado," the Diane Rehm Show (NPR), December 2015.

"ISIS Propaganda department creates new app targeting kids," Sinclair Broadcast Group, May 2016.

"Orlando rampage reflects the scary convergence between terrorism and mass shootings," The Washington Post, June 2016.

Interview with Deborah Feyerick, Erin Burnett OutFront (CNN), July 2016.

Interview with Bill O'Reilly, The O'Reilly Factor (Fox News), July 2016.

Interview with KCTV News, (CBS), July 2016.

11

## Selected Training Experience

Understanding al-Qa'ida,", A Tale of Two Caliphates," Joint Special Operations University, Interagency Collaboration Course and the Combating Terrorist Networks Course, MacDill Air Force Base, various dates, 2009-2016.

"The Strategy of Terrorism," "Evolution of the Global Jihadist Threat," "Radicalization," "Terrorist Use of the Internet," "Understanding Islam," "Islam, Islamism and Violent Jihadism," "Terrorism in East Africa," "Terrorism in Yemen," "Terrorism in South Asia," "Terrorism in South East Asia," "Terrorism in North Africa and the Sahel," "Understanding Hamas," "Understanding Hezbollah," "Countering Violent Extremism," Federal Bureau of Investigation, various dates, 2008-2014.

"Islam in the United States: Culture and Customs," United States Attorneys' Office, various dates 2010-2012.

"Environmental Extremists' use of Arson in the United States," National Fusion Center Fire Services Network, November 2013.

"Extremist Violence by the Numbers," local law enforcement, New York U.S. Attorneys' Office, February 2013.

"Terrorism and Extremist Violence in the United States," National Governors' Association, February 2013-2015.

"A Tale of Two Caliphates," U.S. Army Intelligence and Security Command: Commander's Conference, September 2015.

"Radicalization and CVE," Senior Law Enforcement Training Program, Anti-Defamation League, various dates, 2015-2016.

"Understanding CVE," Foreign Service Institute, Department of State, various dates 2015-2016.

"An Empirical Approach to Evaluating Counterterrorism Effectiveness," International Intelligence Fellows Program, Defense Intelligence Agency, various dates, 2015-2016.

"Conceptual Frameworks for Understanding Global Jihadism," "A Tale of Two Caliphates," "Radicalization and CVE," "Lone Actors and Foreign Fighters," and "Suicide Terrorism," Transportation Security Administration Lecture Series, various dates, 2016.

## Awards and Service

Department of the Army Superior Civilian Service Award:  Presented by the Superintendent of the United States Military Academy for leading the Combating Terrorism Center's Practitioner Education Program, the largest counterterrorism education program of its kind in the United States Government.  This is the third highest award possible for Department of the Army employees.

Selected to facilitate the first and second *National Summit on Empowering Communities to Prevent Violent Extremism* by the Department of Justice and the Federal Emergency Management Agency, 2014 and 2015.

Selected to serve as the Rapporteur to the United Nations Security Council at the UN Counterterrorism Executive Directorate Research Network launch event, February 2015.

Member of the Editorial Board of the International Centre for Counter-Terrorism-The Hague (ICCT).

Professor of the Practice, Department of Criminology and Criminal Justice, University of Maryland

**EXHIBIT 22**

Feb 9 2015        Chats – derived from ORC021557.  User name 'GGG'
                  is identifiable as Enrique Marquez Jr.

GGG:              Actually, I'm usually known as Gman

GGG:              And for a reason too.

GGG:              I was shunned by many of my friends at the time

GGG:              Because they believed I worked for the government
                  at the time.

~C▓▓▓▓▓▓▓▓:        After I moved away from the town that had my few
                  close friends, I had many, many acquaintances in
                  high school.

GGG:              I didn't discover the reason why they shunned me
                  until a couple years later.

~C▓▓▓▓▓▓▓▓:        Why would someone think you work for the
                  government?

GGG:              Religious extremism/terrorism.

~C▓▓▓▓▓▓▓▓:        Make that a complete sentence if you don't mind.
                  There are too many ways to interpret that.

GGG:              http://www.buzzfeed.com/jimdalrympleii/four-
                  southern-california-guysplotted-to-become-
                  jihadis-and?s=mobile

GGG:              People were afraid that I was an informant
                  inciting acts of terrorism in the religious
                  community.

~C▓▓▓▓▓▓▓▓:        So you're a part of a religious community?

GGG:              Ever since that socal incident in 2012

GGG:              Was

~C▓▓▓▓▓▓▓▓:        Muslim?

GGG:              Yes.

~C▓▓▓▓▓▓▓▓:        Are you no longer Muslim or just no longer a part

|       |   |
|-------|---|
|       | of that community? |
| GGG:  | Muslims are pretty social and take it upon as a faithful duty to interact with other muslims , something j disliked very much |
| GGG:  | I'm no longer both. |
| GGG:  | Something I revealed to.my wife since she was led to believe I was still muslim |
| GGG:  | Until I informed her that since we were married I expected her to keep my secrets and I would keep hers |
| GGG:  | And I revealed to her that I was not a Muslim anymore. |
| GGG:  | She didn't mind at all and was quite relieved. |
| ~C▮▮▮▮▮▮: | What brought you to Islam? |
| GGG:  | Brotherhood. At the time, I felt so alone and so out of place that I wanted to belong. |
| GGG:  | It took me several years to realize the mistake I made. |

2

**EXHIBIT 23**



8/6/2015 23:04:39: Enrique Marquez: I don't know what I'm looking for. I have this urge to give my all

8/6/2015 23:04:50: Enrique Marquez: But it has to be someone I can completely trust

8/6/2015 23:05:00: D████████: Its worth it if you find it

8/6/2015 23:05:09: Enrique Marquez: Because they're about to get into shit that they may not have realized

8/6/2015 23:05:12: D████████: But yeah, never settle

8/6/2015 23:05:21: Enrique Marquez: Like I might get imprisoned as a terrorist.

8/6/2015 23:05:22: D████████: It has to be an active want

8/6/2015 23:05:31: D████████: Lolwat

8/6/2015 23:05:48: Enrique Marquez: There's a lot you guys don't know

8/6/2015 23:05:53: Enrique Marquez: About me.

8/6/2015 23:06:16: Enrique Marquez: Which is probably why I'm depersonalized all the time.

8/6/2015 23:06:24: D████████: Like what

8/6/2015 23:06:56: D████████: I actually started feeling way healthier mentally the less secrets I had

8/6/2015 23:07:18: Enrique Marquez: You know about.me being Muslim for a decade right?

8/6/2015 23:07:32: D████████: Something like that yeah

8/6/2015 23:07:34: Enrique Marquez: Hold on phone charger.

8/6/2015 23:12:10: Enrique Marquez: Yeah. I may have been part of an extremely fundamental group.

8/6/2015 23:12:50: Enrique Marquez: There are actually things I need to work on like retrieve certain items because they're under my name

8/6/2015 23:13:12: D████████: Like, women should be homebound and death to America type shit?!

8/6/2015 23:13:21: Enrique Marquez: Yeah

8/6/2015 23:13:47: Enrique Marquez: Also, killing ourselves was justified

8/6/2015 23:14:14: D████████: That's intense

8/6/2015 23:14:29: D████████: Also if ur trollan lol

8/6/2015 23:14:47: Enrique Marquez: I wish was.

8/6/2015 23:14:59: Enrique Marquez: My wife was scared when told her about it.

8/6/2015 23:16:20: Enrique Marquez: I began to find a way out when four guys from my area were caught

8/6/2015 23:16:43: D████████: What made you want to be a part of it

−1−



8/6/2015 23:17:24: Enrique Marquez: I felt part of something. I felt like I belonged and I felt productive.

8/6/2015 23:17:30: Enrique Marquez: http://www.sbsun.com//general-news/20150223/inland-empire-terror-suspects-sentenced-to-25-years-in-prison

8/6/2015 23:18:26: Enrique Marquez: Initially, it was pretty peaceful.

8/6/2015 23:19:25: Enrique Marquez: Over time, I was exposed to the more extreme material. I think the one that influenced me the most the rape of women in Abu ghraib

8/6/2015 23:20:13: D̶̶̶̶̶̶̶̶̶ That famous torture pic is iny mind

8/6/2015 23:20:24: Enrique Marquez: Those guys were caught in 2012. Same year I began to drink and become more involved with others.

8/6/2015 23:20:25: D̶̶̶̶̶̶̶̶̶ "During trial, Kabir and DeLeon were described by their attorneys as frequent marijuana users who often hung out at hookah bars, smoking the drug and engaging in a lot of "big talk," but were essentially harmless."

8/6/2015 23:20:27: D̶̶̶̶̶̶̶̶̶ Lol

8/6/2015 23:20:41: Enrique Marquez: Lmao

8/6/2015 23:20:45: Enrique Marquez: They were idiots

8/6/2015 23:21:26: Enrique Marquez: Ralph would attend the msa club at csusb waving an Inspire magazinr

8/6/2015 23:21:45: Enrique Marquez: Ralph deleon

8/6/2015 23:21:55: Enrique Marquez: He was an idiot.

8/6/2015 23:23:35: ̶̶̶̶̶̶̶̶̶ Extremist groups target the vulnerable. Some just want a place, some are mentally vulnerable

8/6/2015 23:23:46: D̶̶̶̶̶̶̶̶̶: I mean, look at neo Nazis: idiots

8/6/2015 23:23:49: Enrique Marquez: Yeah.

8/6/2015 23:23:53: D̶̶̶̶̶̶̶̶̶ We have a lot in Illinois

8/6/2015 23:25:05: D̶̶̶̶̶̶̶̶̶ Its weird but true. There's a good population of white supremacists in the Chicago area. Eww

8/6/2015 23:25:37: D̶̶̶̶̶̶̶̶̶ Well I don't think being I n a Muslim student group would make you suspect

8/6/2015 23:25:37: Enrique Marquez: It's not even that. I'm surprised I didn't go through with the plans I had back then

8/6/2015 23:25:51: Enrique Marquez: It's not that

8/6/2015 23:25:55: Enrique Marquez: We actually stockpiled

8/6/2015 23:26:10: D████████: To do what

8/6/2015 23:26:50: Enrique Marquez: I'm not gonna say it. I had a difficult time saying it to my wife

8/6/2015 23:27:41: Enrique Marquez: And o hope to god I can still retrieve those items

8/6/2015 23:28:30: Enrique Marquez: Since she's legally bound to me

8/6/2015 23:28:46: D████████: I was just going to say, that wouldn't be her fault

8/6/2015 23:29:02: D████████: Though now if she was told anything, she can't say she doesn't know

8/6/2015 23:29:08: Enrique Marquez: I know. But she would be under scrutiny. Oh god, o shouldn't have told het

8/6/2015 23:29:38: D████████: Just figure out what you have to do to make sure she doesn't get involved

8/6/2015 23:29:46: Enrique Marquez: Yeah

8/6/2015 23:30:21: D████████: I think this country is shit in some ways but damn

8/6/2015 23:30:27: Enrique Marquez: Yeah

8/6/2015 23:31:09: Enrique Marquez: Which is why I'm so "what" with everything people fo

8/6/2015 23:31:38: Enrique Marquez: Does anything matter

8/6/2015 23:34:04: Enrique Marquez: I also realized a lot of Islamic teachings crossed over to this side of myself

8/6/2015 23:34:28: Enrique Marquez: Like disregarding the pleasures of mortal life for the eternal

8/6/2015 23:36:23: D████████: But what if there's nothing beyond this

8/6/2015 23:36:42: D████████: Then you'd have to find a way to make life worth living

8/6/2015 23:36:56: D████████: Sometimes that would require changing a lot of things.

8/6/2015 23:37:30: D████████: Not settling for unfulfilling situations

8/6/2015 23:42:48: Enrique Marquez: Yeah. I know that.

8/6/2015 23:43:26: Enrique Marquez: You're talking to a person who lost faith in God and his believers

8/6/2015 23:43:36: Enrique Marquez: God was a big thing.

8/6/2015 23:46:26: Enrique Marquez: Disillusioned I guess.

8/6/2015 23:46:55: D████████: It happens

8/6/2015 23:46:57: Enrique Marquez: I guess I've never been this open with you guys

8/6/2015 23:47:11: D████████: I mean, I never really believed in god like that

8/6/2015 23:47:34: D████████: But I was suicidally depressed for a good portion of my life



8/6/2015 23:47:57: Enrique Marquez: I figured I woild tskd all this to the grVd with me

8/6/2015 23:47:58: D████████ People have all kinds of shit going on they don't tell people about

8/6/2015 23:48:40: D████████: Its better not to hold on to it though. I think it's easier to talk about it and then be done with it.

8/6/2015 23:49:20: D████████: It won't matter if you fix yo shit now

8/6/2015 23:49:23: D████████ :3

8/6/2015 23:49:49: Enrique Marquez: Yeah. I know.

8/6/2015 23:51:08: D████████ As far as whether anything matters... that's subjective ;D

8/6/2015 23:51:20: Enrique Marquez: Oh you

8/6/2015 23:51:23: Enrique Marquez: Lol

8/6/2015 23:52:03: D████████ If there's something that matters to you, then life has a purpose. I think people can decide what it all means. It isn't like we have another choice.

8/6/2015 23:52:27: Enrique Marquez: That's called depersonalization

8/6/2015 23:53:43: D████████ Well, if you stare into the void it stares back into you

8/6/2015 23:53:48: Enrique Marquez: I have the understanding of rationalizing to getting rid of people and removing that rationalization.

8/6/2015 23:54:43: D████████ Like, removing people from your life?

8/6/2015 23:54:53: Enrique Marquez: Everyone's life.

8/6/2015 23:55:01: D████████ Oh.

8/6/2015 23:55:07: D████████: Don't do that.

8/6/2015 23:55:15: Enrique Marquez: I know.

8/6/2015 23:56:39: D████████: The way you feel about your wife, your friends... someone feels that way about the other person. Rationalize humanizing them that way.

8/6/2015 23:56:58: D████████: Of course, some few don't deserve to be humanized probably

8/6/2015 23:57:24: D████████ Those people are not numerous though.

8/6/2015 23:57:30: Enrique Marquez: Yeah.

8/6/2015 23:58:25: Enrique Marquez: But thats the way it is for people like me and I like the minimal emotional bombardment

8/6/2015 23:58:53: Enrique Marquez: It's only you guys and my wife.

8/6/2015 23:59:50: Enrique Marquez: I've somehow become friends with you guys



8/7/2015 0:01:06: Enrique Marquez: And entrusted my deepest self. At least you guys know I'm not a serial killer. A lot of people think I'm a serial killer.

8/7/2015 0:01:22: Enrique Marquez: Lol

8/7/2015 0:04:30: Enrique Marquez: I swear to god I'm not a serial killer

8/7/2015 0:04:47: Enrique Marquez: So many jokes were had over that.

8/7/2015 0:05:04: Enrique Marquez: I was asked where I kept the hookers buried

8/7/2015 0:06:03: D███████: Lol

8/7/2015 0:07:43: D███████: I don't think the average person is very perceptive

8/7/2015 0:08:02: D███████: People misread me all the time too

8/7/2015 0:08:19: D███████: I don't give a fuck anymore

8/7/2015 0:08:41: D███████: Like you said, its easier to have a smaller circle

8/7/2015 0:09:24: D███████: I have a lot of acquaintances but not many real friends. I think most people would judge that in a bad light

8/7/2015 0:09:35: D███████: But most people are fucking dumb

D███████ changed the subject to "PRIDEFUL AMERICUNTS □"

8/7/2015 0:10:24: D███████: CAPS

8/7/2015 0:11:43: D███████: I guess I'm out for the nite

8/7/2015 0:11:43: Enrique Marquez: Lol

8/7/2015 0:12:05: D███████: If you were trying to scare us you failed Enrique iglesias

8/7/2015 0:12:25: D███████: Don't have too much fireball!

8/7/2015 0:13:52: Enrique Marquez: Lmao

8/7/2015 0:14:05: Enrique Marquez: Thanks

8/7/2015 0:14:26: Enrique Marquez: Inb4 E██ calls the cops

**EXHIBIT 24**

Title: ███████ Summary Review of Facebook ID ████████
Re: ████████████████



D█████    ✛ New Message   ✉  ⚙  🔍

then even more of a reason not to know about these things 😊

I stopped going on irc when you started drinking

**Enrique Marquez**    🕓 11/8, 9:15pm
No one really knows me. I lead multiple lives and I'm wondering when
its all going to collapse on Mr.

D█████    11/8, 9:15pm
incidentally

**Enrique Marquez**    🕓 11/8, 9:16pm
Yeah. My life turned ridiculous.

D█████    11/8, 9:16pm
I think everyone leads multiple lives

**Enrique Marquez**    🕓 11/8, 9:17pm
Involved in terrorist plots, drugs, antisocial behavior, marriage, might go
to prison for fraud, etc.

Thanks for talking to me.

D█████    11/8, 9:18pm
Why wouldn't I

**Enrique Marquez**    🕓 11/8, 9:18pm
/me shrugs. I'm usually the one with the ear because I give sound
advice no one takes seriously.

D█████    11/8, 9:19pm
Haha.

Maybe people aren't looking for advice

**Enrique Marquez**    🕓 11/8, 9:19pm
They're looking for enablers.

D█████    11/8, 9:20pm
validation, yeah

10

**EXHIBIT 25**

Dec 31 2014      Chats — derived from ORC021557.  User name
                 'gmaosndeink' is identifiable as Enrique Marquez
                 Jr.

O▓▓:              lol how about this

O▓▓:              he pre soaks the money in fuel

O▓▓:              then he lights it before the audience knows

Gmaosndeink:     Hmm

O▓▓:              cant stop the fire

Gmaosndeink:     How about he just fucking builds an explosive

X▓▓▓:            woah tee we didnt start the fire

Gmaosndeink:     And kill everyone in a 30ft radius

X▓▓▓:            I have major deja vu right now

X▓▓▓:            0-0

Gmaosndeink:     Fucking greedy motherfuckers

X▓▓▓:            but I am listening to different music than last
                 time

x▓▓▓:            if this all happened before

gmaosndeink:     Just embed tiny bearings in the explosives

gmaosndeink:     And those are your projectiles

gmaosndeink:     Fuckers are gonna shoot past 3k fps

x▓▓▓:            um

gmaosndeink:     And penetrate a lot of shit

**EXHIBIT 26**

Feb 2 2015        Chats — derived from ORC021557.  User name 'gman'
                  is identifiable as Enrique Marquez Jr.

gman:             I need to learn how to weld pipes together
                  without setting off the explosive contents

gman:             Like

gman:             I would weld a gokart frame as a giant pipe bomb
                  frame

gman:             Fucking terrorists don't know shit

gman:             And then I'd sell it to that Russian fps guy

gman:             For his tannerite demos

gman:             What is even his name

gman:             How do we know he doesn't work for the CIA or fbi

**EXHIBIT 27**



## Google Searches

| | | |
|---|---|---|
| anwar al-awlaki's death | https://www.google.com/search?q=anwar+al-awlaki%27s+death&ie=utf-8&oe=utf-8&aq=t&rls=org.mozilla:en-US:official&client=firefox-a&channel=fflb | 4/9/2015 |
| acetone | https://www.google.com/search?q=acetone&ie=utf-8&oe=utf-8&aq=t&rls=org.mozilla:en-US:official&client=firefox-a&channel=fflb | 6/24/2014 |
| M9A3 | https://www.google.com/search?q=M9A3&ie=utf-8&oe=utf-8 | 12/18/2014 |
| M9A3 | https://www.google.com/search?q=M9A3&source=lnms&tbm=isch&sa=X&ei=lwqTVLb4AaHjsATO0oLgCw&ved=0CAoQ_AUoAw&biw=1280&bih=913 | 12/18/2014 |
| M9A3 | https://www.google.com/search?q=M9A3&tbm=isch&source=lnt&tbs=isz:l&sa=X&ei=0AqTVKX0ArSOsQSDiIFI&ved=0CBYQpwU&dpr=1&biw=1280&bih=913 | 12/18/2014 |
| M9A3 | https://www.google.com/search?q=M9A3&tbs=isz:m&tbm=isch&source=lnt&sa=X&ei=6A2TVKTAEIOeggS7gITIAQ&ved=0CBUQpwU&dpr=1&biw=1280&bih=913 | 12/18/2014 |
| http://www.guns.com/2014/12/18/beretta-unveiling-the-new-m9a3/ | http://www.google.com/url?q=http://www.guns.com/2014/12/18/beretta-unveiling-the-new-m9a3/&ust=1418925460857758&usg=AFQjCNEZg_zoRccyty7IT7wrrxFETjQoWA | 12/18/2014 |
| southern california terrorism | https://www.google.com/search?q=southern+california+terrorism&ie=utf-8&oe=utf-8 | 4/9/2015 |
| bomb fuel trigger | https://www.google.com/search?q=bomb+fuel+trigger&ie=utf-8&oe=utf-8 | 9/21/2015 |
| bomb fuel oxydiser | https://www.google.com/search?q=bomb+fuel+oxydiser&oq=bomb+fuel+oxydiser&gs_l=serp.3...22361.23914.0.24307.8.7.0.0.0.0.560.850.2-1j5-1.2.0...0...1c.1.64.serp..8.0:0.c-gPBCsrt2A | 9/21/2015 |

*1*

| bomb fuel oxidizer | https://www.google.com/search?q=bomb+fuel +oxidizer&spell=1&sa=X&ved=0CBsQvwUoAGoVC hMImY- Hi4KJyAIVAzGICh0jJQW3&biw=1280&bih=890 | 9/21/2015 |
| anwar al-awlaki's death | https://www.google.com/search?q=anwar+al- awlaki%27s+death&ie=utf-8&oe=utf- 8&aq=t&rls=org.mozilla:en- US:official&client=firefox-a&channel=fflb | 6/23/2014 |
| bomb fuel trigger | https://www.google.com/search?q=bomb+fuel +trigger&ie=utf-8&oe=utf-8 | 9/21/2015 |
| bomb fuel oxydiser | https://www.google.com/search?q=bomb+fuel +oxydiser&oq=bomb+fuel+oxydiser&gs_l=serp .3...22361.23914.0.24307.8.7.0.0.0.0.560. 850.2-1j5- 1.2.0....0...1c.1.64.serp..8.0.0.c- gPBCsrt2A | 9/21/2015 |

2

# EXHIBIT 28

Sept 21 2015     Chats – derived from ORC021567.  User name
                 'Gmani' is identifiable as Enrique Marquez Jr.

Gmani:           http://hackaday.com/2015/09/21/this-is-what-a-
                 real-bomb-looks-like/

g▓▓▓▓▓▓▓:         Whenever that solo hits

g▓▓▓▓▓▓▓:         I just can't help but clench my fist in front of
                 my heart

T▓▓▓:            yes

T▓▓:             Gmani: that's legendary

Gmani:           Yes

Gmani:           I know

Gmani:           When I create my bomb, it will be undefuseable

T▓▓▓:            the NSA has forwarded this chat to the
                 appropriate local FBI field office

Gmani:           It will be so sensitive, I will have tyo create a
                 gravity field so it wont touch a thing and it
                 wont be affect by

Gmani:           also, this cocaine makes me feel like I'm on this
                 song

D▓▓▓:            ebin

**EXHIBIT 29**

**Downloaded Documents**

**Mar 31 2005 Downloaded Document – derived from ORC020494.**
Name WMD Facilitator Guide V1.pdf
Physical Size999424 B
Logical Size996234 B
Created Date1/17/2015 12:09:51 PM (2015-01-17 20:09:51 UTC)
Modified Date3/31/2005 11:10:00 AM (2005-03-31 19:10:00 UTC)
Accessed Date1/17/2015 3:13:02 PM (2015-01-17 23:13:02 UTC)
Exported asfiles\WMD Facilitator Guide V1.pdf
File Comments:
Name Al Wala Wal Bara Part 3.pdf
Physical Sizen/a
Logical Size734023 B
Created Daten/a
Modified Date5/16/2010 11:24:22 PM (2010-05-17 06:24:22 UTC)
Accessed Daten/a
Exported asfiles\Al Wala Wal Bara Part 3.pdf

**Apr 4 2005 Downloaded Document – derived from ORC020494.**
Namedocument.xml
Physical Sizen/a
Logical Size333926 B
Created Daten/a
Modified Daten/a
Accessed Daten/a
Exported asfiles\document.xml
Files Bookmarked
File Comments:
Name WMD Student Workbook V1.pdf
Physical Size204800 B
Logical Size204659 B
Created Date1/17/2015 12:09:48 PM (2015-01-17 20:09:48 UTC)
Modified Date4/4/2005 9:47:00 AM (2005-04-04 16:47:00 UTC)
Accessed Date1/17/2015 3:12:59 PM (2015-01-17 23:12:59 UTC)
Exported asfiles\WMD Student Workbook V1.pdf

**Dec 24 2006 Downloaded Document – derived from ORC021552.**
NameBetrayalSurvivorGuide.pdf
Physical Sizen/a
Logical Size436471 B
Created Daten/a
Modified Date12/24/2006 3:42:56 PM (2006-12-24 23:42:56 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[MetaCarve]/5/New
Folder/Documents.7z»Documents»hx»BetrayalSurvivorGuide.pdf
Exported as**files\BetrayalSurvivorGuide.pdf**

Page 1 of 14

**Jan 9 2007 Downloaded Document – derived from ORC021552.**
NameeBooks - How to Get the Truth Out of Anyone.pdf
Physical Sizen/a
Logical Size199087 B
Created Daten/a
Modified Date1/9/2007 5:46:52 AM (2007-01-09 13:46:52 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME
[NTFS]/[MetaCarve]/5/download/roms and emulators/untitled
folder.zip»untitled folder»how to»eBooks - How to Get the Truth
Out of Anyone.pdf
Exported as**files\eBooks - How to Get the Truth Out of Anyone.pdf**

**Jan 21 2007 Downloaded Document – derived from ORC021552.**
Name(ebook - Martial-Arts) Pressure Points - Military Hand to
Hand Combat Guide- Great Book Sort of like Muay Thai. (ENGUIA)
1.pdf
Physical Sizen/a
Logical Size628061 B
Created Daten/a
Modified Date1/20/2007 10:13:34 PM (2007-01-21 06:13:34 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME
[NTFS]/[MetaCarve]/5/download/roms and emulators/untitled
folder.zip»untitled folder»how to»(ebook - Martial-Arts)
Pressure Points - Military Hand to Hand Combat Guide- Great Book
Sort of like Muay Thai. (ENGUIA) 1.pdf
Exported as**files\(ebook - Martial-Arts) Pressure Points -
Military Hand to Hand Combat Guide- Great Book Sort of like Muay
Thai. (ENGUIA) 1.pdf**

**Jan 21 2007 Downloaded Document – derived from ORC021552.**
Name(ebook) - martial arts-how to kill (really detailed).doc
Physical Sizen/a
Logical Size363360 B
Created Daten/a
Modified Date1/20/2007 9:47:48 PM (2007-01-21 05:47:48 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME
[NTFS]/[MetaCarve]/5/download/roms and emulators/untitled
folder.zip»untitled folder»how to»(ebook) - martial arts-how to
kill (really detailed).doc
Exported as**files\(ebook) - martial arts-how to kill (really
detailed).doc.rtf**

**<u>Jan 25 2007 Downloaded Document – derived from ORC021552.</u>**
NameAnarchists Cookbook ebook v2000.pdf
Physical Sizen/a
Logical Size1477687 B
Created Daten/a
Modified Date1/25/2007 3:06:22 PM (2007-01-25 23:06:22 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME
[NTFS]/[MetaCarve]/5/download/roms and emulators/untitled
folder.zip»untitled folder»how to»Anarchists Cookbook ebook
v2000.pdf

**<u>Feb 21 2007 Downloaded Document – derived from ORC021552.</u>**
NameExplosives - How To Make Bombs Book 2.pdf
Physical Sizen/a
Logical Size125183 B
Created Daten/a
Modified Date2/21/2007 2:52:32 AM (2007-02-21 10:52:32 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME
[NTFS]/[MetaCarve]/5/download/roms and emulators/untitled
folder.zip»untitled folder»how to»Explosives - How To Make Bombs
Book 2.pdf
Exported as**files\Explosives - How To Make Bombs Book 2.pdf**

**<u>Mar 7 2007 Downloaded Document – derived from ORC021552.</u>**
Name(EBook) - Martial Arts - Bruce Lee Concepts & Principles.pdf
Physical Sizen/a
Logical Size272133 B
Created Daten/a
Modified Date3/6/2007 7:52:48 PM (2007-03-07 03:52:48 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME
[NTFS]/[MetaCarve]/5/download/roms and emulators/untitled
folder.zip»untitled folder»how to»(EBook) - Martial Arts - Bruce
Lee Concepts & Principles.pdf
Exported as**files\(EBook) - Martial Arts - Bruce Lee Concepts &
Principles.pdf**

3

**<u>Mar 7 2007 Downloaded Document — derived from ORC021552.</u>**
NameeBooks - Martial Arts - Physics of Striking.pdf
Physical Sizen/a
Logical Size16943 B
Created Daten/a
Modified Date3/6/2007 7:28:46 PM (2007-03-07 03:28:46 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME
[NTFS]/[MetaCarve]/5/download/roms and emulators/untitled
folder.zip»untitled folder»how to»eBooks - Martial Arts -
Physics of Striking.pdf
Exported as**files\eBooks - Martial Arts - Physics of Striking.pdf**

**<u>Mar 7 2007 Downloaded Document — derived from ORC021552.</u>**
NameHow to Kill Someone with your Bare Hands.doc
Physical Sizen/a
Logical Size4225 B
Created Daten/a
Modified Date3/6/2007 7:23:06 PM (2007-03-07 03:23:06 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME
[NTFS]/[MetaCarve]/5/download/roms and emulators/untitled
folder.zip»untitled folder»how to»How to Kill Someone with your
Bare Hands.doc
Exported as**files\How to Kill Someone with your Bare
Hands.doc.txt**

**<u>Mar 28 2007 Downloaded Document — derived from ORC021552.</u>**
NameSURVEILLANCE - How To Find Hidden Cameras - (Police Survival
Spy Antispying Intelligence) - (eBook 264308 .pdf) (TEC@NZ) .pdf
Physical Sizen/a
Logical Size264308 B
Created Daten/a
Modified Date3/27/2007 5:44:06 PM (2007-03-28 00:44:06 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME
[NTFS]/[MetaCarve]/5/download/roms and emulators/untitled
folder.zip»untitled folder»misc»SURVEILLANCE - How To Find
Hidden Cameras - (Police Survival Spy Antispying Intelligence) -
(eBook 264308 .pdf) (TEC@NZ) .pdf
Exported as**files\SURVEILLANCE - How To Find Hidden Cameras -
(Police Survival Spy Antispying Intelligence) - (eBook 264308
.pdf) (TEC_NZ) .pdf**

4

**Mar 28 2007 Downloaded Document – derived from ORC021552.**
NameThe Terrorist's Handbook.htm
Physical Sizen/a
Logical Size186417 B
Created Daten/a
Modified Date3/27/2007 10:05:24 PM (2007-03-28 05:05:24 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME
[NTFS]/[MetaCarve]/5/download/roms and emulators/untitled
folder.zip»untitled folder»misc»The Terrorist's Handbook.htm
Exported as**files\The Terrorist's Handbook.htm**

**May 5 2007 Downloaded Document – derived from ORC021552.**
Name(ebook - martial arts) Krav Maga - Hand to Hand Combat.pdf
Physical Sizen/a
Logical Size146027 B
Created Daten/a
Modified Date5/14/2007 10:33:16 PM (2007-05-15 05:33:16 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME
[NTFS]/[MetaCarve]/5/download/roms and emulators/untitled
folder.zip»untitled folder»how to»(ebook - martial arts) Krav
Maga - Hand to Hand Combat.pdf
Exported as**files\(ebook - martial arts) Krav Maga - Hand to Hand
Combat.pdf**

**May 27 2009 Downloaded Document – derived from ORC021552.**
Name130__Military_Training_Books.torrent
Physical Sizen/a
Logical Size71496 B
Created Daten/a
Modified Date5/27/2009 3:27:36 PM (2009-05-27 22:27:36 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[MetaCarve]/5/New
Folder/Torrents.7z»Torrents»130__Military_Training_Books.torrent
Exported as**files\130__Military_Training_Books.torrent**

**May 27 2009 Downloaded Document – derived from ORC021552.**
Name230__survival_books.torrent
Physical Sizen/a
Logical Size39322 B
Created Daten/a
Modified Date5/26/2009 9:03:36 PM (2009-05-27 04:03:36 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[MetaCarve]/5/New
Folder/Torrents.7z»Torrents»230__survival_books.torrent
Exported as**files\230__survival_books.torrent.txt**

**May 27 2009 Downloaded Document — derived from ORC021552.**
Name517_Military_Field_Manuals__US_.torrent
Physical Sizen/a
Logical Size57389 B
Created Daten/a
Modified Date5/27/2009 3:26:54 PM (2009-05-27 22:26:54 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[MetaCarve]/5/New
Folder/Torrents.7z»Torrents»517_Military_Field_Manuals__US_.torr
ent
Exported as**files\517_Military_Field_Manuals__US_.torrent.txt**

**May 27 2009 Downloaded Document — derived from ORC021552.**
NameEssential Underground Handbook (P M L Publishing).pdf
Physical Sizen/a
Logical Size1556302 B
Created Daten/a
Modified Date5/27/2009 4:02:00 PM (2009-05-27 23:02:00 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[unallocated
space]/0205001»Carved [7254016].zip»ebooks»Essential Underground
Handbook (P M L Publishing).pdf
Exported as**files\Essential Underground Handbook (P M L
Publishing).pdf**

**May 27 2009 Downloaded Document — derived from ORC021552.**
NameMilitary_Training_ebooks.torrent
Physical Sizen/a
Logical Size51779 B
Created Daten/a
Modified Date5/27/2009 3:26:24 PM (2009-05-27 22:26:24 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[MetaCarve]/5/New
Folder/Torrents.7z»Torrents»Military_Training_ebooks.torrent
Exported as**files\Military_Training_ebooks.torrent**

**May 27 2009 Downloaded Document — derived from ORC021552.**
NameThe $50 and up Underground House Book.pdf
Physical Sizen/a
Logical Size3550328 B
Created Daten/a
Modified Date5/26/2009 9:11:22 PM (2009-05-27 04:11:22 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[MetaCarve]/5/New
Folder/Documents.7z»Documents»The $50 and up Underground House
Book.pdf
Exported as**files\The $50 and up Underground House Book.pdf**

**May 27 2009 Downloaded Document – derived from ORC021552.**
NameUS_Military_Manuals.torrent
Physical Sizen/a
Logical Size33074 B
Created Daten/a
Modified Date5/27/2009 3:27:22 PM (2009-05-27 22:27:22 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[MetaCarve]/5/New
Folder/Torrents.7z»Torrents»US_Military_Manuals.torrent
Exported as**files\US_Military_Manuals.torrent.txt**

**May 27 2009 Downloaded Document – derived from ORC021552.**
NameYou Will Survive Doomsday – Bruce Beach (file version 2).pdf
Physical Sizen/a
Logical Size345921 B
Created Daten/a
Modified Date5/27/2009 4:12:22 PM (2009-05-27 23:12:22 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[unallocated
space]/0205001»Carved [7254016].zip»ebooks»You Will Survive
Doomsday – Bruce Beach (file version 2).pdf
Exported as**files\You Will Survive Doomsday – Bruce Beach (file
version 2).pdf**

**May 28 2009 Downloaded Document – derived from ORC021552.**
NameDictionary of Military and Associated Terms.pdf
Physical Sizen/a
Logical Size2196692 B
Created Daten/a
Modified Date5/27/2009 10:20:36 PM (2009-05-28 05:20:36 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[unallocated
space]/0205001»Carved [7254016].zip»ebooks»Dictionary of
Military and Associated Terms.pdf
Exported as**files\Dictionary of Military and Associated Terms.pdf**

**May 28 2009 Downloaded Document – derived from ORC021552.**
NameFM 21-20 Physical Fitness Training.pdf
Physical Sizen/a
Logical Size6562998 B
Created Daten/a
Modified Date5/28/2009 12:03:54 AM (2009-05-28 07:03:54 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[unallocated
space]/0205001»Carved [7254016].zip»ebooks»FM 21-20 Physical
Fitness Training.pdf
Exported as**files\FM 21-20 Physical Fitness Training.pdf**

**May 28 2009 Downloaded Document – derived from ORC021552.**
NameFM 21-60 Visual Signals.pdf
Physical Sizen/a
Logical Size1228586 B
Created Daten/a
Modified Date5/28/2009 1:36:20 AM (2009-05-28 08:36:20 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[unallocated
space]/0205001»Carved [7254016].zip»ebooks»FM 21-60 Visual
Signals.pdf
Exported as**files\FM 21-60 Visual Signals.pdf**

**May 28 2009 Downloaded Document – derived from ORC021552.**
NameFM 24-19 Radio Operator's Handbook.pdf
Physical Sizen/a
Logical Size2687392 B
Created Daten/a
Modified Date5/28/2009 12:52:54 AM (2009-05-28 07:52:54 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[unallocated
space]/0205001»Carved [7254016].zip»ebooks»FM 24-19 Radio
Operator's Handbook.pdf
Exported as**files\FM 24-19 Radio Operator's Handbook.pdf**

**May 28 2009 Downloaded Document – derived from ORC021552.**
NameFM 44-80 Visual Aircraft Recognition.pdf
Physical Sizen/a
Logical Size3360915 B
Created Daten/a
Modified Date5/27/2009 7:17:40 PM (2009-05-28 02:17:40 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[unallocated
space]/0205001»Carved [7254016].zip»ebooks»FM 44-80 Visual
Aircraft Recognition.pdf
Exported as**files\FM 44-80 Visual Aircraft Recognition.pdf**

**May 28 2009 Downloaded Document – derived from ORC021552.**
NameJP 1-02, DoD Acronyms andTerms.pdf
Physical Sizen/a
Logical Size2142150 B
Created Daten/a
Modified Date5/27/2009 7:40:30 PM (2009-05-28 02:40:30 UTC)
Accessed Daten/a
PathORC021552.E01/Partition 1/NONAME [NTFS]/[unallocated
space]/0205001»Carved [7254016].zip»ebooks»JP 1-02, DoD Acronyms
andTerms.pdf
Exported as**files\JP 1-02_ DoD Acronyms andTerms.pdf**

$8$

**Jul 14 2009 Downloaded Document — derived from ORC021552.**
NameThe Proper Anarchists Cookbook [DrinkyCrow].pdf
Physical Size5283840 B
Logical Size5281994 B
Created Date7/31/2009 3:40:38 AM (2009-07-31 10:40:38 UTC)
Modified Date7/14/2009 9:36:47 AM (2009-07-14 16:36:47 UTC)
Accessed Date6/22/2010 9:56:39 PM (2010-06-23 04:56:39 UTC)
PathORC021552.E01/Partition 1/NONAME
[NTFS]/[MetaCarve]/31/grim/Desktop/The Proper Anarchists
Cookbook/The Proper Anarchists Cookbook [DrinkyCrow].pdf
Exported as**files\The Proper Anarchists Cookbook [DrinkyCrow].pdf**

**May 14 2010 Downloaded Document — derived from ORC020494.**
NamealWalaawalBaraa1.pdf
Physical Sizen/a
Logical Size671237 B
Created Daten/a
Modified Date5/14/2010 2:21:38 PM (2010-05-14 21:21:38 UTC)
Accessed Daten/a
Exported asfiles\alWalaawalBaraa1.pdf

**May 17 2010 Downloaded Document — derived from ORC020494.**
NameAl Wala wal Bara Part 2.pdf
Physical Sizen/a
Logical Size740838 B
Created Daten/a
Modified Date5/16/2010 11:23:32 PM (2010-05-17 06:23:32 UTC)
Accessed Daten/a
Exported asfiles\Al Wala wal Bara Part 2.pdf

9

**File 1349644 Unallocated Space Anwar Al-Awlaki - derived from**

\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 2\08 - ASSEMBLY LAND.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 2\09 - THE HORRORS.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 2\10 - THE HORRORS.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 2\11 - UNIVERSE DISMANTLING.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 2\12 - UNIVERSE DISMANTLING.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 2\13 - UNIVERSE DISMANTLING.MP3
\DEVICE\HARDDISK\VOLUME1\PROGRAM FILES\SONY\SHARED PLUG-INS\FILE FORMATS\MCMPEG\MCPLUG.LNG
\DEVICE\HARDDISK\VOLUME1\PROGRAM FILES\SONY\SHARED PLUG-INS\FILE FORMATS\MCMPEG\MCPLUG.ZIP
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 3\01 - 014 CONCEPTS OF MANAGEMENT 1.MP3
\DEVICE\HARDDISK\VOLUME1\PROGRAM FILES\SONY\SHARED PLUG-INS\FILE FORMATS\MCMPEG\MCPLUGRW.DLL
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 3\02 - 015 CONCEPTS OF MANAGEMENT 2.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 3\03 - 016 THE NON-BELIEVERS ON THE DAY OF JUDGMENT.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 3\04 - 017 THE NON-BELIEVERS ON THE DAY OF JUDGMENT.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 3\05 - 018 THE NON BE,THE VOIDING OF THE DEEDS.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 3\06 - 019 THE NON BE,THE VOIDING OF THE DEEDS.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 3\07 - 020 THE DISPUTES OF THE DAY OF JUDGMENT.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 3\08 - 021 THE CONVERSATION BETWEEN ALLAH AND JESUS ON THE DAY OF JUDGMENT.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 3\09 - 022 THE CONVERSATION BETWEEN ALLAH AND JESUS ON THE DAY OF JUDGMENT.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 3\10 - 023 THE DISPUTES BETWEEN THE LEADERS AND THEIR FOLLOWERS.MP3
\DEVICE\HARDDISK\VOLUME4\$MFT
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 3\11 - 024 THE DISPUTES BETWEEN THE LEADERS AND THEIR FOLLOWERS.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 3\12 - 025 THE DISPUTES BETWEEN THE LEADERS AND THEIR FOLLOWERS.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 3\13 - 026 THE DISPUTES BETWEEN THE LEADERS AND THEIR FOLLOWERS.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 4\01 - THE RESURRECTION.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 4\02 - THE RESURRECTION.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 4\03 - THE RESURRECTION.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 4\04 - THE RESURRECTION.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 4\05 - ASSEMBLY LAND.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 4\06 - ASSEMBLY LAND.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 4\07 - ASSEMBLY LAND.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 4\08 - ASSEMBLY LAND.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 4\09 - THE HORRORS.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 4\10 - THE HORRORS.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 4\11 - UNIVERSE DISMANTLING.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 4\12 - UNIVERSE DISMANTLING.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 4\13 - UNIVERSE DISMANTLING.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 7\01 - TRACK 1.MP3
\DEVICE\HARDDISK\VOLUME1\PROGRAM FILES\SONY\SHARED PLUG-INS\FILE FORMATS\MCMPEG\MCPLUGRW.LNG
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 7\02 - TRACK 2.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 7\03 - TRACK 3.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 7\04 - TRACK 4.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 7\05 - TRACK 5.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 7\06 - TRACK 6.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 7\07 - TRACK 7.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 7\08 - TRACK 8.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 7\09 - TRACK 9.MP3
\DEVICE\HARDDISK\VOLUME1\PROGRAM FILES\SONY\SHARED PLUG-INS\FILE FORMATS\MCMPEG\MPEG3V.DLL
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 7\10 - TRACK 10.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 7\11 - TRACK 11.MP3
\DEVICE\HARDDISK\VOLUME4\MY DOCUMENTS\MY MUSIC\ANWAR AL-AWLAKI\THE HEREAFTER VOL 2, 7\12 - TRACK 12.MP3
\DEVICE\HARDDISK\VOLUME1\PROGRAM FILES\SONY\SHARED PLUG-INS\FILE FORMATS\MCMPEG\MCPLUGRW.DLL

*ID*

**EXHIBIT 30**

There were 46 books taken from ~~████~~ Tomlinson Ave Riverside California:

1. Interpretation of the Meaning of The Noble Qur'an in the English language
By: Dr. Muhammad Taqi-ud Din Al-Hilali, Ph.D. (Berlin) Professor of Islamic Faith and teachings, Islamic University Al-Madina Al-Munawwara
Publisher: Maktba Dar-us-Salam

2. English Translation of the Meaning of Al-Qur'an The Guidance for Mankind
By: Muhammad Farooq-i-Azam Malik
Publisher: The Institute of Islamic Knowledge

3. Collection from Riyad-us-Saliheen
Compiled by Al-Imam Abu Zakariya Yahya bin Sharaf An-Nawawi Ad-Dimashqi Ahadith selected and collected by Sheikh Safi-ur-rahman Mubarakpuri

4. Unheeded Unlawful things which people should be cautious of in Islaam
Compiled in Arabic by: Shaykh Muhammad bin Saalih al-Munajjid
Translated under the supervision of- The Committee for New Muslims
Published: Al-madeenah an-Nabawiyyah

5. Ibn Taymiyyah Expounds on Islam
Selected writings of Shayk al-Islam, Taqi ad-Din Ibn Taymiyyah on Islamic Faith, Life, and Society.
Compiled and translated by: Muhammad 'Abdul-Haqq Ansari
Publisher: Al-Imam Muhammad Ibn Sa'ud islamic University Imadat Al-Bahth Al-'Ilmi Riyadh, saudi Arabia
Institute of Islamic and Arabic sciences in America.

6. The History of the Khalifahs who took the right way
By: Jalal ad-Din as-Suyuti

7. The Ideal Muslim
By: Muhammad Ali Al-Hashimi
Publisher: International Islamic Publishing House

8. El Coran (Spanish)
By: Julio Cortes
Publisher: Tahrike Tarsile Qur'an, Inc.

9. Prophet Manner of Performing Prayers

By: Sheikh Abdulaziz Bin Baz

10. Muslim Minorities Fatawa regarding Muslims Living as
Minorities
By: Shaykh Ibn Baz & Shaykh Uthaymeen
Publisher: Message of Islam

11. In Quest of Knowledge
By: Imam Shafi'i
Publisher: Muslim Youth Publishers Karachi

12. The Gospel of Christ Jesus According to Saint John
Preparations & Comments:
Dr Ibn Malek El-Jamil

13. The Golden Book of Islamic Lists
By: Ahmad H. Sakr, Ph.D.
Publisher: Foundation for Islamic knowledge

14. Khalif'ornia Journal "A quarterly journal to revive the
Muslim mind"
Volume 3, issue 3-4
July- December 1998
Publisher: Islamic Cultural Workshop

15. Duties of an Imam
By: Abdur Rehman Shad
Publisher: Idara Isha'at-E-Diniyat LTD

16. Quiz Book on Islam for all Levels of Expertise
By: Husain A. Nuri
Publisher: Weekend Learning Publishers

17. The Rights of Non-Muslims in the Islamic World
By: Saleh Hussain Al-Aayed, PhD
Translated by: Alexandra Alosh
Publisher: Dar Eshbelia for publishing & Distribution

18. History of Sacrifice (Qurbani)
By Mufti Muhammad Shafi
Publisher: Bilal Books

19. An Introduction to The principles of Tafseer
By: Shaykh-ul-Islaam Ibn Taymiyyah
Publisher: Al-Hidaayah

20. Natural Blood of Women

By Muhammed Bin Salih Al-Utheimeen
Translated & Researched by Dr. Saleh As-Saleh

21. A Brief Illustrated Guide to Understanding Islam
By: I.A. Ibrahim
Publisher: Darussalam

22. A Call for Muslims to respect Religious Acts
By: Ali Bin Hamd Al-Muhammad As-Salihi
Publisher: Al-Qaseem- Onaiza

23. What A Muslim is Required to know about his religion
By: Abdullah Abdul Ghani Al-Khayat
Translated & reviewed by: Presidency of Islamic research, ifta
and Propagation

24. Islamic Creed Based on Qur"an and Sunna
By: Muhammad bin jamil zino
Teacher in Dar-ul-Hadith Al-Khairiya
Makkah Al-Mukarramah

25. Khalif'ornia Journal Volume 1 Number 1 January-March 1996
Publisher: Islamic Cultural Workshop

26. Fundamentals of Islam
By: Alshaykh Mohammad Ibn Sulayman
Publisher: Islamic University

27. Muhammad Man and Prophet
By: Adil Salahi
Publisher: The Islamic Foundation

28. Fundamentals of 'Aqeedah
Ahl-Us-Sunnah

29. The Religion of Islam (hadha 'd-din)
By: Sayyid Qutb
Publisher: International Islamic Publishing House

30. Ibn Taymiyya
The Madinan Way
The Soundness of the Basic Premises of the School of the People
of Madina
By: Ibn Taymiyya
Publisher: Hidaayah Books

31. Unholy War: Terror in the name of Islam

By: John L. Esposito
Publisher: Oxford University

32. Jihad vs. Terrorism
By: Dr. Maher Hathout
Edited by: Samer Hathout
Publisher: Multimedia Vera International

33. Muslim Heroes
Book 6
By: Dr. Mahmoud Esmail Sieny
Publisher: International Islamic Publishers

34. Western Imperialism Menaces Muslims
By: Maryam Jameelah
Publisher: Mohammad Yusuf Khan & Sons

35. Arguments Against seeking help from sources other than Allah
and believing in soothsayers and fo
rtune tellers
By: His Emminence the late Shaikh Abdul Aziz bin Abdullah bin
Baz Printed and published by Ministry of Islamic Affairs,
Endowments, Da'wah and Guidance

36. 33 lessons for every Muslim
Compiled by Abdul Aziz S. Al Shomar

37. The World Today Concepts and Regions in Geography
Fourth Edition
By: H.J De Blij, Peter O. Muller, Antoinette M. G. A.
WinklerPrins

38. The Letters and Treaties of Prophet Muhammad (pbuh)
Compiled by: Dr. Aslam Abdullah
Jointly published by:
The Islamic Society of Nevada, Las Vegas and Iqra International
Educational Foundation, Chicago.

39. The Men of Madina
Volume I
By: Muhammad Ibn Sa'd
Publisher: Ta-Ha Publisher

40. A Madinan View on the Sunnah, courtesy, wisdom, battles and
history
By: Ibn Abi Zayd al-Qayrawani
Publisher: Ta-Ha Publisher

41. Blind Following of Madhhabs
By: Shaykh Muhammad Sultaan al-Ma'soomee al-Khajnadee
Edited by: Shaykh saleem al-Hilaalee
Publisher: Al-Hidaayah

42. Hidden Gems: Practical Wisdom from the Prophet of Islam
Compilation & Commentary by:
Mustafa Umar (Assoc. Director- Islamic Society of Corona- Norco)

43. Fortification of the Muslim through remembrance and
supplication from the Qur'aan and the Sunnah
Compiled and referenced by Sa'eed Ibn 'Ali Ibn Wahf Al-Qahtaani
Adapted from a translation by Ismael Ibraheem
Adapted by Abu Safwaan Fareed Ibn 'Abdulwaahid

44. Islam is a Free Choice-
(Book is missing the cover)

45. La Religon de La verdad
By: Abdal 'aziz Ibn Muhammad Ibn 'Abdallah Al-Arifi

46. Book in Arabic.

**EXHIBIT 31**







**EXHIBIT 32**



2



2



**EXHIBIT 33**

